**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CERENCE OPERATING COMPANY, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:23-CV-482-JRG-RSP |
| | § | |
| SAMSUNG ELECTRONICS CO. LTD. AND SAMSUNG ELECTRONICS AMERICA, INC., | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court is the opening claim construction brief of Cerence Operating Company, LLC ("Plaintiff") (Dkt. No. 83, filed on January 6, 2025), the response of Defendants Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc. (collectively, "Defendant") (Dkt. No. 91, filed on January 24, 2025), and the reply of Plaintiff (Dkt. No. 93, filed on January 31, 2025). The Court held a claim construction hearing on February 21, 2025. Having considered the arguments and evidence presented by the parties at the hearing and in their claim construction briefing, the Court issues this Claim Construction Order.

**Table of Contents**

**I. BACKGROUND** .......... **3**
**II. LEGAL PRINCIPLES** .......... **4**
**III. CONSTRUCTION OF AGREED TERMS** .......... **8**
**IV. CONSTRUCTION OF DISPUTED TERMS** .......... **9**
A. "non-text representation of the [the received / an / the] utterance" .......... 9
**V. CONCLUSION** .......... **16**

## I. BACKGROUND

Plaintiff brings suit alleging infringement of U.S. Patent Nos. 7,395,078 (the ’078 patent), 8,081,993 (the ’993 patent), 11,393,461 (the ’461 patent), 11,087,750 (the ’750 patent), and 9,026,428 (the ’428 patent). The ‘078, ‘993, ‘461, ‘750, and ‘428 patents are collectively referred to as the patents-in-suit. The ‘078 and ‘993 patents share the same specification, and the ‘461 and ‘750 patents share the same specification.

For the purposes of this action, the parties dispute a single term in the ‘078 and ‘993 patents. In general, the ‘078 and ‘993 patents describe a process for sending a voice message via a mobile communication. The Abstract of the ‘078 patent is reproduced below:

> A method of sending a voice message via a mobile communication device, said method involving: receiving an utterance from a user of the mobile communication device; generating a non-text representation of the received utterance; inserting the non-text representation into a body of a text message; and sending the text message over a wireless messaging channel from the mobile communication device to a recipient's device.

Claim 1 of the ‘078 patent is exemplary and is reproduced below:

> A method of sending a voice message via a mobile communication device, said method comprising:
>
> receiving an utterance from a user of the mobile communication device;
>
> generating a non-text representation of the received utterance;
>
> inserting at least some of the non-text representation into a body of a text message; and
>
> sending the text message including the at least some of the non-text representation over a wireless messaging channel from the mobile communication device to a recipient's device.

## II. LEGAL PRINCIPLES

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips*, 415 F.3d 1303 at 1312 (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court first examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims themselves, the specification and the prosecution history. *Phillips*, 415 F.3d at 1312–13; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *see also Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

"The claim construction inquiry. . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.' " *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.*

Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.' " *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

"Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims

absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence is useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862) (internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not useful. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

**B. Departing from the Ordinary Meaning of a Claim Term**

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). "The standards for finding lexicography or disavowal are 'exacting.' " *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## III. CONSTRUCTION OF AGREED TERMS

Prior to the *Markman* hearing, the parties agreed to the order of the claimed steps in claim 1 of the '428 patent to be the following:

> *The first step of "generating a first candidate sequence …" must be performed first before the subsequent four steps listed below.*
>
> *The second step of "presenting the first candidate sequence…" and third step of "identifying at least a first sequence portion of the first candidate sequence…" both can only be performed after the first step (i.e., "generating a first candidate sequence…"), but there is no required order as between the second and third steps.*
>
> *The fourth step of "removing the first sequence portion…" and fifth step of "sending the first sequence portion to an application running on the mobile device" both can only be performed after the second and third steps (i.e., presenting the first candidate sequence…" and "identifying at least a first sequence portion…," respectively), but there is no required order as between the fourth and fifth steps.*

*(See* Joint Claim Construction Chart, Docket No. 98-1.) At the *Markman* hearing, the Court provided the following preliminary claim constructions for the following terms prior to the hearing, to which the parties agreed as their constructions at the *Markman* hearing:

| TERM | AGREED CONSTRUCTION |
|---|---|
| **"automatic speech recognition (ASR)"**<br>('461 Patent, claim 14;<br>'750 patent, claims 1, 6, 8, 14, 15, and 19;) | **"recognizing one or more phonetic words in an acoustic input containing speech"** |
| **"low power mode"**<br>('461 patent, claim 1,<br>'750 patent, claims 14, 16-19) | **"a mode or state that is entered to conserve power that requires one or more wake-up actions to exit"** |
| **"idle mode"**<br>('461 patent, claims 1, 2, 18) | **"a mode or state that is entered to conserve power that requires one or more wake-up actions to exit"** |
| **"lower power mode"**<br>('750 patent, claims 1, 12, 14, 19) | **"a mode or state that is entered to conserve power that requires one or more wake-up actions to exit"** |
| **"active mode"**<br>('461 patent, claim 2) | **"a mode or state that is awake"** |
| **"higher power mode"**<br>('750 patent, claims 1, 14, 19) | **"a mode or state that is awake"** |

| | |
|---|---|
| **"sending the first sequence portion to an application"**<br>('428 patent, claim 1) | **Plain and ordinary meaning** |

Accordingly, the Court adopts the constructions agreed to by the parties as listed above.

## IV. CONSTRUCTION OF DISPUTED TERMS

Following the parties' agreed constructions, one term remains disputed. The Court's analysis as to the disputed term within the claims of the patents-in-suit is presented below.

### A. "non-text representation of the [the received / an / the] utterance"

| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
|---|---|
| Plain and ordinary meaning. | A string of symbols representing the received utterance, each symbol corresponding to sounds such as phonemes, diphones, and triphones, and that is capable of being sent over SMS. |

The phrase "non-text representation of [the received / an / the] utterance" is found in claims 1, 9, and 12 of the '078 patent, and claims 1, 7, 10, and 16 of the '993 patent. The parties dispute whether the term has its plain and ordinary meaning, or whether it has a specific construction based on statements within the specification and prosecution history. *See, e.g.*, Plaintiff's Opening Brief (Dkt. No. 83) at 4-8, Defendant's Responsive Brief (Dkt No. 91) at 2-11, and Plaintiff's Reply Brief (Dkt. No. 93) at 1-4. The key dispute is whether the term covers "non-text" formats such as audio.

During claim construction briefing, Plaintiff argued for a plain and ordinary meaning construction, but did not provide a construction for the plain and ordinary meaning. At the claim construction hearing, the Court proposed the following phrase as a preliminary construction for this term: "a string of phonetic symbols representing the sound(s) of the received utterance." Defendant did not dispute the Court's construction. However, Plaintiff disputed the Court's

preliminary construction, and again argued that it simply has its plain and ordinary meaning. During the claim construction hearing, Plaintiff offered the following proposed construction as the plain and ordinary meaning for the term: "encoded version of [the / the received / an ] utterance." In effect, Plaintiff does not dispute that the Court's proposed construction is accurate for a first embodiment in the specification, but argues that it does not cover a second embodiment (*e.g.*, an audio file embodiment) and therefore is incorrect.

Claim 1 of the '078 patent is reproduced below:

> A method of sending a voice message via a mobile communication device, said method comprising:
> receiving an utterance from a user of the mobile communication device;
> generating a **non-text representation of the received utterance**;
> inserting at least some of **the non-text representation** into a body of a text message; and
> sending the text message including the at least some of the **non-text representation** over a wireless messaging channel from the mobile communication device to a recipient's device.

(emphasis added). Claim 1 of the '993 patent is similar, and is reproduced below:

> A method of operating a mobile communication device, said method comprising:
> over a wireless messaging channel receiving a text message, wherein the text message contains a **non-text representation of an utterance**;
> extracting the **non-text representation** from the text message;
> synthesizing an audio representation of the spoken utterance from **the non-text representation**; and
> playing the synthesized audio representation through an audio output device on the mobile communication device.

(emphasis added). Various dependent claims in each patent provide further limitations to these terms, such as dependent claims 4, 5, 6, and 8 of the '078 patent:

> Claim 4. The method of claim 1, wherein generating the non-text representation of the received utterance involves performing recognition on a signal derived from the received utterance to generate a string of symbols, **wherein the string of symbols is the non-text representation.**

> Claim 5. The method of claim 4, **wherein the symbols in the string of symbols are selected from the group consisting of phonemes, diphones, triphones, syllables, and demisyllables**.
>
> Claim 6. The method of claim 4, **wherein the recognition is phoneme recognition and the symbols in the generated string of symbols are phonemes.**
>
> Claim 8. The method of claim 1, wherein the **wireless messaging channel is an SMS channel and the text message is an SMS message.**

(emphasis added). While claim 1 is on its face seemingly "neutral" as to whether it is limited to a string of symbols, various dependent claims (as shown above) require such a limitation.

The specification has repeated references to the non-text representation term:

> Embodiments include one or more of the following features. The mobile communication device is a cellular phone. Generating the non-text representation of the received utterance involves performing recognition on a signal derived from the received utterance to generate a string of symbols, **wherein the string of symbols is the non-text representation. The symbols in the string of symbols are selected from the group consisting of phonemes, diphones, and triphones (more specifically, the symbols are phonemes).** The wireless messaging channel is an SMS channel and the text message is an SMS message. The method also involves including an indicator with the text message identifying the text message as containing a non-text representation of the utterance. The non-text representation is a compressed version of the received utterance. ('078 patent, 2:21-35)
>
> Embodiments include one or more of the following features. The mobile communication device is a cellular phone. **The non-text representation of the utterance is a string of symbols representing sounds of the utterance. The symbols in the string of symbols are selected from the group consisting of phonemes, diphones, and triphones (more specifically, they are phonemes).** The wireless messaging channel is an SMS channel and the text message is an SMS message. The received text message includes an indicator identifying the text message as containing a non-text representation of the utterance. The non-text representation is a compressed version of the utterance. ('078 patent, 2:47-58)
>
> A user speaks a desired message, or utterance, into a cellular phone. **A phonetic recognition algorithm in the phone then generates a non-text representation of the utterance.** An SMS application in the phone sends this non-text representation in the body of an SMS message via the SMS network to the recipient's phone. ('078 patent, 3:35-40)

> The output is a **non-text representation of the spoken utterance, in this case, a phoneme string**. (‘078 patent, 4:42-43)

> In the embodiments described above, the units of speech used to represent the utterance are phonemes. However, any one of a variety of other symbol sets, other than phonemes, could be used. For example, the symbols could be diphones, triphones, syllables, demisyllables, or any other set that serves to effectively represent the sounds contained within the spoken utterances of the intended users. (‘078 patent, 6:29-35)

(emphasis added). These citations are consistent with the claim language, and generally equate a non-text representation with a string of symbols.

The specification also describes another "embodiment" that performs other algorithms without doing any voice recognition, such as using a vocoder:

> In effect, the phonetic recognition algorithm generates a compressed version of the spoken utterance. In the described embodiment, that compressed version is a non-text representation (i.e., a phonetic string). In fact, other algorithms could be used which simply perform compression without performing any recognition. **For example, instead of using a phoneme recognizer, a vocoder could be used to generate the compressed representation and then that compressed representation would be inserted into the body of the SMS message. In other words, any algorithm that produces a non-text representation suitable for sending over SMS or another non-voice channel could be employed.** It would be desirable that the selected algorithm be able to compress speech sufficiently so that it is possible to send an utterance that is long enough to convey meaningful information. On the receiving end, the appropriate decompression algorithm would need to be implemented to reconstruct the audio version of the spoken utterance.

‘078 patent, 6:53-7:3 (emphasis added). Plaintiff argues that this "second embodiment" is not covered by the Defendant's proposal. In this embodiment, a vocoder can be used to produce a non-text representation suitable for sending over SMS or another non-voice channel. *See id.*

The prosecution history of the ‘078 and ‘993 patents is highly relevant. Each of these patents is subject to a pending Inter Partes Reexamination (IPR). The relevant cited prior art is referred to as "Dolan," which discloses "coded audio" as a form of compressed

media. In the Patent Owner's Preliminary Response, it argued against Dolan and made key distinguishing arguments in relation to the "non-text representation" limitation. In particular, the Patent Owner cited to the patent specification's definition of "non-text" as being "a string of symbols" and differentiated it from the "coded audio" of Dolan:

> The teachings of the '078 patent are entirely consistent with the plain meaning of a "text message" as a type of communication that contains or at the very least is capable of containing text. **The "non-text representation" of the preferred embodiments of the '078 patent is very different from the coded audio of Dolan. While it is "non-text," it is "a string of symbols representing sounds of the utterance," each symbol corresponding to sounds such as "phonemes, diphones, and triphones."** Ex. 1001 at 2:49–53. Moreover, features of the preferred embodiments depend on the ability to send text "characters" within the text message. For example, the feature of choosing a "voice" to replay the message "is implemented by adding an additional string of characters representing 'voice' parameters to the non-text representation of the utterance." Ex. 1001 at 7:8–10. These strings of symbols and characters are suited to be transmitted in the body of a "text message," as taught and claimed in the '078 patent, not in a coded audio message as taught by Dolan.

Patent Owner's Preliminary Response for the '078 Patent, IPR2024-00978 (Dkt. No. 91-2) at Page 8; *see also* Patent Owner's Preliminary Response for the '993 Patent, IPR2024-00979 (Dkt. No. 91-3) at page 8 (emphasis added).

The Court finds that the term does not have a plain and ordinary meaning. Plaintiff does not contend that "non-text representation" is a term of art. Plaintiff's expert admitted that the term is not a term of art and could not recall any instance where it is used or defined in dictionaries, textbooks or other publications. *See* Defendant's Responsive Brief at page 2. Even Plaintiff struggled to provide a plain and ordinary meaning for the term. The Court finds that the term does not have its plain and ordinary meaning.

On balance, the Court finds Defendant's arguments persuasive and consistent with the intrinsic evidence, and rejects Plaintiff's arguments accordingly. The specification's repeated

references to non-text representation as being a string of symbols is consistent with the claims. This meaning is confirmed by the IPR prosecution history of the patents, in which the Patent Owner distinguished the "coded audio" of the prior art with the "non-text representation" of the patents being "a string of symbols." At a minimum, this is probative to the term's meaning, and Defendant argues that it rises to the level of a disclaimer. The Court agrees with Defendant. On balance, the Court finds that the patent owner's remarks in the IPR rise to the level of a disclaimer and help define the term "non-text representation." *See, e.g., TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1345 (Fed. Cir. 2013) (holding that statements made in prosecution defined the term at issue); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (lexicography occurs where patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history"); *see also Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) (applying disclaimer to statements that a patentee makes during IPR proceedings; "a patent owner's preliminary response filed prior to an institution decision and a patent owner's response filed after institution are both official papers filed with the PTO and made available to the public").

Plaintiff's primary argument against Defendant's construction is that it would seemingly exclude the specification's second embodiment as described in column 6, line 53 to column 7, l. 3 of the '078 patent. As described above, in this embodiment, a vocoder can be used to produce a non-text representation suitable for sending over SMS or another non-voice channel. A vocoder is simply a synthesizer that produces sounds from an analysis of speech input, and in this embodiment, even if a vocoder is used, it sends such non-text representation over a SMS channel. However, in the context of the patent, SMS channels are only used to send text-based messages, and Plaintiff does not dispute that an audio file cannot be sent over an SMS channel. In other

words, even Plaintiff's second embodiment does not appear to support its position that an audio file can be a non-text representation as claimed. Still further, even if the second embodiment did support Plaintiff's construction, the Court finds that the disclaimer in the prosecution history results in the exclusion of this embodiment. *See, e.g.*, *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327 (Fed. Cir. 2002) ("where the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a construction is permissible"); *North Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) ("limitations may be construed to exclude a preferred embodiment if the prosecution history compels such a result"). For the same reasons, any claim differentiation argument presented by the Plaintiff as to dependent claims is likewise rejected.

Defendant's original proposed construction of this term included an SMS "capability" limitation. Such an SMS limitation was not present in the Court's proposed construction of this term, and the Defendant did not contest that issue, and thus the Court finds that the SMS limitation appears to be moot. Nevertheless, the specification is clear that while an SMS network is a preferred embodiment, it is also expressly clear that <u>any network</u> over which one might send text, data, and/or media, such as an MMS channel, could be used. *See* '078 patent, 8:29-33. The Court finds that such an SMS limitation is an inappropriate limitation to the preferred embodiment, and should be rejected.

On balance, the Court finds that its proposed construction is consistent with the intrinsic evidence, that the term does not have a plain and ordinary meaning, and the Court rejects Plaintiff's claim differentiation and alternative embodiment arguments. The Court hereby construes the term "non-text representation of [the received / an / the] utterance**"** in the '078 and '993 patents to mean **"a string of phonetic symbols representing the sound(s) of the received utterance."**

## V. CONCLUSION

The Court adopts the above constructions set forth in this opinion for the disputed terms of the patents-in-suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 8th day of March, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE