IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CERENCE OPERATING COMPANY, | )( | |
| PLAINTIFF, | )( | CIVIL ACTION NO. |
| | )( | 2:23-CV-482-JRG-RSP |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| SAMSUNG ELECTRONICS CO., | )( | |
| LTD., ET AL., | )( | SEPTEMBER 5, 2025 |
| DEFENDANTS. | )( | 9:00 A.M. |

REDACTED PRETRIAL HEARING
BEFORE THE HONORABLE ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

FOR THE PLAINTIFF:
Mr. Benjamin T. Wang
Mr. James S. Tsuei
Mr. Jacob Buczko
Ms. Minna Jay
Mr. Daniel B. Kolko
Russ August & Kabat
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA 90025

FOR THE DEFENDANTS:
Mr. Darin W. Snyder
Ms. Luann L. Simmons
Mr. Mark Liang
O'Melveny & Myers
Two Embarcadero Center
28th Floor
San Francisco, CA 94111

FOR THE DEFENDANTS:

Mr. Matthew M. Wolf
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Avenue NW
Washington, DC 20001

Mr. Patrick C. Reidy
Arnold & Porter Kaye Scholer LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602

Mr. Tom Gorham
Gilliam & Smith, LLP
7232 Crosswater Avenue
Tyler, TX 75703

COURT REPORTER:

Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

08:46:34 COURT SECURITY OFFICER: All rise.
08:46:36 THE COURT: Good morning. Please be seated.
09:00:36 MR. SNYDER: Good morning, Your Honor.
09:00:37 THE COURT: For the record, we're here for the pretrial conference in Cerence Operating Company versus Samsung Electronics, et al., which is our Case No. 2:23-482.
09:00:50 Would counsel state their appearances for the record?
09:00:53 MR. WANG: Yes, Your Honor. Good morning. My name is Ben Wang from Russ August Kabat on behalf of the Plaintiff. I'm here with my colleagues, Daniel Kolko, James Tsei.
09:01:06 MR. TSEI: Morning, Your Honor.
09:01:06 MR. WANG: Minna Jay.
09:01:06 MS. JAY: Good morning, Judge.
09:01:09 MR. WANG: Jacob Buczko.
09:01:09 MR. BUCZKO: Good morning, Your Honor.
09:01:16 MR. WANG: And Wendy Liu is our paralegal over there.
09:01:19 THE COURT: All right. Thank you, Mr. Wang.
09:01:21 MR. GORHAM: Good morning, Your Honor. Tom Gorham on behalf of the Samsung Defendants. With me here this morning is Mr. Darin Snyder, Mr. Matt Wolf, Mr. Patrick Reidy, Ms. Luann Simmons, Mr. Mark Liang, and we have a

client representative from Samsung Electronics America, Mr. Tim Jecek. Samsung is ready, Your Honor.

THE COURT: All right. Thank you, Mr. Gorham.

As counsel know, this case is currently set for jury selection on Judge Gilstrap's October 6th docket. I think that it has a very good position on that docket as things currently stand. However there may be cases that will carry over from the dockets ahead of it, and we're -- there's a trial that is starting this morning. There'll be another trial on the 22nd in two weeks.

If the cases that are currently on those dockets are resolved through trial and/or settlement, then they should not impact this case. But if not, then there will likely be an impact on where this case stands on the trial docket.

I expect that Judge Gilstrap won't be in a position to evaluate that, at least until the September 22 trials start and we can tell what has been resolved and what's not. But sometime, I would say that week, there will be likely an email that will go out to this case and the others that may be on the October 6th docket that will have an order of trials in it. But I really can't at this point predict what that will be.

But if we're successful in getting the cases on these earlier dockets resolved, then Cerence is in an

excellent position to go on October the 6th. So my goal is to make sure that it's ready to do so.

Looking at the pretrial order in this case, seeing that we've got two patents that there is a fairly contained list of witnesses, and after consulting with Judge Gilstrap on this, I'm going to set it as 10.5 hours per side for presentation of evidence to the jury. If either side wants to argue for more, I'll be happy to consider their arguments now. If not, that's what the ruling will be.

MR. WANG: Your Honor, 10.5 is great for us.

THE COURT: All right.

MR. SNYDER: No objection from Defendants, Your Honor.

THE COURT: All right. Thank you.

As you know, Judge Gilstrap's practice will be to start with 30 minutes per side of voir dire. Counsel should understand that only the first few minutes, typically three minutes, of that voir dire is to be in a discussion of an overview of the issues in the case. That is to be non-argumentative and fairly high level. And the Court does enforce the non-argumentative aspect of that. The rest of it should be focused on the venire and learning from the venire what they bring to court with them.

After the -- after the voir dire -- and the Court does conduct a limited voir dire of its own before turning

09:05:38 it over to each side for their time. After that, any 09:05:43 challenges for cause will be considered and ruled on, and 09:05:48 then each side will have four peremptory challenges.

09:05:51 Those are exercised in a written fashion -- in a 09:05:58 blind simultaneous fashion, meaning both sides deliver in 09:06:02 writing their four peremptories to the Court.

09:06:06 After those peremptories have been considered, the 09:06:11 first eight jurors remaining will be the trial jury. As 09:06:18 you know, there are no alternate jurors in federal civil 09:06:23 trials, so all eight of them will deliberate at the end of 09:06:27 the case.

09:06:27 In order to assist with your jury selection, there 09:06:36 is the possibility of a questionnaire. I think the docket 09:06:42 control order in this case directed that any requests for a 09:06:46 questionnaire be delivered to our jury administrator, Kecia 09:06:52 Clendening, by September the 9th.

09:06:54 Does counsel know whether that has been done 09:06:58 already?

09:07:00 MR. SNYDER: We've been conferring with the 09:07:02 Plaintiff's counsel, Your Honor, and we anticipate 09:07:04 providing one to the Court today.

09:07:05 THE COURT: All right. Good.

09:07:06 If you have any questions about the format or 09:07:10 anything else, you can take those up with Ms. Clendening. 09:07:14 She's upstairs now probably helping check the jury in. I

don't know. She could be a little busy. But in any event, you have time left to get that done.

Assuming you do get that to her, she'll see that the venire answers that questionnaire. Those answers will be available to you on the Wednesday before the jury selection, and you can arrange to get those through Ms. Clendening in the clerk's office upstairs.

They are given to you, those questionnaires, with the understanding that you will keep all of that juror information confidential, that you will not copy it or distribute it, and that at the close of the jury selection, you'll destroy it.

It is very important to us that the jurors not have the sense that their privacy is being invaded. They give us their entire week, and in return, we want to make sure we're preserving their privacy.

Related to that, if you want to engage in any investigation of the panel when you get that information the day -- the week before jury selection, you should do that investigation in a way that won't get back to the venire that they are being investigated. And what that means is don't talk to their friends, family, co-workers. If you have access to databases that allow you to gather information about them, that's -- that's fine, as long as that's not something that gets back to them.

09:09:26 Judge Gilstrap has a fairly detailed standing order on that that's on the Court's website. If you think that you may be getting close to the line, take a look at that standing order. I think it lays things out.

09:09:42 I'm happy to answer any questions, if you have any, about what the limits of that kind of investigation are.

09:09:51 I'm seeing shaking heads.

09:09:56 All right. Well, like I said, that information will be made available to you the week before.

09:10:06 Closing arguments -- I guess, opening statements will be 30 minutes per side, just as you requested.

09:10:14 I know you requested a little additional time for the closing arguments. The Court's standard practice is 40 minutes per side, but there is the possibility of more, depending on where in the day you are when closing arguments are to be made. So if you want anything more than the standard 40 minutes, be sure to take that up with Judge Gilstrap when you are preparing to close.

09:10:43 I think in your agreement in your pretrial order, you agreed that the rebuttal time for the Plaintiff's closing argument will be limited to 15 minutes, and that's consistent with the Court's practice, as well.

09:11:05 Judge Gilstrap is in chambers during trial on a daily basis by 7:30 for the purpose of being able to

09:11:19 resolve any disputes that come up before the jury reports
09:11:25 at 8:30, typically.
09:11:26 So what you agreed to in your pretrial order seems
09:11:34 like it would work with that. As I understand it, what
09:11:40 you're proposing is that you'll meet and confer about any
09:11:43 issues that come up the night before and let the Court know
09:11:49 by an email to the law clerk assigned to the case by no
09:11:54 later than 10:00 p.m. the night before if you have a
09:11:58 dispute that needs to be resolved by the Court the next
09:12:04 day.
09:12:05 You've laid out, I think, an appropriate procedure
09:12:08 for delivering a binder about the dispute to the Court by
09:12:18 7:00 a.m. so that by 7:30 or thereabouts, counsel will be
09:12:25 ready to meet with the Court about it.
09:12:29 As mentioned, the jury will report each day at
09:12:34 8:30. The Court has arranged for lunch to be provided to
09:12:40 the jury in the courthouse so that the lunch break can be
09:12:46 kept to a relatively short time, typically 45 minutes or
09:12:52 so, and so counsel should plan on also having obviously a
09:12:57 short lunch during the trial, as well.
09:13:04 The Court will typically adjourn at 6:00 or
09:13:08 thereabouts, and that's in pursuit of what the jurors tell
09:13:11 us, that they would prefer to have a longer day and a
09:13:13 shorter trial, and that's what we try to deliver for them.
09:13:17 There is one issue I wanted to bring up about

deposition disputes. Up until fairly recently, if there were going to be depositions that the Plaintiff intended to use on the first day, meaning on the evidence that will occur typically in the afternoon of the first day after jury selection, those objections to those depositions would be resolved as part of the pretrial conference.

We're now changing that so that those issues will also be taken up by Judge Gilstrap in a way very similar to what you've agreed to for the ongoing deposition disputes during the trial.

Obviously, in order to resolve those first-day objections before the day of requires reaching out to the Court before trial. So it is incumbent on the Plaintiff, if there are depositions that they want to be able to use on the first day, to either make sure that there are no objections to those depositions or to notify Judge Gilstrap's chambers the week before and arrange a time to get those objections resolved.

I don't think that there have been problems with getting that arranged with his chambers. If there are issues with that, reach out to mine, and I'll make sure that happens. But I just want you to be aware that if those objections don't get resolved before that first day, you're just not going to be able to use those depositions that first day. So that is incumbent on you.

09:15:25 Along those lines, I was not sure about one part of the pretrial order, and that's on Page 13 of the pretrial order, there's a reference to some type of objections regarding deposition testimony that the parties are contemplating would be presented to the Court on the day of, it looks like, and I'm not sure what the intent is, and I don't know if that's talking about issues with the edits or what, but I'd like to hear from counsel for Plaintiff on that.

09:16:19 I'm talking about Paragraph 63 of the pretrial order, the last sentence in that paragraph, which is on Page 13, is talking about 8:00 p.m. the day before the deposition testimony is expected to be read or played.

09:16:37 There's a comment on raising objections, and I'm not sure what that's about.

09:16:46 MR. SNYDER: Your Honor, I think I can address that.

09:16:48 THE COURT: All right.

09:16:49 MR. SNYDER: Darin Snyder for the Defendant.

09:16:51 I believe you're referring to the last sentence of Paragraph 63?

09:16:57 THE COURT: That's right.

09:16:57 MR. SNYDER: Right. And that refers merely to objections that might be raised to the actual video to be played. The parties typically exchange designations and

09:17:06 objections in written format using the transcript. That then gets translated into a video that plays the selected designations. That last sentence refers to exchanging with the other side the actual video to be played so that the other side can review it, make sure that it conforms to the agreements or Court's rulings on what is going to be played and isn't edited incorrectly or in a deceptive manner. And if there's an objection to the video, that would then get raised after that. So it relates only to the video and the way that it is edited, not to the selection of the testimony.

THE COURT: Well, the whole point of having the objections raised two days before they're to be used is to avoid having issues that have to be resolved on the day the deposition is to be used.

So --

MR. WANG: Your Honor, I -- maybe I'm -- maybe I'm misreading it, but I read this as it's the day before the deposition testimony is going to be used at trial. So --

THE COURT: Right. But it says raise objections by 9:00 p.m. that day, which means those would then be presented to the Court on the day the deposition is to be used.

MR. WANG: Presumably that morning, or the afternoon if the depo is not going to be played until later

in the day?

THE COURT: Well, I can tell you that the intent of the Court is to resolve those the day before during that. And so if you're talking about what to do if one party violates the Court's ruling on the deposition objections, I guess that can be raised whenever it's noticed, but it will not be met well, that -- it's not intended that the morning of the day when you're going to play a deposition that you'll be presenting the Court with issues about it.

MR. SNYDER: I understand the issue, Your Honor. Perhaps the parties -- counsel can meet and confer and come up with a revised proposed version of Paragraph 63 to make sure that those can be presented -- any issues with the video can be presented the day before.

THE COURT: All right. I do think that they're not going to be well met if they're raised the morning that you intend to use the deposition.

MR. SNYDER: I do not intend to -- I hope to avoid any situations that are not well met, Your Honor.

THE COURT: That's part of my goal, too, is to help you avoid that.

MR. WANG: Your Honor, if you want to strike the last sentence, we're fine with that. We're more than capable of resolving things two days before. And if not,

we'll have to bother the Court about it.

THE COURT: All right. Well, I'll consider that that sentence has been modified by our current discussion.

Thank you both.

Let me see, there were a couple of other issues that were raised in the pretrial order that I guess we might as well take up while we're in it.

There was an issue -- a dispute preserved in Paragraph 58 -- I don't know if that has since been resolved -- that had to do with whether the translated depositions should show both the native language response and the interpreter's response.

MR. WANG: That's right, Your Honor, at Page 11 of the order.

So there were a lot of depositions where the witnesses' native language was in Korean, Your Honor, so we had interpreters and also a check interpreter.

Our preference would be just to have the question -- the original question, which is in English, played to the jury, and then the translated answer in English played to the jury.

So the translated question in Korean would be excised, so would the Korean answer. We just thought that that was a way to kind of streamline things and hopefully not cause any distractions to the jury.

09:21:40 THE COURT: You know, in the past when this issue
09:21:42 has come up, if either side wanted the witnesses' native
09:21:51 language answer to be included in the deposition, we have
09:21:54 allowed that on the theory that sometimes the body language
09:22:00 of the witness is relevant to an understanding of the
09:22:06 answer as interpreted.
09:22:12 I think often the parties agreed, just as you're
09:22:16 proposing, in order to save time, not to include that. And
09:22:21 I don't know if the Defendant is requesting that that
09:22:27 always be included, but I think in instances where they
09:22:32 think it's important to the understanding of the answer,
09:22:35 the Court would allow them to insist that the native
09:22:41 language response be included.
09:22:43 MR. WANG: Your Honor, I understand. And if there
09:22:46 are specific witnesses where they would like the answer
09:22:50 played to the jury in the native language, then I would
09:22:53 just ask that they give us advance notice of who those
09:22:55 witnesses are just to help our preparation of the cutting
09:23:00 down.
09:23:00 And then -- and then I think what I heard from the
09:23:04 judge is the practice is at least that the question doesn't
09:23:07 need to be played to the jury that is translated, right?
09:23:11 THE COURT: I would agree with that.
09:23:14 MR. WANG: Okay.
09:23:14 THE COURT: I don't think there is any need for

09:23:17 the jury to hear the question in both languages.

09:23:20 MR. WANG: Great.

09:23:23 MR. SNYDER: Darin Snyder for Defendants, Your 09:23:26 Honor.

09:23:26 If I understood correctly, I think we're in 09:23:29 agreement, but I do -- just to clarify, I do think the 09:23:33 default should be in this case, consistent with the Court's 09:23:37 regular practice, the English version of the question would 09:23:41 be played, the foreign language version of the answer would 09:23:45 be played, and then the English translation.

09:23:47 It's possible the parties would agree on 09:23:50 exceptions to that. I don't think that could be done on a 09:23:53 witness-by-witness basis until we know what the actual 09:23:57 clips would be because it does depend on the witness's body 09:24:03 language. It's giving the jury an opportunity to judge 09:24:06 their credibility. That is the whole point of having the 09:24:10 videotaped deposition.

09:24:11 The procedure in which the witness's answer in 09:24:14 their native language is not displayed means that all you 09:24:18 have on videotape is them sitting there as someone reads -- 09:24:22 gives an English question and an English response. They're 09:24:28 a spectator at that point, and that really defeats the 09:24:31 purpose of the deposition.

09:24:32 THE COURT: I do understand that, and obviously 09:24:35 there are some depositions where evaluating the credibility

09:24:39 is very important, and there are others where it's just a
09:24:42 matter of communicating information.
09:24:43 So I think it's a little too strong to say that
09:24:46 the Court's regular practice is that both be played. I
09:24:53 think it's the Court's regular practice that the parties
09:24:58 have the option of having both played. And what I'm
09:25:02 hearing is that Samsung intends to exercise that option in
09:25:07 most of these cases, but -- so I'll just tell you,
09:25:15 Mr. Wang, that I think that you should make sure that your
09:25:19 team takes that up with the Defendant with respect to each
09:25:21 of the translated depositions that are going to be offered,
09:25:27 but the Court will allow the Defendant to insist on
09:25:34 including the native language answers to the extent they
09:25:37 want to do that.
09:25:46 So with respect to the pretrial order, that
09:25:54 paragraph of -- Paragraph 58 is amended in that regard.
09:26:00 The next issue that I saw in the pretrial order
09:26:09 was in Paragraph 66, which had to do with the disclosure of
09:26:18 demonstratives to be used during closing arguments.
09:26:23 Has there been any further resolution on that?
09:26:30 MR. WANG: I don't believe so, Your Honor. We had
09:26:35 in our last meet and confer, which I guess was two days ago
09:26:38 about this, we asked for clarification on what the
09:26:42 Defendant considered -- would consider to be a new
09:26:47 demonstrative. Do they agree that all trial testimony is

not considered new, even if, for example, it's highlighted? But we haven't resolved it beyond just raising that question to them.

THE COURT: Well, let's take that up. And I will say that the Court is sensitive to the fact that closing demonstratives are often prepared very close in time to the argument. So to the extent there is a disclosure requirement, it is not going to be far in advance of the arguments themselves.

But what is your -- the position you're seeking, Mr. Snyder?

MR. SNYDER: Thank you, Your Honor.

I think the answer to Plaintiff's counsel's question on what constitutes new is found in Paragraph 49 where the parties agreed that they need not provide advanced notice of the intent to use testimony given, demonstratives previously used, enlargements, highlighting, ballooning, or other annotations of admitted trial testimony.

THE COURT: So your definition of new then in response to Mr. Wang's question would be anything that is -- would be required by that paragraph?

MR. SNYDER: That is correct.

And frank -- to be blunt, Your Honor, we have done this many ways. All I'm trying to do is avoid a situation

09:28:23 where we have to make modifications at the very last minute
09:28:27 or where Plaintiff's proposal is that there is no
09:28:32 disclosure. We have a situation where -- and I'm sure
09:28:35 everyone hopes that no one in this case would do it -- you
09:28:39 have some kind of inflammatory graphic that is shown to the
09:28:44 jury when the Court greatly discourages if not prohibits
09:28:48 objections during closing. So providing some opportunity
09:28:51 to see now graphics and slides to avoid exactly that
09:28:55 situation.
09:28:56 THE COURT: And I would say greatly discourage is
09:28:59 correct. Prohibited, I would say, is not correct and --
09:29:05 because we do rely on waiver. So you're not prohibited,
09:29:09 but you are -- you are discouraged.
09:29:13 And that is the reason why whenever this issue has
09:29:15 come up, I have cited to some extent with the party that
09:29:21 wants disclosure of closing demonstratives, and in this
09:29:25 case, we're just talking about new demonstratives. But the
09:29:32 timing is often the issue.
09:29:34 And I don't know -- Mr. Wang, with the
09:29:37 understanding that if there are new demonstratives, they're
09:29:40 going to need to be disclosed, do you have a position on
09:29:44 what timing you can live with?
09:29:48 MR. WANG: Your Honor, I'll -- if the Court's
09:29:53 going to go that route, then we would propose that any --
09:29:57 anything considered new be -- be disclosed to the other

side by 7:00 a.m. that morning.

THE COURT: And typically, I have found that fairness would dictate that this needs to be mutual, and it needs to be simultaneous.

MR. WANG: I'd hope so.

THE COURT: You shouldn't have to show your hand before the Defendant shows their hand, as far as those demonstratives go.

So you're proposing that 7:00 a.m. on the day of the closings be the time when there'd be a mutual exchange?

MR. WANG: Yes, Your Honor.

THE COURT: And then obviously that exchange would be followed by a meet and confer, if there are any objections. And I guess how much time -- what, just notify the Court by what time?

MR. WANG: I would say as soon as the Court brings us into chambers. Sorry, that doesn't make sense, Judge.

We would -- probably after 30 minutes, we'd meet and confer, and then as soon as that's over, we would immediately send an email to the clerk and the Court notifying the Court that we have maybe any remaining disputes on the closing demos, and then we would take that up in chambers as soon as the Court allowed us.

THE COURT: So an exchange of new demonstratives by 7:00 a.m. on the day of the closing and a notification

to the Court of any disputes by 7:30?

MR. WANG: I think we could do that, Your Honor.

THE COURT: Okay.

MR. WANG: We're not going to cross the line with our closing demonstratives, Your Honor, so I would make a push for no exchange.

And then just to clarify on what we consider new, if we take trial testimony and we put it on a PowerPoint slide, just because it's transformed from Trial Director to a slide, I don't consider that new.

THE COURT: I would agree -- I think that would be an understanding of Paragraph 49 that Mr. Snyder just pointed to. It talks about no -- no problem with prior testimony or enlargements, highlighting, ballooning, or other annotations of admitted trial testimony. So that -- I think a PowerPoint that has trial testimony would be the same.

MR. WANG: And then my last clarification, Judge, is if we took an excerpt from the final jury instructions, that wouldn't be considered new either, right?

THE COURT: That is not referenced in the -- in Paragraph 49, but I guess if there's an objection to that --

MR. SNYDER: No, Your Honor. In fact, I would be happy to amend Paragraph 49 to refer to jury instructions

and the verdict form.

THE COURT: All right. It sounds like --

MR. SNYDER: I think that's typical, and that's not the kind of material we're concerned about.

THE COURT: All right. Mr. Wang, you're in agreement with that?

MR. WANG: Yes, Your Honor. That sounds good.

THE COURT: All right. Then Paragraph 49 will be deemed amended to that extent.

And Paragraph 66 will be amended to the extent we just discussed with exchange of new demonstratives by 7:00 on the day of closing and notice to the Court by 7:30 if there are disputes.

There was also an issue in Paragraph 70 that I'm not fully able to understand, not knowing enough about what the Samsung or Google fact witness issues are.

MR. SNYDER: The issue, Your Honor, is the Plaintiff's attempt to reserve the right to call or recall any previously recalled witness regardless of its affiliation.

So in the preceding paragraph, which is the top of Page 17, and this -- this sentence is agreed: Samsung reserves the right to call any Samsung or Google fact witness again in its case-in-chief if that witness was first called in Plaintiff's case-in-chief, and Plaintiff

09:34:30 reserves the right to call any previously called witness
09:34:34 again during Plaintiff's rebuttal.

09:34:37 So the issue is if Plaintiff calls a
09:34:43 Defense-affiliated witness in its case, we would like the
09:34:46 right to recall that witness during our case-in-chief when
09:34:49 we have to put on our case, rather than have to -- we have
09:34:53 the option to do that rather than putting on that evidence
09:34:56 in the midst of Plaintiff's case. These would be our
09:34:59 witnesses, Defense witnesses. We're not trying to reserve
09:35:02 the right to recall Plaintiff's witnesses.

09:35:04 In contrast, what Plaintiff is trying to do is
09:35:08 reserve the right during its very limited rebuttal case of
09:35:12 recalling any witness, including Defense-affiliated
09:35:18 witnesses from Samsung or Google. We don't object to them
09:35:21 reserving the right to recall one of their own witnesses, a
09:35:24 Cerence witness.

09:35:26 What we do object to is them trying to reserve the
09:35:29 right to recall a Defense-affiliated witness, a Samsung or
09:35:33 Google witness, which precludes us, among other things,
09:35:36 from having those witnesses released after they testify.

09:35:42 THE COURT: Well, Mr. Snyder, I'm going to deny
09:35:48 that exclusion and just say that you -- you should ask
09:35:57 whether any particular witness can be released and get that
09:36:01 issue resolved by Judge Gilstrap at that time. I don't
09:36:07 think it's appropriate in the pretrial order to exclude

their ability to seek that.

So I will strike that last portion of Paragraph 70 on Page 17 and say that's something that you should raise when and if you want a witness to be released.

I didn't see any other disputed issues in the pretrial order. Is there anything else that either side wants to raise before the pretrial order is adopted?

MR. SNYDER: One additional issue, and that relates to the scope of the Court's standing limine orders. Many of those orders relate to what the parties can and cannot do and what party-affiliated witnesses -- how they can be questioned. And we would ask that that be extended also to Google -- references to Google and to Google witnesses.

As the Court knows, Google's technology is at issue in this case. It is participating in this case, although it is not a named Defendant. So references to parties or witnesses for a party would not automatically extend necessarily to Google, and we think, given the circumstances of this case, it should extend to Google.

So, for example, references to Google's overall revenue would be prohibited in the same way that it would be prohibited for Samsung's overall revenue.

I apologize to the Court. I raised this issue with Plaintiff's counsel only this morning, and they said

09:37:57 that they would get back to me. But that is an additional
09:38:00 issue that relates to the -- that would relate to the joint
09:38:04 pretrial order that I did want to raise with the Court.
09:38:07 THE COURT: All right. Is there any other
09:38:12 standing MIL that you would want to extend to a non-party
09:38:19 other than the one about the overall size and revenues?
09:38:23 MR. SNYDER: I don't have the list in front of me,
09:38:25 Your Honor. But essentially, all of the ones that refer to
09:38:30 parties or those that are related to parties, for example,
09:38:34 30(b)(6) witnesses or corporate designees would relate only
09:38:38 to a party.
09:38:39 THE COURT: Well, I will be happy to consider
09:38:51 specific standing MILs that you want to have extended to
09:38:58 Google or Samsung. But I can't just say that all of the
09:39:02 standing MILs will apply to them the same as they apply to
09:39:07 the parties.
09:39:08 So why don't you look further into that, and when
09:39:15 we finish with the MILs in this case, we can get back to
09:39:20 that issue, and you can identify for me which standing MILs
09:39:25 you're particularly concerned about, and we'll take it up.
09:39:27 MR. SNYDER: We will do that. Thank you, Your
09:39:29 Honor.
09:39:29 THE COURT: All right. Thank you.
09:39:30 I will note also that the Court's practice is to
09:39:45 take up Rule 50 motions at the close of all of the

09:39:50 evidence, and so I make a point of saying during the
09:39:57 pretrial that the parties are ordered to hold their Rule 50
09:40:02 motions until the close of all evidence so that there won't
09:40:06 be a concern about waiver by so doing. So in any event,
09:40:14 you are so directed.

09:40:19 You can expect that there'll be an informal charge
09:40:24 conference off the record at some point near the close --
09:40:27 near the end of the evidence to try and determine where the
09:40:31 issues really are.

09:40:33 I have looked at the submitted jury instructions
09:40:40 that were attached to the pretrial order filing, and the
09:40:46 form of those is good, but the parties are evidencing too
09:40:53 much attachment to your own forms.

09:40:54 I'd ask you to look at the plentiful prior
09:41:03 examples from recent trials and try to narrow the issues
09:41:07 where you dispute what the Court has been doing so that you
09:41:14 can have a more focused argument on the jury instructions.

09:41:18 So I'll just say that the Court will expect the
09:41:21 parties to continue to meet and confer on jury instruction
09:41:25 issues and narrow the disputes from where they stand now.

09:41:32 The same applies to the verdict form, but in any
09:41:37 event, the -- you've got a good start at those.

09:41:41 The Court also has a rule that the parties might
09:41:51 need to be aware of, and that is having your witnesses and
09:41:57 your team not refer to others by first name only but during

09:42:02 the trial to use last name or first and last name but not
09:42:08 first name only. Make sure your witnesses are aware of
09:42:12 that because that will be enforced.

09:42:14 There's also a new standing MIL -- relatively
09:42:21 new -- that directs that when you're talking about prior
09:42:24 rulings of the Court, to just refer to them as rulings of
09:42:28 the Court as opposed to rulings by any particular judge by
09:42:34 name of the Court. So that's something that you should be
09:42:38 aware of, too, that's in the latest version of the Court's
09:42:42 standing MILs.

09:42:46 There is also a standing order on sealing the
09:42:49 courtroom during confidential evidence. Your pretrial
09:42:55 order reflects that counsel are aware of that issue and
09:43:01 hopefully are consulting Judge Gilstrap's standing order on
09:43:08 that so that you can reserve -- or preserve the ability to
09:43:13 have the record -- the transcript sealed to the extent you
09:43:17 think it needs to be. So read that standing order and make
09:43:23 sure you comply with it.

09:43:24 One of the goals of that is to see that the
09:43:27 courtroom is sealed and unsealed as few times as possible
09:43:32 so we call on counsel to group that confidential evidence
09:43:38 as much as possible and, of course, to be sure to let the
09:43:43 Court know when you are through with that so that the
09:43:47 courtroom can be unsealed.

09:43:54 You, I think, in the pretrial order have a section

09:44:00 talking about the jury notebooks. But in any event, we
09:44:06 will require jury notebooks. They need to be delivered to
09:44:13 chambers at the same time that you're picking up the jury
09:44:18 questionnaires that Wednesday before jury selection.
09:44:24 And I will say I don't know whether Judge Gilstrap
09:44:27 is going to move the jury selection on this docket to the
09:44:32 Friday before, but you should be aware that he has been
09:44:37 doing that in a lot of recent cases to allow more evidence
09:44:44 time during the week of. So just be aware that that is a
09:44:49 possibility.
09:44:50 But in any event, that's one of the reasons why
09:44:53 we're saying that the jury information and the jury
09:44:57 notebooks will be due on that Wednesday is to accommodate
09:45:02 the possibility that jury selection will be moved up to
09:45:07 Friday.
09:45:07 But the jury notebooks are, as I'm sure you are
09:45:12 aware, three-ring binders that have the patents-in-suit. I
09:45:18 know there are two at this point in this case. Obviously,
09:45:22 if it gets narrowed before trial, whatever patents are
09:45:26 remaining. There also should be the claim terms. That
09:45:34 would be in just a chart form, not the claim construction
09:45:37 order itself but just the disputed terms and the Court's
09:45:42 construction in columns -- terms on the left, constructions
09:45:50 on the right.
09:45:52 There importantly needs to be a page for each

09:45:55 witness that has a picture of the witness and a -- the name 09:46:02 of the witness, no further information. No titles or 09:46:07 descriptions of the witness, such as Plaintiff's damages 09:46:12 expert or the like. Descriptions should not be there, just 09:46:18 the head and shoulders picture and the name underneath it 09:46:24 and lines on the rest of the page for taking notes and 09:46:32 additional pages at the back of the notebook for additional 09:46:37 notes.

09:46:38 All of that is done with the idea of helping the 09:46:40 jury recall the testimony of the witnesses when they get to 09:46:49 their deliberation. And they always tell us that seeing 09:46:52 the witness's picture helps them summon back up the 09:46:55 recollection of that testimony. So those notebooks need to 09:47:03 be provided.

09:47:03 I know that there were some stipulations referred 09:47:12 to in the pretrial order. If there are stipulations that 09:47:16 either side thinks it's important that the jury have before 09:47:21 the final jury instructions, you should make a request to 09:47:27 have those included in the preliminary jury instructions or 09:47:33 just plan on advising the jury yourself.

09:47:39 Sometimes all you care about for a stipulation is 09:47:41 that you know the other side is going to observe it. And 09:47:44 if that's the case, the jury doesn't need to be informed of 09:47:48 it at all. But you should not expect the Court to read the 09:47:51 stipulations to the jury unless they're included in the

09:47:56 preliminary or final jury instructions.
09:47:59 Are there any issues about stipulations that counsel want to address now as far as how those should be handled? If not, I'll just leave it to you to make sure that they are presented in whatever way you think is necessary.
09:48:23 MR. WANG: We don't have any that we need to discuss now, Your Honor.
09:48:25 THE COURT: All right.
09:48:26 MR. SNYDER: No issues for Defendants, Your Honor.
09:48:27 THE COURT: All right. Thank you both.
09:48:28 I'll also point out that the Court's practice is to hold experts to the four corners of their reports, and that means that the Court will need a copy of those reports in the event there are objections that come up about whether a particular question exceeds the scope of the expert's report. So you will get an email closer to trial from the Court asking for both hard copies and electronic copies of the expert reports. Not talking about all the attachments but just the opinions, the ordinary text of the expert's report. And so you can be planning on having those ready to submit to the Court.
09:49:33 I will point out that those objections occasionally require the Court to send the jury out, which obviously takes substantial time. So those -- that time is

09:49:44 charged to the loser of the objection, and so those
09:49:49 objections should be made judiciously.
09:50:02 I think that is what I needed to take up in terms
09:50:04 of the issues in the pretrial order, which is now adopted.
09:50:08 I would like in a moment to hear any objections to
09:50:13 witnesses other than those that are in pending motions to
09:50:19 strike or Daubert motions. Then we'll turn to the motions
09:50:26 in limine. And finally, we will take up the pre-admission
09:50:31 of exhibits.
09:50:33 I received a copy of the email from counsel about
09:50:39 the organization of objections to the exhibits -- the
09:50:44 bucket lists, in other words. But what I am not able to
09:50:49 tell is whether counsel have narrowed the exhibit lists to
09:50:55 conform to Judge Gilstrap's standing order on exhibits.
09:51:03 The lists that were filed with the pretrial order
09:51:07 a few weeks ago were not in conformance with that standing
09:51:12 order. If there has been further narrowing of the exhibit
09:51:19 lists since then such that they're now in compliance, then
09:51:23 I'll be happy to go forward with that pre-admission
09:51:29 process.
09:51:29 If not, then that is something that we will
09:51:35 schedule for a further hearing.
09:51:38 I did not see a joint exhibit list. There may now
09:51:45 be one which would -- which would reduce the individual
09:51:49 party list down to something within or close to the

09:51:56 standing order.

09:52:01 But can either side tell me where we stand on 09:52:05 that?

09:52:05 MR. WANG: Yes, Your Honor.

09:52:08 So we're -- we're definitely close to the limit. 09:52:15 So currently, the Plaintiff's exhibit list has 54 exhibits 09:52:20 on it. There are 11 of those exhibits that are either -- 09:52:27 completely unobjected to. So we've requested that we shift 09:52:32 those to the joint list. And then there's a handful that 09:52:35 the only objection to them are that they are cumulative. 09:52:40 In other words, I guess Defendant says why do you need 09:52:42 these? You have something else similar.

09:52:45 We think that collection, unobjected to or simply 09:52:49 cumulative objected to exhibits, a total of which are 11, 09:52:52 should all be moved to the joint list, which would then 09:52:55 take us to 43 on the PTX-list, which I think is close or 09:52:59 within the limits, or close enough for now.

09:53:02 And then the JTX list currently has 57 on it. So 09:53:05 there's room to add those 11 that I'm suggesting. And all 09:53:10 three of the current lists were filed last night with the 09:53:14 Court, the JTX, the PTX, and the DTX lists.

09:53:21 THE COURT: All right.

09:53:21 MR. WANG: So that's the current status, Your 09:53:24 Honor.

09:53:24 THE COURT: All right. Thank you, Mr. Wang.

Mr. Snyder, what about your side?

MR. LIANG: All right. I'll take up the exhibit issues.

So Plaintiff's proposed exhibit list right now is about, I think, 45 exhibits or in that range. It's very close to that.

MR. SNYDER: Plaintiff's or Defendants'?

MR. LIANG: Pardon?

MR. SNYDER: Plaintiff's or Defendants'?

MR. LIANG: The Defendants' exhibit list, DTX is -- so just giving the other side of -- our side of it. So they're at 51, I think you said, or 57 on your end?

MR. WANG: It's 54 currently.

MR. LIANG: Okay.

MR. WANG: But we're proposing to shift 11 of those.

MR. LIANG: Yeah. And we have a few, at least, I can shift that don't really have any objections, as well.

I think the JTX list also -- we did file it last night. There are -- we've been talking with the other side, the Plaintiffs, about removing some of those, as well, to make room for additional space to put on the joint list, and we'll continue conferring on that.

I think -- you know, we add up all the exhibits in total, I think we're going to probably be able to make --

09:54:19 we will definitely be able to make the limits.

09:54:22 I think we're -- the Plaintiff's position, as told 09:54:26 to us, is that they want to see how the motions -- some of 09:54:28 the pretrial motions are resolved, and that might inform 09:54:31 what gets moved and added to the JTX list.

09:54:34 THE COURT: Well, it sounds like you're close 09:54:37 enough that I -- it makes sense to go forward with the 09:54:45 pre-admission process today.

09:54:46 I will say, though, that the order that follows 09:54:49 that will be that you get all three lists in strict 09:54:55 conformance with that standing order.

09:54:59 So I'm happy to go there, and it sounds like 09:55:03 progress will be made. And if you can agree on moving 09:55:08 exhibits from the individual party list to the joint list, 09:55:13 it sounds like you may be where you need to be without 09:55:17 having to go back and further trim your individual lists.

09:55:25 MR. LIANG: Right. I think that's accurate. I 09:55:27 think you add up the totals, we're probably within the 70 09:55:32 plus 30 -- 75 plus 30 plus 30, and we'll probably -- we'll 09:55:35 just need to -- it's a matter of filling up the JTX list 09:55:38 and reducing the number of disputed exhibits.

09:55:41 THE COURT: All right. Then I will plan to get to 09:55:43 that today.

09:55:43 Is there anything else that either side thinks 09:55:48 needs to be on the agenda for today beyond what I just

09:55:53 outlined?

09:55:53 MR. WANG: Well, Your Honor, just to note that we
09:55:57 also -- I guess their motion to compel is also set for this
09:56:01 afternoon at 1:30 just -- in the trailing case.

09:56:04 THE COURT: Yes. And that is in the trailing
09:56:10 case, yes.

09:56:14 Anything else for the Defendant?

09:56:15 MR. SNYDER: Nothing further, Your Honor. But
09:56:17 if -- if you would like, I can address the issue of which
09:56:20 of the Court's standing orders on limine motions we believe
09:56:25 should relate -- should be extended to include non-party,
09:56:29 Google.

09:56:31 THE COURT: All right. Go ahead and tell me.

09:56:32 MR. SNYDER: It's a -- fortunately, a limited
09:56:35 list. I appreciate the Court's guidance, as always, in
09:56:38 asking us to look because it is what -- it was much
09:56:41 narrower than perhaps my initial description suggested.

09:56:43 The first would be Court MIL No. 3, which relates
09:56:49 to a party's overall financial size, wealth, or executive
09:56:53 compensation.

09:56:55 THE COURT: All right.

09:56:55 MR. SNYDER: MIL No. -- Court MIL No. 13, which
09:57:00 relates to either party's other litigations or
09:57:03 arbitrations.

09:57:07 THE COURT: All right.

09:57:08 MR. SNYDER: Court MIL No. 14, the size of the parties' law firms or number of attorneys representing the parties.

09:57:16 THE COURT: Is there going to be an active role by counsel for Google in front of the jury?

09:57:24 MR. SNYDER: Any attorneys who represent Google in front of the jury will also represent Samsung, Your Honor. They will be appearing on behalf of the named party, Samsung. There will be representatives from Google present.

09:57:39 THE COURT: All right.

09:57:39 MR. SNYDER: And there will be witnesses from Google.

09:57:42 THE COURT: So I don't know how there could be any comment on the counsel for Google that wouldn't be a comment on the counsel for a party.

09:57:53 MR. SNYDER: That is perhaps correct, Your Honor.

09:57:55 THE COURT: All right. What else?

09:57:57 MR. SNYDER: Court MIL No. 21, which relates to having an affirmative duty to seek an opinion of counsel.

09:58:07 THE COURT: All right.

09:58:08 MR. SNYDER: Court MIL No. 24, the presence or absence of a party's corporate representative, employee, or other witness.

09:58:18 THE COURT: All right.

09:58:19 MR. SNYDER: And Court MIL No. 25, which prohibits trying the empty chair.

09:58:25 THE COURT: All right. Well, we will -- I'll give Plaintiff an opportunity to consider those things. And at the end of the MIL discussion, we'll return to those and make a decision.

09:58:53 So that takes me to whether there are objections to the witnesses listed by either side in the attachments to the pretrial order other than those that may be in pending motions to strike or Daubert motions.

09:59:14 MR. WANG: Your Honor, just to the extent there may be designated deposition testimony that we have our objections to, then that's already been identified.

09:59:25 And then -- and then we don't have any stand-alone objections beyond those caveats, but I'd ask that maybe the Court recommend to both sides that they be more specific on who will be live as opposed to may calls, because there are many that are designated as may calls.

09:59:43 THE COURT: And tell me about the recommendation you want the Court to make.

09:59:46 MR. WANG: Mostly to focus it on them. Like, you know, I don't think ours is really any mystery, although we do have a lot of mays. But, you know, it's more difficult for us to figure out who they intend to bring. Maybe that's always the case, Your Honor.

10:00:02 THE COURT: All right. I don't recall having the impression in looking at the witness list from either side that they were unusually long.

MR. WANG: Your Honor, I think that -- one thing that jumped out to me is that the only will calls that they identified were their -- were their expert witnesses. And, you know, I'm happy to tell them that we for sure will also call Mr. Rodriguez. He's the CFO of Cerence, and so that would be a will call live on our part. And so maybe they can do the same on their part to at least identify their corporate representative at trial. And anything more we can get out of them, the sooner the better.

THE COURT: All right. Well, I do think that there is a greater obligation on the parties to advise about live witnesses. And certainly I know that to the extent you're bringing witnesses in from outside the country, you know which ones you're making arrangements with well before trial.

Mr. Snyder, can you or someone on your team speak to a date by which you can advise about the universe of live witnesses that may be coming?

MR. SNYDER: I believe, Your Honor, the pretrial order has a procedure for disclosing live witnesses. And if I recall correctly, it's two days before they are scheduled to appear -- two court days.

10:02:08 It's a little bit difficult to inform the Plaintiffs of who will come live until we've heard Plaintiff's case. And I don't think that there is anything disproportionate currently. If you look at the witness list, they have -- they list only two witnesses that they will call live, both experts. They've told us today for the first time that Mr. Rodriguez is going to appear live. He was originally listed as may call by deposition or live.

10:02:39 So I don't think that there's any lack of parallelism in what's being -- what's being disclosed, and it's difficult for the Defendants to be more certain until we know what Plaintiff's case is going to be.

10:02:50 THE COURT: All right. Well, thank you, Mr. Snyder.

10:02:54 Mr. Wang, to the extent that there could be any further clarification on that, I think it would have to start with the Plaintiff providing that clarification itself because I think it is true that the Defendants' testimony is responsive to the Plaintiff's case.

10:03:20 MR. WANG: Your Honor, so I would at least request that they identify their corporate representative that they will have for trial, just as we just did with Mr. Rodriguez.

10:03:33 THE COURT: All right. I do think that it's reasonable to have the corporate representative identified

10:03:39 in advance of trial.
10:03:45 Mr. Snyder, what are your thoughts on that?
10:03:48 MR. SNYDER: If the Court is going to require
10:03:50 that, we will of course comply, Your Honor. I'm not sure
10:03:54 I've ever heard that requirement before.
10:03:56 Also, it's not certain that the corporate
10:04:00 representative will testify. The corporate representative
10:04:04 can be any number of people, depending on the needs of the
10:04:10 case and availability.
10:04:11 THE COURT: Well, all I'm really talking about is
10:04:13 the corporate representative who will testify. To the
10:04:17 extent you want a representative just to be present and
10:04:20 you're not going to call that representative and you don't
10:04:26 expect the Plaintiff to -- in other words, if it's not
10:04:29 someone who's designated as a potential witness, then
10:04:36 certainly designating them is not particularly important
10:04:41 but...
10:04:43 Well, I'll just -- at this point, Mr. Wang, I'm
10:04:49 just going to ask that the sides confer about that issue,
10:04:54 and if you have a request that you are not able to resolve
10:05:01 by conferring, then you can take that up with the Court
10:05:07 after that, and I'll consider it.
10:05:13 MR. WANG: Your Honor, I guess I would -- I would
10:05:15 just -- if we could just -- do they not know? Are they
10:05:20 saying they don't know?

10:05:21 THE COURT: Well, have you had this discussion with them?

10:05:23 MR. WANG: I haven't, Your Honor.

10:05:25 THE COURT: Okay. Well, don't have it now.

10:05:27 MR. WANG: Okay.

10:05:28 THE COURT: So at this point, we can turn to the motions in limine.

10:05:39 And I'll hear the Plaintiff's motions in limine first.

10:05:48 MR. BUCZKO: Good morning, Your Honor. This is Jacob Buczko for Plaintiff.

10:06:01 Cerence's Motion in Limine No. 1 seeks to exclude evidence and argument regarding unelected prior art. And I actually don't have slides on this. I'm going to use the document camera.

10:06:17 So Court MIL 4 prohibits invalidity arguments about unelected prior art, and the parties, through the briefing, have come to a substantial agreement -- an apparent agreement that there won't be evidence and argument regarding unelected prior art references. But there is one particular item that still stands out, Your Honor.

10:06:42 [redacted]. And that's a

10:06:54 [redacted].

10:07:06 And so in particular, they're arguing that's a non-infringing alternative to the patents-in-suit.

10:07:18 Now, in this case, the date of the hypothetical negotiation is not in dispute. It's 2021 or 2022, and that's based on the issue date of the patents-in-suit. So it can't possibly be any sooner.

10:07:31 And the inquiry of whether or not something is a non-infringing alternative centers around availability and acceptability at that hypothetical negotiation date, and it's an alternative technology that doesn't practice the claims of the patents-in-suit.

10:07:48 [redacted], which is before the priority date of the patents-in-suit, and basically backdoor it as an unelected prior art reference.

10:08:17 And the reason why we're concerned about that is that there was a deposition of a -- of the [redacted] in this case, and a large part of the deposition was about whether or not this [redacted]

[redacted]

These are quintessential prior art arguments. These are not non-infringing alternative arguments which have to do with availability/acceptability a decade later. There is actually nothing in that deposition about availability/acceptability in 2021, 2022. So this really appears like a backdoor prior art argument.

Secondarily, Your Honor, I think at least 10 or so of Defendants' exhibits are about the [redacted], and so that draws more suspicion that it's going to be a backdoor unelected prior art argument in violation of the Court MIL.

And so, Your Honor, we put in our brief some of the testimony that gave us concern, and I'm going to put it on the document camera.

Hopefully that's legible but...

So this was the [redacted]. And here, we see Samsung's attorney asking, you know, about a particular press release: Was this published to [redacted] website around August 2nd, 2011?

This is a decade prior to the hypothetical

negotiation, and it asked about, you know, a voice trigger, which was a technology -- you know, a claimed technology of the patents-in-suit.

And here, it's -- the testimony was elicited: [redacted]

And that is kind of a characterization of the technology of the claimed elements of the patents-in-suit in terms of sending voice commands either to a server or using context to parse them in kind of one go.

And next -- I mean, we see here it continues. [redacted].

So low-power mode -- and this mentions specifically low-power mode which is a limitation of both patents-in-suit. And it's a key limitation, Your Honor. And this is, again, going back to this time frame before the priority date of the patent-in-suit instead of the relevant time frame for non-infringing alternatives of 2022 and asking about low-power mode which is probably one of the most hotly disputed claim elements in this case --

And then it goes on, you know, the press release from [redacted],

10:11:40 [redacted] solution could wake the smartphone from the low-power mode. That's quintessentially the technology at issue here.

And, again, there's -- we didn't see anything in the deposition about availability/acceptability a decade later.

So, you know, our concern here is that this is a backdoor prior art argument. [redacted]. And that, in our view, is in -- captured by Court MIL 4 and should be precluded.

Defendants cite a case in their brief, I think it's the Lionra case. And that case had to deal with non-infringing alternatives and allow the non-infringing alternative, but that was specifically elected prior art. The key thing here is that this is not elected prior art, and that puts it in the Court MIL.

So we're not seeking to strike -- wholly strike [redacted] through this motion. We understand that their experts, Mr. Bress, and they have a damages expert, Ms. Rowe, that they have opinions about it being a non-infringing alternative. But there ought to be [redacted].

10:13:07 There's no reason to go back in time before the priority
10:13:10 date and say that it practices claim elements. The inquiry
10:13:14 ought to be on relevant time frame of availability and
10:13:17 acceptability, which is around, you know, 2021, 2022.
10:13:22 One last point on this is Defendants in their
10:13:27 opposing brief, they argued that this is relevant to our
10:13:30 copying allegations. So two points on that -- or maybe
10:13:34 three points on that.
10:13:35 First point is that the copying allegations are
10:13:39 subject to a motion for summary judgment, and there's a
10:13:42 MIL -- their MIL 1, which in effect we believe is a motion
10:13:45 for summary judgment, but that might be taken up today.
10:13:48 But assuming that there is going to be evidence of copying
10:13:52 in the case, the relevant time frame for the copying is
10:13:55 2015. That's when the development began on the accused
10:13:58 functions in this case.
10:13:59 There's no reason to address the copying
10:14:02 allegation to go back in time before the priority date or
10:14:05 focus or make -- or focus on evidence of what was known in
10:14:10 the United States before the priority date of the
10:14:13 patents-in-suit when it's really 2015.
10:14:15 And so, again, that -- we think that we ought to
10:14:25 have clarification of the Court's MIL 4 that the
10:14:27 prohibition against invalidity arguments of unasserted
10:14:32 claims extends to the proposed non-infringing alternative

10:14:33 of [redacted].

10:14:35 Thank you, Your Honor.

10:14:35 THE COURT: All right. Thank you, Mr. Buczko.

10:14:45 MR. WOLF: Good morning, Your Honor. Matt Wolf 10:14:51 for Samsung.

10:14:52 There is one thing we plainly intend to use the 10:14:54 evidence counsel just discussed for. There is one thing we 10:14:58 hope not to need it for. We'll talk about that probably in 10:15:02 about half an hour. And there's one thing we certainly 10:15:05 will not be using it for, and let me start with that.

10:15:09 We will not be using the evidence counsel talked 10:15:11 about -- and, Mr. Reidy, I am trying to get this to -- 10:15:11 thank you.

10:15:20 We will not be using the evidence that counsel 10:15:23 talked about for purposes of, as he put it, a backdoor 10:15:27 invalidity argument. We're well aware of the rules, both 10:15:31 of this court and of the Federal Rules of Civil Procedure 10:15:35 in terms of disclosure. In fact, we're going to be relying 10:15:37 on those later in this very hearing when we come to 10:15:39 Plaintiff's activities. We are not intending to use this 10:15:42 as a side door, backdoor, non-front door 102 or 103 10:15:51 argument.

10:15:51 [redacted]
10:15:55 [redacted].

10:15:56 Counsel said again and again that you have to prove

availability of that non-infringing alternative at the time of the negotiation.

So establishing that this technology was available in advance prior to is one of our burdens. So it's a bit odd for him to say why are they talking about its [redacted], wherever. Well, that's precisely because that means it was available as of 2021.

THE COURT: Well, you know, it is inherently suspicious to have a question that is asking about February of 2013 when the priority date is March of 2013.

MR. WOLF: So that goes to what we hope not to use it for. Some of this evidence is relevant to the copying issue. So let me jump to that, Your Honor.

I'm going to be up here shortly explaining why we don't believe copying should be in this case. [redacted].

[redacted] So that time frame directly rebuts copying. It wasn't that we used what they had. [redacted].

So it is true, Your Honor, that some of these

10:17:35 dates will be less relevant if copying is not in the case,
10:17:40 and then we'll be focusing simply on the fact that it was
10:17:43 available as of 2021.

10:17:48 THE COURT: Well, what does that have to do with
10:17:50 your question about February of 2013?

10:17:53 MR. WOLF: [redacted], that is
10:18:13 overwhelmingly probative evidence that we didn't copy
10:18:16 anything two years later.

10:18:17 THE COURT: [redacted]?

10:18:25 MR. WOLF: [redacted]. And as you see
10:18:40 on the screen, there's no Daubert motion, there's no effort
10:18:42 to exclude it as a non-infringing alternative.

10:18:46 THE COURT: And my question is about February of
10:18:48 2013.

10:18:49 MR. WOLF: Right.

10:18:50 THE COURT: Why pick -- single out that?

10:18:54 MR. WOLF: We don't need to single out that if
10:18:56 copying is out of the case. If copying is in the case,

then it becomes relevant because it's saying what you said [redacted]. So that date is contingently relevant.

THE COURT: [redacted]

[redacted].

THE COURT: So that month?

MR. WOLF: [redacted].

THE COURT: All right. You know February is a month of the year. What happened in February of 2013 other than the fact that it's the month before the priority date --

MR. WOLF: I understand your question.

If that's a -- there was a long series of questions about dates. I mean, they singled out the one that is most relevant to their claim that it's 102/103. We can avoid that sensibility. That's not a core -- if we want to say prior to a certain date or prior to the claims of copying, we can craft that so we don't get close to that trip wire. That was just a long series of questions as of 2009, '10, '11, '12, '13. That's the way the deposition played out.

So, Your Honor, I understand your -- I'll call it

an admonition.

THE COURT: Well, I do think that you're certainly entitled to establish that you had this disclosed non-infringing alternative, and I think you're entitled to say, you know, that you had it long before this copying, but my concern is twofold.

One, if you focus on the priority date of the patent, it's pretty much inescapable that that is being focused on to reflect on the validity of the patent. [redacted], that would also be a clear indication that it's being used for invalidity because the non-infringing alternative doesn't have to satisfy the claims of the patent. It just has to satisfy your needs for this product.

MR. WOLF: Your Honor, I certainly understand your point as to the date, and we will be careful not to call that out in the way you're suggesting.

As to the second point, there is an overlap -- this is where the copying issue comes -- we come back to the copying issue. When they say -- and you're going to hear about this shortly. When they say certain features -- because they don't try to -- for nexus, they don't put a claim chart up and say their product practices the patent.

They say certain features -- key features in their language -- certain key features were copied.

[redacted]. So that's the point of doing that.

But I understand Your Honor's point that if you start matching it up to claim language, it starts to look and feel a little bit too much like a 102/103 argument, and we are not trying to do that.

THE COURT: All right. [redacted]. And so this -- the ruling on this MIL needs to be crafted to allow that to go without limitation.

All right, Mr. Wolf.

Let me hear from Mr. Buczko, and then I can see if I need to hear further from you. Thank you.

MR. WOLF: Thank you, Your Honor.

MR. BUCZKO: Yes, Your Honor.

[redacted] The main point is when you put it all together the way that it was put together in that deposition play that Samsung's -- has -- they've designated it for play in

10:23:36 this trial, when you talk about key features before the priority date, also in the United States, which, you know, I think these products were designed largely in Korea, is -- that's quintessentially an invalidity argument.

So the -- the relevant time frame for copying is 2015, [redacted]. And so there's no reason to go before that 2013 priority date. That's where the prejudice is and we believe the violation of the Court MIL on invalidity arguments.

So I do think there's a -- probably a somewhat simple way to craft an order on this to allow Samsung to make its arguments about key features being in TrulyHandsFree and its non-infringing alternative arguments but not go -- you know, not do any explicit claim-by-claim mapping and also not go before 2013 and not talk about what's known or available in the United States.

THE COURT: I don't see a problem with Samsung being able to point out when it acquired whatever it acquired from TrulyHandsFree, as long as what they're describing is the key features that the Plaintiff alleges they copied. And you'll just have to make a decision on the advantages of that.

But I will grant this motion to the extent that the Defendant, without obtaining prior leave, is prohibited

10:25:19 from comparing the TrulyHandsFree to the priority date of
10:25:29 the patent and to the limitations of the asserted claims of
10:25:35 the patent and -- [redacted].
10:25:43
10:25:49
10:25:53

10:25:59 MR. BUCZKO: And inherent in that order, Your
10:26:01 Honor, is if Plaintiff does not present copying evidence,
10:26:04 is that last sentence inapplicable?

10:26:08 THE COURT: If you don't present copying evidence,
10:26:12 then they would have no justification for offering that
10:26:20 they had [redacted].
10:26:31

10:26:36 I don't know -- I guess --

10:26:40 MR. WOLF: Your Honor, may I suggest that one
10:26:43 might be the devil's in the details when we get to trial
10:26:47 because there are things -- if it was just being used for
10:26:50 non-infringing alternatives, we agree that the range would
10:26:53 be narrower. The precise range might have to be defined as
10:26:53 we hear Plaintiff's case.

10:26:57 So I'm not sure we need to get that level of
10:26:59 detail today. I think we all know that -- the guardrails
10:27:02 Your Honor is intending, or at least it's on the record.

10:27:05 THE COURT: Well, if copying falls out of the case
10:27:08 and we need to revisit it, then you can raise it at that

10:27:12 time. But it's too hard to consider all the different
10:27:16 possibilities.

10:27:19 MR. BUCZKO: Understood, Your Honor.

10:27:20 MR. WOLF: Thank you, Your Honor.

10:27:21 MR. BUCZKO: And thank you.

10:27:22 THE COURT: All right. Thank you.

10:27:50 MR. BUCZKO: Your Honor, may I proceed with MIL 2?

10:27:52 THE COURT: Yes.

10:27:53 MR. BUCZKO: Okay. So Cerence's MIL 2, it's
10:28:00 really drawn to a somewhat narrow argument that we think --
10:28:03 and prejudicial argument that we think Samsung is going to
10:28:06 make, and that's indicated -- actually clearly indicated in
10:28:10 its opposition that it's going on it make.

10:28:12 Samsung should not be permitted to present
10:28:15 evidence or argument on Cerence's purported failure to
10:28:19 license a Mobile Text Entry portfolio of patents through an
10:28:26 intermediary named Global IP.

10:28:29 Now, importantly, Your Honor, the Mobile Text
10:28:31 Entry portfolio does not include the patents-in-suit. It
10:28:33 does not include patents related to the patents-in-suit.
10:28:35 It is a separate portfolio of patents. And we're concerned
10:28:41 that Samsung is going to argue that because Cerence
10:28:44 failed -- or was unable in that time frame to license that
10:28:49 portfolio of patents, that the industry -- or -- doesn't
10:28:53 want or rejected Cerence's patents writ large encompassing

10:28:58 the patents-in-suit here. That goes to infringement,
10:29:01 validity, and damages. And it unfairly goes to those
10:29:06 points, Your Honor.
10:29:07 A little bit of background. In 2021/2022, again,
10:29:13 Cerence enlisted a third-party, Global IP Group, to attempt
10:29:19 to license the Mobile Text Entry portfolio. It sent out
10:29:20 offers to a number of tech companies. I think the numbers
10:29:24 I've seen are, like, between 12 and 20. [redacted]
10:29:28
10:29:34 . That's the subject of a Daubert motion we filed
10:29:36 against Ms. Rowe. And, you know, our position is that that
10:29:41 agreement -- opinions on that agreement violate at least
10:29:44 three recent Federal Circuit cases, but that isn't relevant
10:29:48 to this motion here.
10:29:49 What we're focusing on here is that Samsung
10:29:54 apparently is going to argue that the -- the industry not
10:30:00 taking a license to those patents means that Cerence's
10:30:03 patents in general are bad or that no one wants them or
10:30:06 that they're not accepted in the industry. And, again,
10:30:08 those patents are not the patents-in-suit. They're not
10:30:11 related to the patents-in-suit. This is beyond a damages
10:30:14 argument, Your Honor. This also goes to
10:30:17 infringement/invalidity.
10:30:19 Defendants have argued that, well, the Mobile Text
10:30:24 Entry patent portfolio, they have a technical comparability

opinion on that, that it's technically comparable to the patents-in-suit. We dispute that.

We also have a technical non-comparability opinion. But even assuming that they're technically comparable, that shouldn't allow this argument that those patents that have completely different infringement, validity, and probably also damages profiles being not adopted by the industry means that the patents here are worse, are not infringed, not valid.

It's also -- from the testimony that we put into our brief, Your Honor, it's seems that, you know, we're concerned that Samsung is going to try to confuse the issues with the Mobile Text Entry portfolio and the patents-in-suit.

On the document camera here, this is the testimony we put in our brief. So these are questions elicited by Samsung's counsel during the deposition of our corporate representative on licensing, Mr. Tony Rodriguez. So these are questions about the licensing outreaches, and it reads here: So in a two-year period, roughly, Cerence contacted 10 to 20 different companies about licensing its patent?

And this is patent singular. It sounds like counsel is talking about the patents-in-suit. That's a portfolio of about -- I think a hundred patents that have to do with Mobile Text Entry, we believe not Voice

10:31:54 Assistant technology.

10:31:54 And then there's another question: So you contacted 10 to 20, possibly more companies -- again, referring to this licensing outreach on completely separate portfolio -- you're only suing Samsung, isn't that right?

10:32:06 Samsung is not sued on those patents. So it's -- we just -- again, this looks like it's going to be used, these outreaches and apparent -- or argued rejection of this Mobile Text Entry portfolio is going to be used by this -- by Samsung to confuse issues and to show that the patents-in-suit here are not valid, not infringed, bad patents generally, and we believe that should be excluded.

10:32:33 THE COURT: All right.

10:32:34 MR. BUCZKO: Thank you, Your Honor.

10:32:34 THE COURT: Thank you, Mr. Buczko.

10:32:40 Mr. Liang, before I hear your response, we'll take the morning recess. We'll be back in 15 minutes.

10:32:47 COURT SECURITY OFFICER: All rise.

10:32:49 (Recess.)

10:32:50 COURT SECURITY OFFICER: All rise.

10:32:51 THE COURT: In the meantime, Mr. Liang, I'm ready to hear your response.

10:46:50 MR. LIANG: All right. Mark Liang for the Samsung Defendants on behalf -- in opposition to MIL No. 2 for Cerence.

10:47:10 Now, the unconsummated offers and licensing discussions that Cerence had, you heard, there were about 20 -- 10 to 20 of those discussions to companies they reached out to. The 2021, 2022 time frame is relevant to Georgia-Pacific Factor No. 4, which considers licensing policies and programs. And it's relevant to that factor. It's also relevant to the fact that their expert -- their damages expert, Mr. Bergman, mistakenly, you know, didn't consider the fact that there was this licensing program in that time period.

10:47:16
10:47:19
10:47:23
10:47:26
10:47:29
10:47:32
10:47:35
10:47:39
10:47:41

10:47:42 He stated: Cerence had no program to license its patents.
10:47:46

10:47:47 And in rebuttal, our expert pointed out that, you know, as was just discussed, there was a program. We acknowledged it was for the Mobile Text Entry patents. In the May '21 and onward time period where they reached out to 10 to 20 different companies. We identified them.
10:47:51
10:47:53
10:47:57
10:48:01

10:48:03 So it's relevant to Georgia-Pacific Factor 4. It's also relevant to Mr. Bergman's credibility, given that, you know, he didn't consider these facts in analyzing that factor.
10:48:07
10:48:10
10:48:14

10:48:15 And the main -- one of the main points I heard from Plaintiff's counsel is that, you know, these -- the Mobile Text Entry patents was at issue in these discussions, and that doesn't include the patents-in-suit.
10:48:19
10:48:22
10:48:27

10:48:29 Well, there's two points on that. I think first off, they can address that through examination at trial. I mean, their own witness, Mr. Rodriguez, on direct, redirect, any point can simply point out that it was for the Mobile Text Entry patents. It didn't include these asserted patents. So, you know, it isn't -- that can be addressed through -- very simply through examination.

Second, there's actually -- hasn't been a real dispute about technical comparability in our view. I think their expert did give an opening opinion, speaking very generally that he didn't think they were comparable, but he didn't consider that this portfolio actually includes -- well, it's called Mobile Text Entry. There's no dispute it actually includes well over 20 patents that actually relate to speech recognition. They have that in the titles, and that's the general subject matter of the two patents in this case.

And you might have gathered from the briefing on some of the motions that the specific aspects of these two patents are using contextual information and a server to aid in the process of speech recognition. And our expert, Mr. James Bress, found three patents in the speech recognition category that actually are about using context information or using servers. So they're actually about the same very specific features that are recited in the two

10:49:42 patents in this case.

10:49:43 The other side in their briefing, as well as their remarks, didn't really cite any relevant case law to support their position. We cite in our briefing -- this is one of them -- where this district allowed in evidence about the Plaintiff's efforts to license to others, even if they didn't result in licenses. And it even included in the bottom of the slide there a motion in limine denied as to attempts to license a technically comparable patent, one that wasn't one of the asserted patents in the case.

10:50:12 As another precedent -- this wasn't in our briefing -- we found it since then, but this is another decision from this Court actually, USAA versus PNC Bank, where unconsummated offers and negotiations that didn't result in licenses with third parties were allowed in, at least to the extent that -- you know, the existence of the discussions and the structure of any offers that were made not to the amounts, and that -- that's a fine position for us, as well, just to reference the existence of those offers. We think, again, it's relevant to Georgia-Pacific Factor No. 4.

10:50:49 And just to skip ahead here, the -- again, they didn't point to any relevant case law in their opposition briefing, not in their remarks. The only cases they cited just to rebut them here, Monterey versus Renesas and

10:51:06 Headwater.

10:51:06 The first case was actually a discovery dispute
10:51:08 over whether to allow evidence or negotiation related to a
10:51:12 consummated license, and that's not the issue here. In
10:51:14 fact, [redacted]
10:51:17 [redacted], then so should the
10:51:19 negotiations.

10:51:20 Here, that was what Monterey was about, and it was
10:51:26 a discovery dispute.

10:51:27 Headwater, the other case they cite, was about
10:51:30 efforts by the Plaintiff to sell itself as a whole company
10:51:31 to two other companies, one Verizon, one to InterDigital,
10:51:35 and the facts of the case dictated that the InterDigital
10:51:37 one was allowed in. It was probably more relevant.

10:51:40 So, you know, they haven't cited any relevant case
10:51:43 law on this. Meanwhile, this Court's -- district's
10:51:49 precedence are in our favor on this point.

10:51:51 THE COURT: You know, Mr. Liang, if the Plaintiff
10:51:54 takes the position that they have some practice of not
10:51:57 licensing their patents, then certainly that opens the door
10:52:02 for you to put on evidence about their attempts to license
10:52:08 them in the past. I'm expecting that they're not going to
10:52:12 do that in view of the fact that you have this evidence
10:52:23 that you have.

10:52:23 So how is it relevant to the Georgia-Pacific

Factor No. 4, I guess it is, if they're not going to put in front of the jury any claim that they don't license their patents?

MR. LIANG: Well, it's relevant because there is evidence that they had a licensing program, that they were eager to license the patents. There's also evidence that when certain companies like Apple didn't want to take an offer to these -- the Mobile Text Entry patents, they were willing to actually offer other licenses, as well. This was also covered in the deposition of their corporate representative.

THE COURT: I just -- I think that the attempt to indicate that the fact that they were unsuccessful in licensing unrelated patents reflects on the value of the asserted patents is just not persuasive to me.

What does it matter that they had other patents that nobody wanted to license?

MR. LIANG: Well, it's the fact that they're -- A, they had a program or a concerted effort to try to monetize their patent portfolio. It was -- the efforts were focused at the time on the Mobile Text Entry, but they extended to other patent portfolios, as well.

And it's also the fact that these patents, as I noted, were technically comparable, as well. This is under the -- sorry, they were technically comparable as we

10:53:48 explained on this slide. And this district has allowed in efforts to license technically comparable patents. It's a reflection of their licensing programs and the value that other companies they turn to were willing to -- that they put on patents that were similar from the same Plaintiff.

10:54:08 THE COURT: I'm not familiar with the ATI case from 15 years ago, but whatever the relevance was there, I don't see it here. And I certainly think if they take the position at trial, and I'm about to find out if they will, but if they take the position at trial that they don't license their patents or that they have some policy that does not involve efforts to license their patents, then you can impeach that with the evidence you're talking about. But other than that, I think that it's unfairly prejudicial to try and point out to the jury that they failed to market unrelated patents.

10:55:02 MR. LIANG: Well, Your Honor, I mean, we'll hear from them, but I mean, their expert has taken the position in his report that they had no program.

10:55:10 He also -- there's a footnote here, and the footnote is actually to a conversation with their corporate representative, Mr. Rodriguez, where he cited Mr. Rodriguez as asserting there's no program. So both their corporate representative, their damages expert asserted, there's no program, and we'll hear from them whether that's something

10:55:29 they're not going to say at trial, I guess.

10:55:32 THE COURT: All right. Thank you, Mr. Liang.

10:55:42 Mr. Buczko, tell me why your expert took the 10:55:47 position in his report that the company had a policy of not 10:55:55 licensing their patents.

10:55:56 MR. BUCZKO: So, Your Honor, the text of Factor 4 10:56:00 is policy of not granting license or maintaining -- excuse 10:56:03 me -- monopoly of, quote, the invention. So it's tied to 10:56:09 the patent-in-suit. And there wasn't a policy of licensing 10:56:13 the patents-in-suit. So...

10:56:17 THE COURT: Was there a policy of not licensing 10:56:19 it?

10:56:20 MR. BUCZKO: There was not a policy of not 10:56:21 licensing, so there wasn't -- there wasn't a policy either 10:56:25 way. In that regard, there was -- the only licensing that 10:56:31 our client did was in -- like I explained in 2021, 2022, 10:56:36 enlisted a third-party, Global IP Group, to try to license 10:56:40 a particular portfolio where they put patents off to the 10:56:43 side.

10:56:45 Mr. Liang said that this shows that Cerence was 10:56:48 eager to license these patents. That's actually not true. 10:56:51 It shows that Cerence wanted to license those patents. It 10:56:56 didn't include these patents in that portfolio. It chose 10:56:59 not to do that. So that's what Mr. Bergman's point was, 10:57:03 was that it didn't have a program -- an established program

10:57:06 to license the invention.

10:57:08 THE COURT: Well, if Mr. Bergman goes forward with
10:57:10 that position at trial, I think that opens the door because
10:57:14 it's not very credible that they had a policy against
10:57:19 licensing these but they were happy to license all their
10:57:23 others.

10:57:23 MR. BUCZKO: Your Honor, I may have confused
10:57:26 things, and I may have misspoken.

10:57:28 Mr. Bergman will not say that there was a policy
10:57:31 to not license these patents. As I understood his opinion
10:57:38 and the testimony from the corporate representative is that
10:57:41 there just was no established policy one way or the other
10:57:43 with regard to the patents that are asserted in this case.

10:57:46 THE COURT: Well, I think that if he makes that
10:57:53 statement, it's certainly not unreasonable for the
10:57:58 Defendant to be able to point out to the jury that they
10:58:01 were trying to license a lot of other patents. And
10:58:06 certainly that is something that is fairly considered along
10:58:12 with whether they had a program or not to license the
10:58:18 asserted patents.

10:58:20 So I do think that if you offer that argument or
10:58:24 testimony, that'll open the door to the evidence that we're
10:58:29 talking about here. But if there is no such opening of the
10:58:36 door, then I think that it's appropriate to grant this
10:58:43 motion in limine to the extent that without seeking leave,

that the Defendants would not be permitted to offer evidence about the failure to successfully license unrelated patents.

Is there anything else that falls within the scope of this motion in limine?

MR. BUCZKO: Your Honor, that satisfies Plaintiff.

THE COURT: All right. Thank you.

Mr. Liang, if you want to be heard on that, I'll give you the last word on it.

MR. LIANG: No, I don't think we have any further comments on that.

THE COURT: All right.

MR. TSEI: Good morning, Your Honor. This is James Tsei for Plaintiff, Cerence.

Before I begin, may I have the Court's permission to pass out a set of -- a rather small set of limited slides?

THE COURT: Yes.

MR. TSEI: Thank you, Your Honor.

And may I approach the bench to hand up a copy, as well?

THE COURT: Yes.

MR. TSEI: Mr. Kolko, can we please put up the first page of the slide deck for the following MILs, 3, 4, and 5? Thank you.

11:00:32 Thank you, Your Honor.

11:00:40 So, again, my name is James Tsei. I'll be presenting Cerence's positions and arguments for Cerence's Motions in Limine Nos. 3, 4, and 5.

11:00:53 Mr. Kolko, can you please advance one slide? Thank you.

11:00:56 I'll try not to rehash the arguments which the parties have already skillfully briefed. And so I'd like to just make the following points.

11:01:07 The late-produced evidence that was produced by a party after the close of fact discovery, as well as evidence that was produced quite literally hours before the close of fact discovery, should be excluded from being presented to the jury in this case because their use and reliance on which would irreparably unfairly prejudice Cerence.

11:01:31 So I see the issues as being logically divided into three separate groups. The first group is the late production of usage metrics by both Samsung and Google, both at the literal last day of discovery, as well as weeks later at the close of expert discovery. Your Honor likely is aware that the facts relating to the production of the usage metrics in question has been fully briefed by the parties in the pending motions to exclude certain expert opinions of Samsung's experts.

For the record, the motions in question are Cerence's motions to exclude opinions of Samsung's survey expert, Dr. Joel Steckel, filed at Docket 139, as well as Cerence's motion to exclude opinions of Samsung's non-infringement expert filed at Docket 141.

So to summarize the issue, Your Honor, the relevant Google usage metrics were produced in the case quite late, at about 3:00 p.m. the day the fact discovery deadline was met. And so for that purpose alone, as Cerence explained in its papers, as well as the in limine filing, we just never had an opportunity to examine the relevant factual witnesses to investigate the bases for the Samsung expert's reliance on that late-produced evidence.

So, too, with the Samsung metrics, which were produced at the close of expert discovery.

Now, on the Samsung usage metrics, the excuse or lack thereof, is readily apparent, not only because Cerence specifically requested those use metrics much earlier in the case but also because the functionality that's at issue for those late-produced use metrics was accused and highlighted by name in the infringement contentions.

And today, I don't believe Cerence has seen an adequate justification or explanation from Samsung for why that data was produced so late. And so for the ordinary reasons of fairness, we believe that the exclusion of any

11:03:49 arguments or presentation of that evidence should be the proper outcome for trial.

THE COURT: And are both the Google and the Samsung metrics addressed in the pending motions you referred to?

MR. TSEI: They are, Your Honor.

THE COURT: All right.

MR. TSEI: The second issue that I see this motion in limine to cover is the evidence and interrogatory response that Samsung produced at the close of expert discovery relating to what we believe was a new undisclosed non-infringement argument regarding certain Samsung Galaxy A series models. This issue is also fully briefed in the parties' motions, as well.

To summarize the issue, Your Honor, essentially three days before Samsung served its non-infringement rebuttal expert report, it also served an amended interrogatory response to Cerence's pending -- or then pending contention interrogatory seeking non-infringement positions.

And in this interrogatory response, [redacted] And along with that unsupported assertion cited in the interrogatory

11:05:14 response various publicly available web pages, press releases, and reviews of Galaxy A models to apparently support the argument that was being presented in that interrogatory response.

For the reasons I believe the Court is also aware of through the papers, that was simply too late. And on this issue, as well, we don't believe there has been an adequate explanation or justification articulated by Samsung that would permit them to, in fact, present this evidence to the jury or make the argument to the jury.

And, finally, we believe a third category that's presented on this slide here is -- I don't want to say catch-all, but there are a number of other exhibits that we have seen on the Defendants' trial exhibit list which were also produced late in discovery or I believe after the close of fact discovery.

And I just want to focus on one example which we've referenced in the briefing here, which is DTX-148. It was formerly referred to as DTX-168, but it is, in fact, DTX-148.

So DTX-148, Your Honor, is a collection of what appear to be videos and photographs of a Samsung Galaxy S III device. The S III device is not an accused product in this case. I understand it was released in the year 2012 and that Samsung's reliance on the Galaxy S III

11:06:57 device in the case is limited to invalidity issues and
11:07:01 issues about non-infringing alternatives for which Samsung
11:07:07 had the burden of proof to establish with their opening
11:07:09 reports and also to produce relevant evidence prior to the
11:07:12 close of fact discovery.

11:07:13 So in plain English, Your Honor, we got these
11:07:20 photos and videos at the end of expert discovery which we
11:07:24 actually don't know exactly what they show. We can infer
11:07:28 that they document a physical device that Samsung's counsel
11:07:30 has in their possession, and you can sort of see, I guess,
11:07:34 the attorney operating the phone in some way.

11:07:39 So there are a couple of problems with allowing
11:07:42 them to basically pre-admit these videos and photographs
11:07:46 into evidence. First, we don't know exactly what the
11:07:49 device is, we've never seen it before, nor have we ever
11:07:52 been given the opportunity to inspect it.

11:07:54 THE COURT: Mr. Tsei, why isn't this something
11:07:57 we're going to take up in the exhibit hearing about
11:08:01 DTX-148?

11:08:01 MR. TSEI: I don't disagree with that, Your Honor.
11:08:04 DTX-148 is one of the buckets that have been listed for the
11:08:08 Court's consideration.

11:08:09 THE COURT: All right. Well, then I'll take that
11:08:11 up when we get to that.

11:08:12 Is there anything about the other two parts of

11:08:19 this MIL that you mentioned that is not contained in the two motions you referred to?

MR. TSEI: Well, Your Honor, I believe the catch-all Category 3 -- I'm sorry, Your Honor, to be directly responsive to Your Honor's question, I'd like to remind Your Honor that Category 3, which is the catch-all category, refers to other items that Defendants appear to intend to present at trial which were late-produced in the case.

THE COURT: I'm not going to grant a MIL to an undisclosed catch-all of exhibits. If those exhibits were, in your opinion, late-produced, we can take that up in connection with the effort to admit them.

What is there in that catch-all that wouldn't have to come up through the exhibit hearing?

MR. TSEI: I actually don't believe there are any such exhibits. The disputes I think that are currently ripe include, to our knowledge, all of the DTX -- DTX exhibits proposed by Samsung, which we believe were late-produced.

THE COURT: All right. Well, I think there may well be individual different issues with respect to different Defense exhibits in that catch-all bucket. So I'll -- I will reserve those for the exhibit hearing.

What I want to find out, then, is whether the

11:09:55 Defendants believe that there's anything on those first two issues you mentioned that is not adequately addressed in the briefs. And if that is the case, then I will defer Motion in Limine No. 3 to the consideration of those motions.

11:10:16 MR. TSEI: Thank you, Your Honor. I'll step down.

11:10:18 THE COURT: All right.

11:10:18 MR. TSEI: Mr. Kolko, you can take that down.

11:10:20 THE COURT: Thank you, Mr. Tsei.

11:10:22 MR. SNYDER: Thank you, Your Honor. Darin Snyder for the Samsung Defendants.

11:10:25 I believe the answer to your question is that the subject matter of -- of Categories 1 and 2, and to the extent I understand it, even Category 3, are addressed in the other pending motions or in the context of specific exhibits.

11:10:44 I do think it is fair to point out, though, that there is a difference between a limine motion that seeks to prohibit the use of certain exhibits and a Daubert motion that is restricting the use of expert -- or restricting certain expert testimony.

11:11:03 Expert testimony can be based on unadmitted evidence. It can even be based on inadmissible evidence under certain circumstances. And there can be exhibits that are admitted that are or are not the subject of expert

testimony.

The details of the usage data I believe are found in the -- detailed in the briefing related to Mr. Steckel -- the Daubert directed to Mr. Steckel and the accompanying supporting documents. I'd be happy to discuss them at whatever point the Court would like.

I do think it's particularly important in that context to recognize a difference between documents that are produced during discovery, even if it is on the last day that is within the discovery period, and documents that are discovered late, for which we did in the briefing identify very specific rationales, and the -- Mr. Tsei's Category No. 2 related to the disclosure of non-infringement arguments. I believe that is specifically addressed in the motion -- the Daubert motion related to Mr. Bress.

THE COURT: You know, there is a difference, but as far as production on the last day, in my mind, if the documents produced on the last day were documents that could have been produced much earlier and there's no good reason they weren't, then I'm not going to consider that producing them on the last day is compliance with discovery.

But I do understand that sometimes things don't become relevant until late in discovery, and maybe there

11:12:57 was no notice of the need to produce them, but it's
11:13:03 certainly not acceptable to hold relevant documents until
11:13:07 the last day when there's no good reason for it.

11:13:09 MR. SNYDER: This was -- I think, as the papers
11:13:12 made quite clear, Your Honor, this was not a situation
11:13:16 where either Defendant Samsung or third-party Google was
11:13:19 withholding information for tactical purposes. There is a
11:13:23 lengthy history involving both of them. It is different
11:13:27 because one was a party, and the usage information we're
11:13:30 referring to was originally appended to interrogatory
11:13:35 responses which were originally answered and then
11:13:37 supplemented multiple times during the discovery period.

11:13:41 And for the Google documents, there was a late
11:13:45 subpoena that was served by the Plaintiff, and then lengthy
11:13:49 negotiations, and it was not clear until very, very late
11:13:52 that this was even information that they were interested
11:13:55 in.

11:13:55 THE COURT: Well, all of those may well be
11:13:59 completely appropriate explanations for something happening
11:14:04 on the last day. I just don't think that there's anything
11:14:08 particularly magical about getting it in under the wire if
11:14:12 there's no reason that it came up that late.

11:14:16 But I understand your point, and obviously I'll
11:14:19 have to examine the briefing and the exhibits on those
11:14:25 motions. But I will carry this MIL, understanding that

11:14:31 I'll have to make sure that it -- the MIL is adequately
11:14:39 addressed by the ruling on those motions.
11:14:41 MR. SNYDER: Thank you, Your Honor.
11:14:42 THE COURT: All right. Thank you, Mr. Snyder.
11:14:45 Mr. Tsei, if you want to move on to the next one.
11:14:48 MR. TSEI: Yes, Your Honor. But I would ask the
11:14:50 Court's permission to just very briefly mention one final
11:14:54 thing with respect to Cerence's MIL No. 3.
11:14:57 THE COURT: All right. Go ahead.
11:15:00 MR. TSEI: So, Mr. Kolko, if you could please go
11:15:10 back to that same slide.
11:15:11 So very briefly, Your Honor, there is a
11:15:17 difference, of course, between the outcome of Cerence's
11:15:21 Daubert motion on Dr. Bress and Dr. Steckel and the outcome
11:15:26 on the MIL.
11:15:27 Now, if the MILs are granted, there's actually a
11:15:30 delta in terms of the effect of the relief that would be
11:15:34 obtained versus the granting of the Dauberts which would,
11:15:38 in our mind, just preclude the relevant experts from
11:15:41 making -- or providing the opinions at issue.
11:15:43 We want to also make sure that the relief granted
11:15:46 with respect to the MIL is sufficient to capture the --
11:15:50 what I earlier referred to as the delta possibility, which
11:15:53 is the prospect of a fact witness that Samsung or Google
11:15:57 may bring to trial to sponsor and discuss this

11:16:01 late-produced usage data.

11:16:05 THE COURT: I understand that, and I'll try to
11:16:07 keep in mind the pending or carried MIL No. 3 when
11:16:16 addressing these issues on the motions.

11:16:18 MR. TSEI: Thank you, Your Honor. And just when
11:16:20 Your Honor is reviewing the papers regarding the use
11:16:23 metrics, I would respectfully ask the Court to focus on the
11:16:27 representations made by counsel for Google and Samsung with
11:16:31 respect to the need or lack thereof of non-technical
11:16:37 discovery that is use metrics and other marketing
11:16:41 information.

11:16:42 So with that said, I believe I'm ready to proceed
11:16:45 to MIL No. 4.

11:16:47 THE COURT: All right.

11:16:48 MR. TSEI: So Mr. Kolko?

11:16:55 So MIL No. 4, Your Honor, concerns what we see as
11:16:59 a vastly overbroad designation of deposition testimony from
11:17:04 various non-expert fact lay witnesses where the questions
11:17:09 are framed in a way where we believe it elicits and invites
11:17:14 confusion by the jury, that is to what weight to assign to
11:17:20 that lay witness testimony.

11:17:21 And more specifically, it's these questions, many
11:17:26 of which we've excerpted and shown to the Court in the MIL
11:17:29 briefing which used patent-specific legalese language.

11:17:35 So, for example: Did you invent this claim

11:17:38 limitation prior to the priority date?

11:17:40 Was this limitation well known in the art prior to the priority date?

11:17:46 And in many egregious cases, Your Honor, Samsung's attorney just recited the claim language for an entire claim and asked the lay witness, quote, what does this mean, end quote?

11:17:59 And in other cases, Your Honor, Samsung's attorneys asked witnesses to explain and define claim terms which the Court has already previously construed.

11:18:10 And so the net effect of these hours of deposition designations, Your Honor, is to suggest to us, I think, an unfair attempt to introduce fact witness testimony in a way that would invite the jury to improperly make legal conclusions about things like what claim terms mean, what was known in the art, what was well known in the art, and so on.

11:18:36 And so I think under the standard rule here, which is under Federal Rule of Evidence 701, that sort of opinion testimony should not be permitted, and given that Samsung has evidence and intent to, in our view, violate that rule, the MIL should be granted.

11:18:56 So Samsung, of course, makes several arguments in their opposition to this MIL which I'll briefly address.

11:19:03 So first, Samsung says lay witnesses can talk

about their percipient experience, which is completely true. We don't disagree.

So, for example, if Samsung found a piece of the deposition transcript where they asked the witness to explain what they provided to Samsung in 2012 with respect to the S-Voice Voice Assistant technology, we see that to be probably okay, but it's the way that the questions are framed which invite the improper confusion and generate the unfair prejudice.

THE COURT: So how can I grant a MIL that's based on the way a question is framed?

MR. TSEI: Well, Your Honor, to the extent that we believe designations were framed in such a way that invited the unfair prejudice, we have preserved the objections in the deposition designation spreadsheets with the objection 701 and improper legal conclusion.

Now, I know that Samsung said in their opposition that the MIL was overbroad and unspecific, but the population of depo designations here is specific, and we can, of course, provide that by just pointing to the hours of deposition testimony in the depo designation Excel spreadsheets for which we have lodged those objections.

Samsung also argues we should just let the trial court during trial take up the dispute here, but we don't see that as, I guess, an efficient application of the

11:20:38 Court's judicial resources where there is, in fact, this
11:20:41 overriding issue for which if there is guidance from the
11:20:44 Court, would resolve, in our view, the vast majority of the
11:20:49 depo designations here across the hours of testimony.

11:20:51 THE COURT: What is the overriding issue?

11:20:53 MR. TSEI: Well, the overriding issue is the
11:20:57 questions posed by Samsung attorneys during the depositions
11:21:01 where they are very clearly questions which call for legal
11:21:06 conclusions, as well as questions which plainly invite
11:21:10 testimony which could generate a contradiction with the
11:21:13 Court's prior rulings, such as the Court's claim
11:21:17 constructions.

11:21:17 THE COURT: You know, that sounds like you're
11:21:20 asking that I grant a MIL that says the rules of evidence
11:21:23 will be observed.

11:21:25 MR. TSEI: Not quite, Your Honor. I think that
11:21:30 there is, I guess, a penumbra of potential outcomes here.
11:21:34 Samsung, I expect, will argue, of course, that the
11:21:37 questions are permissible and not in violation of the rules
11:21:41 of evidence. And so, you know, our ask to you, Your Honor,
11:21:45 is take a look at the exemplary questions that Samsung's
11:21:49 witnesses posed and inform the parties that these questions
11:21:53 are just not permitted under the rules of evidence, which I
11:21:56 think would, in fact, just resolve the entire dispute.

11:22:04 THE COURT: Well, do you have this exemplary

question that you want to put before the Court?

MR. TSEI: Yes, Your Honor.

So if I could get the document camera, please.

So, Your Honor, across Pages 9 through 11 of Cerence's motions in limine briefing, we've excerpted various examples of such questions. A particularly egregious example, Your Honor, is shown in the first full paragraph on Page 11, which is a question posed to, I believe, a fact witness where the attorney recited an entire claim limitation and asked the witness: Explain what this means.

Another example of such improper questioning, in our view -- well, examples of such improper questions we've also provided in bullet point form on Pages 9 and 10, an example of which would be, for example, what I'm showing to the Court on the document camera where Samsung's attorney said: This particular concept, including using a claim term -- alluding to a claim term requiring server communication was, quote, well known by 2013 -- that is, by the critical date of the asserted patents.

And so these are just two examples of such questions we believe are common across hours of deposition -- deposition designations.

And, you know, Your Honor also made the point that I don't believe Samsung denies or disputes that the hours

11:24:08 of deposition designations we've identified and objected to in the appropriate Excel spreadsheet do, in fact, follow this format, and so if there is agreement on the parties on that issue, I believe the issue is ripe for the Court to resolve.

11:24:30 THE COURT: All right. Thank you, Mr. Tsei.

11:24:37 MR. REIDY: Good morning, Your Honor. Patrick Reidy for the Samsung Defendants, and I'll be addressing Cerence's disputed MIL No. 4.

11:24:57 Your Honor, as we explained in the briefing and as I think you were pointing out in your questions to Mr. Tsei, it's very difficult to understand the scope of Cerence's MIL 4. We understand that they've excerpted some exemplary deposition testimony in their MIL, but their request appears to cover some vague amount of Samsung's deposition designations that we believe would be much better resolved in the context of specific designations.

11:25:39 I think --

11:25:43 THE COURT: Mr. Reidy, I'm going to interrupt you to say that I don't believe that these issues can be resolved on a motion in limine. And, frankly, not knowing what the full context of the deposition designations are makes it very difficult to evaluate one question in isolation. And I'm not going to attempt to address multiple questions through a motion in limine.

So I am going to deny Motion in Limine No. 4 without prejudice to reurging these issues in connection with the objections to the deposition designations in the ordinary course.

MR. REIDY: Thank you, Your Honor.

THE COURT: Thank you, Mr. Reidy.

Mr. Tsei, you can go on to your MIL No. 5.

MR. TSEI: Yes, sir.

Mr. Kolko, please turn to the slide regarding MIL No. 5. Thank you, Mr. Kolko.

So, Your Honor, the issue I think here has been further narrowed in view of the parties' briefing. I believe the parties are, at least in principle, in agreement that one side should not be able to criticize the expert of the other side for not responding to rebuttal opinions to which that expert had no right to respond under the Court's docket control order.

So at least to that extent we believe that the MIL should be granted, if only to hold Samsung to its representation that it does not intend to make any such improper arguments during the trial presentation and cross-examination of Cerence's experts.

So Your Honor may also recall that Samsung asks for, I guess, a -- you know, what I would call a carve-out from this MIL in its opposition. It says it wants to be

11:28:01 able to ask the relevant Cerence expert here, Dr. Nikil
11:28:09 Jayant, whether he reviewed or -- whether he reviewed any
11:28:12 specific source code files or performed any, quote,
11:28:15 unquote, testing with respect to the accused products. And
11:28:21 we don't necessarily disagree that Samsung is permitted to
11:28:23 do that. It's just that the way that they have indicated
11:28:27 an intent to make that argument, for example, in their
11:28:30 papers regarding the summary judgment for non-infringement
11:28:34 motion, that -- in the way that they made it suggests they
11:28:37 have an improper intent to make the improper argument.
11:28:41 And so with that clarification, Your Honor, we
11:28:44 believe the MIL should be granted.
11:28:46 THE COURT: All right. All you're seeking in this
11:28:48 MIL would be an order that the questions not imply that the
11:28:57 expert had an opportunity to provide a response when the
11:29:03 expert did not?
11:29:05 MR. TSEI: That's right, Your Honor.
11:29:06 In addition, though, however, we would also, you
11:29:12 know, want the Court's relief here to encompass an
11:29:17 instruction against Samsung from implying or suggesting
11:29:20 that Cerence's experts had an obligation to respond to the
11:29:25 rebuttal opinions, not just an opportunity to do so.
11:29:32 THE COURT: All right. Thank you, Mr. Tsei.
11:29:34 MR. REIDY: Thank you, Your Honor. Patrick Reidy
11:29:53 again.

11:29:53 So I think we are largely in agreement with Mr. Tsei and Cerence on MIL 5, that is, we can agree not to argue or suggest that Dr. Jayant should have prepared reply opinions.

11:30:14 But as stated in our opposition to Cerence's MIL 5, we do believe that Samsung should be permitted to cross-examine Dr. Jayant about his failure to conduct similar testing and review the same source code files that Samsung printed as part of preparing its opening report and opinions on infringement.

11:30:34 So I'm not sure -- Your Honor, I'm happy to answer any other questions that you may have about our intent, but I think the parties are generally in agreement here.

11:30:44 THE COURT: So it sounds like there is no argument against an order that neither side suggest or argue that an expert failed to submit some further reply that our rules do not permit.

11:31:05 MR. REIDY: That is correct, Your Honor.

11:31:06 THE COURT: All right. Well, I will grant it -- MIL No. 5 to that extent.

11:31:14 Thank you, Mr. Reidy.

11:31:26 That takes us to the Defendants' motions in limine.

11:31:36 MR. WOLF: Thank you, Your Honor. Matt Wolf, talking about Samsung's MIL No. 1.

Your Honor, there are three independent reasons why Cerence's copying narrative should not be allowed in this case. [redacted]. In other words, two pieces of evidence entirely within Cerence's control and knowledge.

So let's get to the first reason why they should not be permitted to make a copying case, and that is starkly similar to what we just heard from counsel was a basis for a MIL when we got to No. 3, which is they didn't tell us about their copying claim in discovery, not on the last day, not the day before, not the day after the close of discovery.

Here's their interrogatory answer back in March: Detail all bases, on a claim-by-claim basis for each of the asserted claims, for all secondary considerations/objective indicia of non-obviousness.

Copying. This is what they said: There has been potential and actual copying of the claimed inventions. Cerence incorporates by reference its contentions above pertaining to commercial success and long-felt need and failure by others.

The only other sentence that is not on the slide

is: We will supplement as discovery proceeds.

There's no mention of a document. There's no mention of Glen Wilson, their inventor. There's no mention of any fact of any kind whatsoever, just a statement to look elsewhere, which we'll do in a second, and a promise to supplement, a supplementation which never occurred.

So let's go ahead and look at commercial success and long-felt need.

Your Honor, this is the briefing, so I won't take our time now, but there's no mention in the commercial success section of any copying allegations or any facts supporting such allegations.

Turning to the long-felt need, the second of the cross-references. This is interesting for two reasons. One, because, again, there is no mention of any copying or any facts underlying a copying claim.

But, second, we see multiple references to documents supporting their long-felt need contention. So Cerence full well knew how to put facts in response to an interrogatory answer.

In a bit of a Lizzie Borden defense, they said we should have moved to compel the lack of an answer on copying. But when they say we'll supplement with any evidence we have and no supplementation is forthcoming, I'm not sure what our motion to compel should have said. Do

11:34:55 you really mean that you have nothing else? Can you
11:34:57 confirm you have nothing else?

11:35:00 They told us they'd tell us if they had evidence
11:35:03 in support of their copying claim, and they never came
11:35:06 forward with such evidence, despite the fact in that very
11:35:10 same interrogatory answer showing they full well knew how
11:35:13 to tell us when they had evidence purportedly in support of
11:35:17 one of their claims.

11:35:19 And, Your Honor, this doesn't just call to mind
11:35:22 MIL No. 3. This also calls to mind the discussion we just
11:35:26 had of reply. The fact that they never told us any
11:35:30 evidence they had in support of copying, any document, any
11:35:34 witness, any deposition testimony had real-world prejudice,
11:35:38 not least of which is the way this court, as many do,
11:35:42 structures expert reports. We don't have an opportunity to
11:35:47 respond to the reply brief when Dr. Jayant first referenced
11:35:53 their first purported copying claim. We didn't have a
11:35:57 report to respond to. We didn't have the right to respond
11:35:59 to the first time they raised this.

11:36:01 Had they put the reference to the 2012 agreement,
11:36:05 had they put the reference to Mr. Wilson's views, well,
11:36:09 then we could have put that in our opening invalidity
11:36:12 expert report.

11:36:12 THE COURT: Mr. Wolf, I understand this argument.

11:36:16 Are there other arguments in MIL 1? If not, I'm

11:36:21 ready to hear from the Plaintiff on MIL 1.

11:36:26 MR. WOLF: Your Honor, very briefly, and I don't
11:36:29 want to belabor this, but I want to talk about the nexus
11:36:34 issue because this is an unusual case where they have, in
11:36:39 trying to bolster their damages, undercut whatever claim
11:36:43 they might have to nexus. And here's what I'm talking
11:36:48 about, and then I'll sit down after this.

11:36:49 We see here in response to the purported copying,
11:36:59 for example, Cerence's 6302 shows the following. This is
11:37:04 Dr. Jayant's reply evidence of what supposedly shows
11:37:08 copying. The problem is elsewhere in his report, he told
11:37:11 us that that exact document -- we see highlighted at the
11:37:15 top, Cerence 6302. Let's go to the bottom. [redacted]
11:37:20
11:37:22
11:37:27
11:37:30 .

11:37:31 So Dr. Jayant points to one document that says
11:37:34 supports copying, but in the same report says that that
11:37:39 document proves, in his mind, that what was supposedly
11:37:43 copied lacks the functionality and benefits of the
11:37:47 patents-in-suit.

11:37:48 So not only do they not put forward a nexus claim,
11:37:51 they actually affirmatively argue against a nexus. They
11:37:55 affirmatively state there is no nexus. That's

11:37:59 extraordinary, Your Honor. We looked for case law in this court and elsewhere where a Plaintiff affirmatively said this thing that supposedly evidences copying actually has nothing to do with the patents-in-suit. We couldn't even find that case. Not a surprise, Your Honor, because that's an extraordinary fact unique to these circumstances.

So I know that some courts are loathe to strike copying allegations on lack of nexus grounds, but here, we have the affirmative admission of no nexus.

With that, Your Honor, I will sit down and let counsel speak.

THE COURT: All right.

MR. WOLF: Thank you.

THE COURT: Thank you, Mr. Wolf.

MR. WANG: Thank you, Your Honor.

So my name is Ben Yang. I'll handle the argument in response to Samsung's MIL 1.

So, Your Honor, let's see -- sorry, I'm having some difficulty.

Okay. Your Honor, so maybe you'll ask me to do it in reverse based on what I heard, but the MIL should be denied because, first, we have -- our understanding of the law on copying is that it may be shown through circumstantial evidence. That would include access in combination with similarity, it would include copying as to

potential predecessor products, and if that copying and those predecessor products include key patented features.

So our understanding of the copying law is maybe a little bit broader than what the Defendant is proposing, but I'll walk you through the cases that support our position in this MIL.

THE COURT: Well, first tell me do you dispute that during discovery, you did not give notice of any evidence of copying?

MR. WANG: So, Your Honor, I do dispute that, and so what Mr. Wolf showed the Court was just a snippet of the response to Interrogatory No. 9, just the one that had the copying heading on it. And that's what he showed.

What he didn't show was what was above that, which was a general interrogatory response to any secondary considerations of obviousness or non-obviousness. And in that more general objection to that specific topic, there's more explanation.

Now, the explanation doesn't refer to Mr. Wilson's testimony because at that time, Mr. Wilson's deposition had not been taken. But it nevertheless incorporated any fact witness testimony that would occur later that goes to this issue, and it refers to such events potentially happening.

Now, Mr. Wilson's testimony happened in March, Your Honor.

11:41:23 THE COURT: All right. Mr. Wang, the question is just a basic one. Do you dispute that during discovery you did not disclose any evidence of copying?

11:41:34 MR. WANG: It's not expressly referenced in the interrogatory response, Your Honor.

11:41:42 THE COURT: Is it implicitly -- I mean --

11:41:46 MR. WANG: It is in the sense that Cerence says that this is an issue that -- for which the Defendants bear the burden and that --

11:41:57 THE COURT: How is copying an issue with respect to which they bear the burden?

11:42:01 MR. WANG: In the sense that this is -- this is in response to an argument that the patents are invalid, Your Honor.

11:42:08 And so when they put forth that argument in their invalidity opening report and they argue that maybe there are secondary considerations that show that it is obvious as opposed to non-obvious, then we may respond to that.

11:42:23 And so in our interrogatory response, we said this overarching issue of invalidity is of course theirs. But to the extent that there's any discovery from party witnesses or third parties, including document production and depositions, that should be incorporated into the interrogatory response.

11:42:45 And so we provided that response in February 28th,

11:42:51 2025, Your Honor. Mr. Wilson was then deposed in March.
11:42:54 And when they deposed him, they asked him these direct
11:42:57 questions. So it's not like they didn't know that this
11:43:00 testimony existed. [redacted]
11:43:15 And that's the testimony that I show
11:43:17 on this slide -- on Slide 5, Your Honor.
11:43:19 So this was --
11:43:21 THE COURT: Wilson is your witness?
11:43:22 MR. WANG: Yes, he's our witness, Your Honor.
11:43:25 He's an inventor on the patents-in-suit. He was an
11:43:28 engineer at both of the two predecessor entities.
11:43:31 THE COURT: So why do you need his deposition by
11:43:33 the Defendant to know whether he has evidence of copying?
11:43:38 MR. WANG: Your Honor, it didn't come into the
11:43:44 record and didn't become known to either of the parties
11:43:46 until they took the deposition of Mr. Wilson and they asked
11:43:49 him about copying.
11:43:50 THE COURT: You never asked your own witness about
11:43:52 copying?
11:43:53 MR. WANG: Your Honor, I don't recall that we did,
11:43:59 and I didn't know that this testimony was something that
11:44:03 was going to come out. And so what I show on the slide is
11:44:09 what he -- what he -- the information that he responded to

11:44:11 and provided at that deposition. [redacted].

11:44:33 Now, there's no dispute that that happened, but it does also become relevant to copying. ASR is automatic speech recognition, and NLU is natural language understanding. So ASR is just converting the speech to text, and NLU is then trying to figure out, well, what was meant by that.

11:44:50 [redacted].

11:45:03 [redacted].

11:45:14 Now, this last highlighted testimony was really kind of what came out in Wilson's deposition that goes directly to copying which is he said that Samsung eventually reproduced our ASR engines and our NLU engines.

11:45:28 THE COURT: [redacted]?

11:45:39 MR. WANG: So his -- his evidence is not direct, Your Honor. It's circumstantial. [redacted]. We've done it on our own. And they've -- and I show on the slide: [redacted].

11:46:20 THE COURT: You know, Mr. Wang, I know if the shoe was on the other foot, if Samsung engineers revealed something harmful to your case only when you were taking their deposition after the close of discovery, you would object to the use of that testimony. And I'm struggling to see this as being any different from that.

11:46:39 MR. WANG: Your Honor, I don't think I would argue that I -- well, if it happened after fact discovery, of course, Your Honor. If this testimony came from the Samsung engineer during fact discovery, I wouldn't argue that I lacked notice of it.

11:46:55 THE COURT: I understood that this happened after fact discovery.

11:46:58 MR. WANG: No, no, Your Honor. I'm sorry about that if I suggested this.

What I was trying to say is that the Wilson deposition occurred after our interrogatory response but still within the fact discovery period, Your Honor. And these were questions that -- that counsel elicited from Mr. Wilson directly on copying, especially that last bullet point, Your Honor.

So certainly if there was a Samsung witness that testified and gave us bad facts and that was during the fact discovery period, I wouldn't argue that that's not allowed to come in, Your Honor, because we had fair notice of it, just as they did with Mr. Wilson.

THE COURT: All right. So the objection, then, is that you didn't amend your interrogatory answer and refer to this specifically regarding copying?

MR. WANG: It seems that way, Your Honor.

And, you know, sometimes you do see parties, you know, closer to the end of fact discovery after the depositions have been taken do that sort of pro forma supplementation to say see deposition transcripts of the witnesses that have been taken. And we didn't do that in this case, Your Honor, but I would say that that's -- that's really kind of putting form over the substance of what happened, Your Honor.

They were aware of the Wilson testimony on an overall issue for which they bore the burden, and they

11:48:27 asked these questions about copying, and Mr. Wilson gave
11:48:31 them what he believed to be true.
11:48:34 THE COURT: Is there other evidence that you
11:48:38 intend to offer regarding copying beyond the testimony of
11:48:42 Mr. Wilson?
11:48:42 MR. WANG: Well, Your Honor, so there is. So
11:48:46 there's -- so if you look at the title, so we're referring
11:48:50 to percipient testimony. That really is Mr. Wilson's
11:48:53 testimony. The expert testimony is the testimony from our
11:48:56 expert, Dr. Jayant. [redacted]
11:49:00 [redacted]
11:49:05 [redacted]
11:49:09 [redacted] And then simply the fact that the accused
11:49:13 system, Bixby, does have many of the similarities to key
11:49:19 features that are in the asserted patents.
11:49:20 And so what I show on Slide 5 is just a summary of
11:49:24 what Dr. Jayant had in his -- in his rebuttal report, and
11:49:30 he's identifying this key technology that Samsung had in
11:49:34 the S-Voice product.
11:49:35 [redacted]
11:49:39 [redacted]
11:49:42 [redacted]
11:49:46 [redacted]
11:49:52 [redacted].
11:49:54 Now, this is the 2012 agreement that I was

11:49:57 referring to. And so on the left are some of those
11:50:03 agreements that have relevance to copying, and then on the
11:50:07 right, [redacted].
11:50:39 And, you know, those are key features of what later appear
11:50:42 in the patents, Your Honor.
11:50:43 So all of this is circumstantial evidence that
11:50:46 would support a claim of copying, Your Honor.
11:50:51 THE COURT: All of this is before the priority
11:50:54 date of the asserted patents, huh?
11:50:57 MR. WANG: That's right, Your Honor. And so
11:50:59 that's where this -- this case I think is really helpful,
11:51:03 Your Honor, the Anthrex case from this Court.
11:51:06 Sometimes you'll hear parties say, well, you can't
11:51:09 have that copying evidence because what you says -- what
11:51:12 you say is being copied is not an actual product that
11:51:15 embodies the patent, this one-for-one sort of requirement.
11:51:19 But it's actually -- there's actually more wiggle
11:51:22 room there, Your Honor. You can have a product that is --

that has been accessed by the Defendant and from which they have copied. And even if that product isn't an embodiment, it may be a predecessor, it can still be relevant to copying if it has key patent features that later do appear in that patent.

And the Court found this satisfies the minimum threshold to support the opinion concerning copying, of course, recognizing that that's a circumstantial inference, which is still fair game.

[redacted] So that's -- that should be fair game to at least establish a claim of copying.

[redacted].

THE COURT: Are the various items that Dr. Jayant refers to in his report as evidence of copying, are those things that you disclosed during discovery?

MR. WANG: [redacted] and

11:53:05 [redacted].

11:53:11 And then the only additional thing would be the
11:53:13 Wilson testimony, Your Honor. Dr. Jayant collects that --
11:53:16 that body of evidence and reaches his conclusions that,
11:53:20 yes, they had access; yes, what they had access to, some of
11:53:26 it is -- has the key features that later appear in the
11:53:29 patent, Your Honor.

11:53:33 THE COURT: All right.

11:53:35 MR. WOLF: Your Honor, may I?

11:53:36 THE COURT: Yes, you may.

11:53:37 MR. WOLF: Your Honor, I want to start with
11:53:51 Mr. Wilson, and I bristle a little bit at the notion that
11:53:56 counsel said, form over substance. We asked him to tell us
11:54:00 what your evidence of copying was, and he pointed to some
11:54:02 oblique testimony that [redacted]

11:54:09 We asked, in that same deposition, Mr. Wilson
11:54:11 directly about copying. We were being very careful: [redacted]?

11:54:21 [redacted]

[redacted]?

Answer: Not to my knowledge.

There is no fair reading of that testimony that suggests we were put on notice that Mr. Wilson was going to be a centerpiece of their copying story. They didn't supplement their interrogatories for sure. They also didn't tell us in any other form before the close of discovery or before our expert had to put in his report on secondary considerations like copying.

So that's Mr. Wilson. That's the first pillar of their copying story.

The second pillar, at the risk of being redundant, [redacted]. You just have to show key features. But I'm going to remind your Court -- the Court about what Dr. Jayant said about that very document.

At the bottom: [redacted].

So, Your Honor, whatever wiggle room from Arthrex

that counsel wish to avail themselves of isn't here. But more importantly, [redacted].

So getting back to the simple question, how were we put on notice by Cerence of what their copying claim was such that we could put in expert reports on it, such that we could talk to folks, such that we could notice depositions, if necessary? How were we put on notice of that? The answer is we weren't. We were told nothing.

And any fair reading of the record would suggest that Mr. Wilson told us there was nothing to see here and Dr. Jayant himself told us there was nothing to see here until our ability to take discovery or say things when expert reports had closed, and then they could create this narrative, this circumstantial narrative, this eight-step back bank shot on a pool table and say we should have known that was their argument.

Thank you, Your Honor.

THE COURT: All right. And, Mr. Wolf --

MR. WOLF: Yes, sir.

THE COURT: -- are all the arguments that you're

11:57:21 raising here also asserted in a motion directed to
11:57:28 Dr. Jayant's report?
11:57:30 MR. WOLF: There is substantial overlap, but
11:57:32 they're not coextensive.
11:57:34 So, for example, Your Honor, what we don't want
11:57:37 them to do is get up in opening and say, we're going to
11:57:40 prove to you there was copying, and then try to do it
11:57:43 through a fact witness that they didn't disclose. So there
11:57:46 is no doubt, Your Honor, overlap. And if Your Honor wanted
11:57:49 to address kind of the whole bundle of issues in response
11:57:52 to that, that would be perhaps an efficient way to do it,
11:57:57 but simply deciding whether Jayant could say it or not does
11:58:01 not resolve whether counsel could say it in opening based
11:58:04 on fact witnesses or just based on pointing at a document
11:58:07 and supposing things.
11:58:09 Does that answer your question, Your Honor?
11:58:11 THE COURT: Yes, it does, Mr. Wolf.
11:58:13 MR. WOLF: Thank you.
11:58:15 MR. WANG: Your Honor, may I respond to just a few
11:58:16 of those points?
11:58:17 THE COURT: You may.
11:58:26 MR. WANG: Thank you.
11:58:27 So what I really want to address, Your Honor, is
11:58:29 how they're characterizing Dr. Jayant's report and his
11:58:33 opinions in that report and then, secondly, their argument

11:58:36 that we didn't fairly disclose some of this copying evidence.

11:58:39 Now, you already know our position on Mr. Wilson's deposition that happened after but still within the fact discovery period, Your Honor, but I want to take you to the actual interrogatory response -- interrogatory responses.

11:59:00 So may we switch to the camera here? Thank you.

11:59:02 Okay. So this is -- what I'm showing here is Document 197-6. It is the relevant interrogatory responses.

11:59:12 Now, they asked in Interrogatory 11 about our sort of what evidence do we have to support our damages case, okay? And you'll see why this is relevant. In our response to Interrogatory No. 11, we specifically called out Cerence Bates Stamp 6302. [redacted]. Now --

11:59:35 THE COURT: I thought it was Interrogatory 9 --

11:59:37 MR. WANG: Exactly. Exactly, Your Honor. So in Interrogatory 11, we called out the [redacted] that is relevant to copying.

11:59:45 Then in Interrogatory 9, about the secondary considerations, we incorporate by reference our response to Interrogatory 11, the financial interrogatory. And so let me get back to that.

12:00:01 So this is on Page 24. This is part of

12:00:07 Interrogatory 9. Additional evidence of the commercial success of the claimed inventions can be found in each of the Defendants' financial document production and/or Defendants' responses to Cerence's financial interrogatories, including all produced documents cited thereto.

12:00:23 And then when we get to copying, we refer back to the commercial success part of secondary considerations, Your Honor.

12:00:33 So they did know about the [redacted]. And, of course, they did, Your Honor, because of the whole [redacted].

12:00:44 Then about their issues with Dr. Jayant, they keep saying that he somehow totally contradicted this argument that some of these key features were copied by Samsung. And they point to -- okay. So, good, it's on the screen. And they keep pointing to Paragraph 17 -- 1718 and 1719 where he talks about [redacted] technology. He's talking about a different feature from what was being provided by Samsung.

12:01:15 [redacted]

12:01:27 And then when you look at Paragraph 1717 and 1718,
12:01:30 those are the paragraphs where Dr. Jayant talks about these
12:01:34 agreements, you won't see anywhere in there where he
12:01:36 actually says this is not technically comparable because
12:01:40 that's not his opinion. It would be really sort of
12:01:44 irresponsible for Dr. Jayant to say an agreement about a
12:01:50 predecessor to the patents-in-suit aren't technically
12:01:53 comparable. He just wouldn't do that.

12:01:56 But when he does find something not technically
12:01:59 comparable, he just says it expressly, Your Honor, and you
12:02:02 can see that in 1719, which is a different agreement, Your
12:02:05 Honor. I just point that out as an example.

12:02:07 [redacted]
12:02:12 [redacted]. [redacted]
12:02:16 [redacted] [redacted]
12:02:21 [redacted] That's fine. [redacted]
12:02:24 [redacted] And that's
12:02:24 the key -- those are the key features that go to copying in
12:02:27 this case, Your Honor.

12:02:27 So they're just incorrect when they say that
12:02:33 Dr. Jayant somehow was totally inconsistent with this.

12:02:35 THE COURT: Well, I'm going to carry Defendants'
12:02:40 Motion in Limine No. 1 to consider in connection with
12:02:44 Dr. Jayant's testimony. I do think that copying is an
12:02:48 important issue, and I want to make sure that I have an

opportunity to examine thoroughly what both sides are presenting on that. And I will make sure that the ruling on Dr. Jayant's motion goes beyond just his opinions and addresses the issue of copying entirely.

MR. WOLF: Thank you, Your Honor.

THE COURT: All right. And we're going to recess now until 1:15. We'll come back and continue at that time.

MR. WOLF: Your Honor, may I ask, my colleague will be doing the motion to compel argument for the Cerence 2 matter. Should I tell him a different time to come back for that?

THE COURT: Unless he wants to wait, we'll get to that when we finish this. I also have one other motion in a different case to take up somewhere in the middle of the afternoon.

MR. WOLF: I'll tell him to be here at 1:30.

THE COURT: Okay.

MR. WOLF: Thank you, Your Honor.

THE COURT: All right.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Good afternoon. Please be seated.

All right. Mr. Liang, I think I cut you off when we recessed. So I'll give you a chance.

01:15:17 MR. LIANG: All right. Your Honor, Mark Liang on
01:15:41 behalf of the Samsung Defendants speaking on Samsung's MIL,
01:15:47 disputed MIL No. 2.
01:15:48 Your Honor, based on the briefing -- Cerence's
01:15:55 opposition, I think the parties -- I read it we're actually
01:15:59 in agreement that we're not going to refer to any
01:16:01 [redacted]
01:16:04
01:16:06
01:16:09
01:16:10 So, you know, I think this is something that --
01:16:14 citing the Headwater case that Cerence admitted -- this is
01:16:16 on the slide. But they also asked for -- to follow the
01:16:20 Headwater example in the sense that the Court should give
01:16:22 [redacted]
01:16:25
01:16:29
01:16:31
01:16:32
01:16:35
01:16:39 case is distinguishable, and the instruction was given in
01:16:43 that case, because there was a feature called Firebase
01:16:48 Cloud Messaging service, FCM in that case. And opposing
01:16:52 counsel actually know more about that than I do. [redacted]
01:16:55

01:16:59 [redacted]

01:17:56 So if you have another way that it can be done short of an instruction from the Court, there is no problem with that. [redacted]

01:18:24 So if you have another way that that can be accomplished in this case, tell me about it.

01:18:31 MR. LIANG: All right. So if the Court -- in our briefing we mentioned the Hardin/Hill example as another way this has been handled by Judge Gilstrap a couple of

years ago. [redacted]

01:19:58 [redacted]
01:20:00
01:20:02 about that same feature at trial.
01:20:05 THE COURT: Well, so your answer is you're not
01:20:08 sure?
01:20:09 MR. LIANG: I'm saying he has enough information
01:20:11 [redacted]
01:20:14
01:20:17
01:20:21
01:20:23
01:20:26 ?
01:20:28 MR. LIANG: I can't recall immediately. But it
01:20:33 was -- the whole deposition -- this whole case has been
01:20:38 [redacted]
01:20:39
01:20:42
01:20:46
01:20:52
01:20:56
01:21:05 And if you're satisfied
01:21:09 that that will occur during his testimony, then that would
01:21:16 be sufficient. But if that does not happen, then that
01:21:20 would open the door to the Plaintiff to bring that out.
01:21:29 And so that's why I'm asking a pointed question.

01:21:32 [redacted]
01:21:41 [redacted]
01:21:44 the possibility is you're asking whether we can prepare the
01:21:47 witness to address these issues?
01:21:50 THE COURT: I am not going to get into --
01:21:53 MR. LIANG: Okay.
01:21:54 THE COURT: -- how you accomplish that. I'm just
01:21:56 going to say that if you produce a witness who's not able
01:21:59 [redacted]
01:22:20 [redacted]
01:22:41 THE COURT: I think that may be true, and so I
01:22:43 [redacted]
01:22:50 [redacted]
01:22:53 [redacted] that's
01:22:56 shown on this slide.

01:22:59 THE COURT: Any way you accomplish it.

01:23:01 MR. LIANG: All right.

01:23:04 THE COURT: Mr. Tsei, if you want to respond to 01:23:06 that, go ahead.

01:23:08 MR. TSEI: Yes, Your Honor. Thank you.

01:23:09 Your Honor, I take it Your Honor's suggesting to 01:23:20 counsel for Google and Samsung that they find some other 01:23:23 way other than the Court having to give the instruction 01:23:26 prior to the witness testimony. I take the point and 01:23:28 understand it. That was a possibility that was kicked 01:23:31 around in the previous case, as well.

01:23:33 My main concern here on Cerence's behalf is if the 01:23:36 witness is not prepared to confirm the details of the 01:23:40 [redacted]. 01:23:49 I believe that was also the Court's concern in the previous 01:23:52 Headwater 103 case, which is why it worded the instruction 01:23:56 the way that it did.

01:23:57 Now, I unfortunately cannot predict what they will 01:24:01 [redacted] I think we would agree that that 01:24:16 would address the Court's concern that, you know, was at

issue in the Headwater 103 case.

[redacted]

THE COURT: Well, Mr. Tsei, the way this ruling is going to go is that this MIL will be granted on the condition that the jury is informed of that. And if at the end of the direct examination you believe the jury has not been so informed, then you should approach and seek leave, and Judge Gilstrap will guide you from there.

MR. TSEI: Excuse me, Your Honor. I'm not quite sure what the suggestion from Your Honor is, [redacted]

THE COURT: Just like I'm not going to tell Samsung how to prepare its witnesses, I'm not going to tell you how to make your motions. But if you believe that this condition on this order has not been fulfilled, then you should seek leave.

MR. TSEI: Okay. I think I understand.

Can I ask a clarifying question then, Your Honor?

THE COURT: All right.

[redacted]

THE COURT: Only if you value your law license.

MR. TSEI: Okay. Understood.

THE COURT: Okay.

[redacted]

THE COURT: I heard that.

MR. TSEI: -- can we point that out?

THE COURT: I understand that. But in any event, my ruling will be the same on this.

MR. TSEI: Thank you, Your Honor.

THE COURT: Thank you.

MR. WANG: Your Honor, can I ask a question about -- in the past cases where this has been an issue, the instruction was given right before the witness took the stand. And so I presume if the instruction isn't given, that they will try to elicit that testimony right out of the gate? You know, I wouldn't want them to do it, like, in the middle when everyone is about to fall to asleep or go to lunch. You know, it should be upfront is what I'm wondering about.

THE COURT: I think as long as the jury is informed of that, that's the concern that the Court has,

[redacted]

[redacted]

But I understand that's not the case here. If counsel determine that they have no other way to do it, I trust they will raise that issue with the Court in advance. But the important thing is that the jury have that information, not the manner in which the information is given.

MR. WANG: I understand, Your Honor. You know, I'm not -- [redacted]

THE COURT: That's something that if that's a concern you have, you should raise that with Defense counsel and see, but my concern is just what the jury is advised about it.

MR. WANG: Understood. We'll check the

01:28:34 transcript, Your Honor.
01:28:35 THE COURT: All right. Then I'll grant Motion in
01:28:39 Limine No. 2 with the condition that we have addressed.
01:28:53 MS. SIMMONS: Good afternoon, Your Honor.
01:28:59 THE COURT: Good afternoon.
01:29:00 MS. SIMMONS: Luann Simmons for the Samsung
01:29:01 Defendants. I'm going to speak to Samsung's MIL No. 3 if
01:29:05 Your Honor is ready to move to that one.
01:29:07 THE COURT: Yes.
01:29:08 MS. SIMMONS: Okay. My understanding, based on
01:29:10 the opposition is that the dispute has been narrowed. My
01:29:15 reading of the -- Cerence's opposition is that they agree
01:29:18 that they will not present evidence or argument that any of
01:29:22 their products or those of their customers or predecessors
01:29:27 practice the patents or that [redacted]
01:29:32 . And that what remains
01:29:37 of the dispute is that, as I read it, Cerence would like to
01:29:40 be able to present evidence and argument that, number one,
01:29:45 its products use or are protected by the asserted patents,
01:29:51 and, number two, similarly, its business uses or is
01:29:55 protected by the asserted patents.
01:29:56 THE COURT: And, Ms. Simmons, frankly, it would be
01:30:00 helpful to me to hear from the Plaintiff and then give you
01:30:04 a chance to respond because I'm not sure what it means for
01:30:09 their business to be protected by the patents. And perhaps

01:30:13 if we get some more specificity there, you can focus your
01:30:20 argument.

01:30:21 MS. SIMMONS: Thank you. Also, Your Honor, that
01:30:24 was one of my questions, as well, particularly in light of
01:30:28 the representations from this morning that there was no
01:30:29 attempt to license these patents. It's unclear to me how
01:30:34 they could protect the business. But I will take
01:30:36 Your Honor's lead.

01:30:38 THE COURT: All right. Thank you.

01:30:39 MR. BUCZKO: Good afternoon, Your Honor.

01:30:46 THE COURT: Good afternoon.

01:30:47 MR. BUCZKO: So the notion of a product -- a
01:30:51 patent protecting a product, it goes beyond whether a
01:30:55 patent per se is practiced by a product that the patent
01:30:59 owner sells.

01:31:00 So, for example, in this case, Cerence sells
01:31:04 intangible software modules and that the patents -- the
01:31:08 system claims of the patents-in-suit, they have physical
01:31:10 limitations such as a processor, a microphone, and also
01:31:16 there are method claims that aren't practiced by products.

01:31:19 But the notion of protection, and this was
01:31:22 explained at deposition by Mr. Rodriguez, is that
01:31:28 Cerence -- these are Voice Assistant patents, and Cerence
01:31:31 is a Voice Assistant company. Cerence can internally use
01:31:35 the methods. Cerence's customers could use the methods.

01:31:40 And importantly, Your Honor, Cerence could assert the
01:31:42 patents against both directly and indirectly competitive
01:31:45 products, such as in this case, with -- there's an
01:31:50 expert opinion in this case from Mr. Bergman that the
01:31:54 Google Assistant directly competes with Cerence's products,
01:31:57 which -- that's accused here, and that the Samsung Bixby
01:32:00 indirectly competes with Cerence's products here.
01:32:02 And that is -- a completely separate inquiry is
01:32:08 whether as a matter of comparing elements to physical
01:32:12 products, whether that practices the claims.
01:32:14 And, Your Honor, Mr. Rodriguez --
01:32:19 THE COURT: You know, there's nothing limiting the
01:32:21 products of Cerence to physical products. Any products
01:32:26 that you sell, whether they be software or physical or
01:32:29 otherwise, but if you're saying none of the products
01:32:35 practice the patent, how do the patents protect the
01:32:39 business?
01:32:40 MR. BUCZKO: Because the patents can apply to
01:32:43 competitive products, and the patents give a right to
01:32:48 exclude. And also the methods could be used internally
01:32:52 by Cerence. It could be used by Cerence's customers who
01:32:54 use the products. It creates a penumbra of patent rights
01:32:59 that affects competitive products and protects the
01:33:02 business.
01:33:02 THE COURT: I thought your agreement was that your

01:33:06 customers don't practice the patents?
01:33:08 MR. BUCZKO: That actually -- I don't believe, Your Honor, that was our agreement in -- our agreement was that Cerence -- Cerence sells software modules. They go on to customers. Cerence doesn't control what the customers do with them, but the customers can, if they want to, practice and use the patents. But Cerence doesn't control it in that way.
01:33:45 So I don't know if there's something in our brief that -- I mean, it certainly wasn't the intent to make that agreement, but the agreement was that the Cerence products, as sold by Cerence, don't practice.
01:33:56 THE COURT: Okay. Well, I do think it's important to understand what is agreed to and what is not.
01:34:05 So you're agreeing that there'll be no evidence that the products of Cerence practice the patents?
01:34:14 MR. BUCZKO: Correct, Your Honor.
01:34:16 THE COURT: That your predecessors, for instance, Nuance --
01:34:23 MR. BUCZKO: Correct, Your Honor.
01:34:23 THE COURT: -- did not practice the patents?
01:34:25 MR. BUCZKO: They did not sell products that practice.
01:34:28 THE COURT: But you do not agree that your customers don't practice the patent?

01:34:33 MR. BUCZKO: Right, Your Honor.

01:34:38 THE COURT: All right.

01:34:42 MR. BUCZKO: And that's where a lot of the protection is in terms of Cerence's customers have the right to use the products in an infringing way with the patents.

01:34:52 And also, again, it's the competitive products that can be kept off the market or licensed, such as what's being sought after in this case. And also it's the internal use by Cerence that technically other companies aren't supposed to be able to use that have that internal use.

01:35:07 And Mr. Rodriguez testified to that.

01:35:18 And if I could have the document camera, please, Ms. Asbel.

01:35:23 THE COURT: That's all right. I don't need to see that at this point.

01:35:26 But let -- that's fine. I think with that clarification, I can let Ms. Simmons continue with her argument.

01:35:36 Thank you, Mr. Buczko.

01:35:38 MR. BUCZKO: Thank you, Your Honor.

01:35:39 MS. SIMMONS: Thank you, Your Honor.

01:35:44 Let me know when you're all set.

01:35:47 THE COURT: I am.

01:35:48 MS. SIMMONS: Okay. As to the customers, Your Honor, if I could just pick up on that. There is -- I believe what Cerence said, and if I misrepresented this, it's my bad, and I apologize. What Cerence said in its opposition from my recollection was that it has no knowledge one way or the other whether its customers practice. And there is no evidence in the record from an expert or anyone else that any of Cerence's customers practice the patents. So it's unclear to me how that would come in other than through sort of speculation.

01:36:19 In any event -- so if I misrepresented that, though, I apologize. It's my understanding that there is no evidence that customers practice the patents.

01:36:32 THE COURT: So what you're seeking -- it looks like there's two separate parts to your MIL. The first is that no evidence that Cerence's products practice the patents, and I think that's conceded.

01:36:50 MS. SIMMONS: I agree, Your Honor -- or its predecessor's products.

01:36:54 THE COURT: All right. And tell me about the rest of it.

01:37:00 MS. SIMMONS: Yes, agreed with what you -- how you just phrased it, Your Honor.

01:37:06 My reading of the opposition, though, is that Cerence would like to still be able to say that its

01:37:11 products use the asserted patents or are protected by the asserted patents, even though they do not practice the asserted patents.

And it is our view that that would similarly be misleading and confusing to the jury and unfairly prejudicial because "use" and "protected by" are really just different words for saying -- trying to convince the jury that their products do practice the patents when, in fact, they do not.

And there might have been an argument that perhaps "use" or "protected by" was meant to reference a licensing activity with respect to these patents, but as Your Honor heard this morning with regard to Cerence's MIL 2, there are -- Cerence has had no such activity. It has not attempted to protect its patents or use its patents with respect to these -- with respect to its products by trying to license the two asserted patents.

So the only end result of allowing Cerence to provide evidence or testimony that -- or argument that Cerence's products use or are protected by the asserted patents would be to give the misimpression to the jury that the products practice the patents, which they do not.

THE COURT: I guess one of the arguments I heard is that by -- by the word "protected," their argument is that their patents can prevent some competitors' products

01:38:42 from being made or sold and that that lack of competition
01:38:50 would be a protection?

01:38:51 MS. SIMMONS: Your Honor, we think that that still
01:38:54 gets too close to the line of confusing the jury into
01:39:00 thinking that the products use the patents. And, again, I
01:39:03 think it might be a -- sort of a dicier question were it
01:39:06 the case that Cerence actively used these two patents as
01:39:10 part of its licensing campaign, if it were out trying to
01:39:17 prevent competitors, besides Samsung who it is suing now,
01:39:17 from using these two patents, that might be a thornier
01:39:20 question. But as we heard this morning, that is not the
01:39:22 case with respect to these two patents.

01:39:27 THE COURT: All right. Thank you, Ms. Simmons.

01:39:32 MS. SIMMONS: Thank you, Your Honor.

01:39:34 MR. BUCZKO: So, Your Honor, I do think there's a
01:39:44 clear distinction between whether or not a product
01:39:46 practices a patent versus whether or not a patent and
01:39:50 patent rights, the right to exclude, protects a business by
01:39:53 way of keeping out, as you mentioned, competitive -- I
01:39:58 mentioned earlier competitive products -- potentially
01:40:02 competitive products.

01:40:03 And we never said that customers don't use or we
01:40:05 don't know or care whether customers use our products. We
01:40:07 just don't -- they have the freedom to use the products in
01:40:12 an infringing manner, and that provides value and

protection to Cerence's business in terms of the right to exclude.

It's a completely different logical end point, then, whether our products actually practice.

THE COURT: How do your customers acquire the right to practice your patents?

MR. BUCZKO: Well, if our customers purchase the software module, they can be used in a manner that would infringe -- that would use the patents, they could. We don't necessarily require it that way, but that could happen.

THE COURT: If the software module doesn't practice the patent, how does purchase of that patent give one the right to practice the patent?

MR. BUCZKO: If the software module -- well, number one, they're method claims. So the method claim -- if a customer performs the method, then -- of something that was sold from Cerence -- I mean, I do think there's certain areas of law, such as exhaustion, that would apply there. I mean, I don't think Cerence would sue its own customers for using --

THE COURT: It may not. Do you mark these products with the asserted patents?

MR. BUCZKO: These products are intangible articles. They're software modules that are just

downloaded from a central server, so there's nothing to mark.

THE COURT: I mean, there are ways to virtually mark software products.

MR. BUCZKO: For virtual marking, Your Honor, it's my understanding that there needs to be an actual patent pending -- something put on a -- something physical that directs to a website that's virtual marking. There's just nothing physical here, and this relates -- there's a case out of Delaware from a few years back that found that Siri, which is a voice assistant, is an intangible article that can't be marked. So this is in a similar vein.

THE COURT: So it's very odd to me. I've never heard a distinction made between a product that practices a patent and a product that is protected by a patent.

MR. BUCZKO: And I think the focus here, Your Honor, is that specific products being protected by -- it's the Cerence's Voice Assistant business that is protected by the patents. So -- and that includes the products, of course. But it's the general business. It's its place in the marketplace. It has patent protection, and it has the ability to keep out competitive products. It has the ability to -- you know, to also give its customers protection, and it also has -- it has the ability to internally use the patents in design and development for

01:42:56 those matters.

01:42:58 And, Your Honor, Defendants are free to cross-examine our corporate rep on this and say but the products don't practice, right? Mr. Rodriguez was clear in his deposition that the products don't practice. And we actually have expert testimony that says the products don't practice.

01:43:13 So if to the extent there's any contradiction, and I actually don't believe there are, but -- there is, but that can be addressed during cross-examination. There doesn't need to be exclusion of this point, Your Honor.

01:43:25 THE COURT: You know, my concern is that I think it is inherently going to cause the jury to believe that you're saying your products practice the patents if you say your products are protected by the patents.

01:43:43 MR. BUCZKO: Your Honor, we will not say our products practice the patent. We'll be very clear that our products don't practice the patents, that they're intangible articles. In fact -- I mean, that's part of something we need to prove up. Samsung has a marking defense in this case. And so we need to actually say the products don't practice, that they're intangible articles.

01:44:03 THE COURT: And that's what this sounds to me like is a way to skate between the marking requirement and to be able to say we're protected by but we don't practice.

01:44:20 MR. BUCZKO: I don't think, Your Honor, we're trying to skate by the marking requirement. We're just following the law of the marking requirement that says it doesn't apply to intangible articles. That's a statute with specific requirements, and we don't have to mark.

01:44:35 But that doesn't change the fact that we can have patents that can keep out competitive products, such as Google Assistant and Samsung Bixby from the market, and that provides protection, and that's the way our client views it or that we can use the methods internally or that our customers could use it.

01:44:58 THE COURT: And do you have any case law that you think supports the distinction between practicing a patent and being protected by a patent?

01:45:04 MR. BUCZKO: Well, Your Honor, in terms of the Georgia-Pacific factors, Factors 4 and 5, those talk about how -- the policy with regard to the invention and -- and 5 is competitive impacts, and that's the point we're getting at is more of the competitive impact of protection, not the fact that the products actually do the patent. It's -- it's just -- to me, it's just a logically different thing.

01:45:42 THE COURT: And my question is has any court ever recognized that difference?

01:45:47 MR. BUCZKO: I can't answer that one way or the

01:45:49 other, Your Honor. But here, we're going to be clear that
01:45:54 we don't practice. And so -- and we have testimony that
01:46:00 explains the difference in terms of internal use and
01:46:04 methods. There's certainly -- I mean, it's black letter
01:46:07 patent law, the difference between methods and system
01:46:09 claims and that sort of thing, and that's a big part of
01:46:14 where we're -- our point with this.

01:46:17 THE COURT: Uh-huh. And where -- where is that
01:46:23 testimony that makes clear the difference, and I'll look at
01:46:28 it?

01:46:29 MR. BUCZKO: So, Your Honor, this is Exhibit 16 to
01:46:43 the briefing on this, and we put some in our briefing that
01:46:46 I can put on the document camera.

01:46:48 THE COURT: And is this -- what -- which brief is
01:46:53 this an exhibit to?

01:46:55 MR. BUCZKO: I believe that Samsung in their
01:47:01 motion at Exhibit 16, but Mr. Rodriguez's testimony, and
01:47:05 then -- so we cited to that because that was in the record,
01:47:08 and so this is Exhibit 16 to Samsung's MIL briefing, which
01:47:12 is Mr. Rodriguez's -- our 30(b)(6), his -- his testimony --
01:47:16 his 30(b)(6) testimony.

01:47:17 THE COURT: All right.

01:47:17 MR. BUCZKO: And so here -- Mr. Rodriguez before
01:47:21 this said during his testimony that, you know, essentially
01:47:24 this point. We don't -- our products are intangible

01:47:27 articles, they don't practice the patent, but they do
01:47:29 protect our business.
01:47:31 And Samsung asked: Why is it valuable for Cerence
01:47:35 to have these patents?
01:47:36 And Mr. Rodriguez explained that: We have a right
01:47:38 to certain technology that is used and can be used within
01:47:41 the organization, can be used outside of our organization
01:47:45 and value with the business, and there can be value
01:47:47 associated with -- outside of the business, such as if it's
01:47:50 infringed upon, it can --
01:47:52 THE COURT: All right.
01:47:53 MR. BUCZKO: -- keep partners or outsiders out.
01:47:59 THE COURT: I will look at Mr. Rodriguez's
01:48:00 deposition.
01:48:01 MR. BUCZKO: Thank you, Your Honor.
01:48:01 THE COURT: Thank you, Mr. Buczko.
01:48:04 Ms. Simmons, if -- I intend to carry this MIL to
01:48:09 look further into this distinction and -- but if you have
01:48:13 any final remarks, feel free.
01:48:16 MS. SIMMONS: I'll be brief, Your Honor. Thank
01:48:18 you.
01:48:18 Just two quick points. I do believe it is -- it
01:48:20 is not fair to expect that the jury would understand
01:48:24 the black letter law distinctions between practicing and
01:48:27 using or protecting with respect to Cerence's products.

01:48:33 My second point would be that the argument seems
01:48:37 to be mushing up the concept of the patents being used by
01:48:42 or protecting products versus the business as a whole. The
01:48:48 testimony that we just saw on the screen from Cerence's
01:48:52 30(b)(6) witness talked about patents protecting its
01:48:55 business, not its products. And even with respect to its
01:49:00 business, and this is the allegation that the patents
01:49:04 protect its business, we heard very clearly this morning
01:49:07 that Cerence had no policy of trying to use these two
01:49:11 patents to get the licenses or to stop others from
01:49:15 infringing.

01:49:16 And so to me it seems contradictory to then say
01:49:20 that they can testify -- have a witness testify that these
01:49:23 patents protect the business. And that was in connection
01:49:26 with Cerence MIL 2. And those are the only follow-up
01:49:31 points I wanted to make, unless Your Honor has questions
01:49:33 for me.

01:49:34 THE COURT: All right. Not at the moment,
01:49:36 Ms. Simmons. Thank you.

01:49:38 MS. SIMMONS: Thank you, Your Honor.

01:49:41 MR. REIDY: Good afternoon, Your Honor. Patrick
01:49:56 Reidy for the Samsung Defendants.

01:49:58 I'll be addressing Samsung's disputed MIL No. 4,
01:50:04 related pre-suit communications between Cerence and [redacted]
01:50:07 and Samsung.

01:50:08 So at this point, our main concern is that if
01:50:15 Your Honor excludes the copying story or copying argument
01:50:21 from the case, that Cerence will nevertheless introduce
01:50:26 much of the same evidence on its way to leading the jury to
01:50:30 make an inference that Samsung copied or otherwise acted
01:50:34 unfairly or wrongly in its business relationship with --
01:50:40 with Nuance.
01:50:41 So with that, I'll just say -- recap our briefing
01:50:49 briefly. I don't think the parties dispute that pre-suit
01:50:52 communications are not relevant to any pre-suit willfulness
01:50:56 or pre-suit inducement as those claims are not in the case.
01:51:00 We understand that Mr. Bergman, Cerence's damages
01:51:06 expert, in the context of his discussion of Georgia-Pacific
01:51:11 Factor No. 5, referenced some potential discussions between
01:51:14 Cerence and Samsung related to speech recognition in TVs,
01:51:19 and as we said in our motion, we're comfortable with
01:51:23 Cerence soliciting that testimony if it chooses.
01:51:28 In Cerence's opposition, however, they expand
01:51:32 their arguments about the reasons why they believe these
01:51:36 pre-suit communications are relevant to damages. And my
01:51:40 understanding is that they're taking the position that,
01:51:44 well, Mr. Bergman relies on the [redacted]
01:51:49 in the context of his
01:51:54 profit splitting theories.
01:51:56 As Your Honor probably is aware, we have a Daubert

01:51:59 motion pending against Mr. Bergman for his use or reliance
01:52:03 on the [redacted]. We also have
01:52:08 independent objections to that agreement as an exhibit.
01:52:17 So I don't think --
01:52:19 THE COURT: Mr. Reidy, I can tell you that it is
01:52:23 unlikely that the Court will exclude all of the pre-suit
01:52:29 communication and history between Samsung and Cerence and
01:52:35 its predecessors. If there are specific parts of that that
01:52:40 you believe are unduly prejudicial, unfairly prejudicial,
01:52:48 that's something that I'll look at further.
01:52:54 So tell me what I should be concerned about there.
01:52:58 MR. REIDY: Your Honor, to the extent that you
01:53:03 agreed to -- that some of these pre-suit communications are
01:53:06 relevant to damages to some extent, we would submit that
01:53:11 any discussion of the specifics of the technology that
01:53:17 [redacted], any suggestion that that
01:53:21 technology is somehow a key feature or a key part of the
01:53:27 asserted patents in this case would be unduly prejudicial
01:53:31 and lead to the inferences that we're concerned about in
01:53:35 the context of our MIL 1 and our other pending motions
01:53:38 related to the copying issue.
01:53:40 So --
01:53:43 THE COURT: And that would really go hand-in-hand
01:53:46 with the issue of whether copying stays in or is out. If
01:53:54 copying goes out, then I think you've got a more forceful

01:53:59 argument that the technology transfer issues are less relevant and more prejudicial. But if copying remains an issue in the case, then it's hard for me to see how we would exclude those details.

MR. REIDY: Yes. So understood, Your Honor. And I think your assessment is accurate.

To perhaps try to put a finer point on it, the extent to which these communications are relevant to damages, there's very little, if anything, that would need to be discussed about the [redacted]. And as I said, we have independent objections to the exhibits that we can address when appropriate.

THE COURT: All right. Thank you, Mr. Reidy.

MS. JAY: Good morning (sic), Your Honor, Minna Jay on behalf of Plaintiff, Cerence, in opposition to Samsung's MIL 4.

Can you go to Slide 2, please, Mr. Kolko? Thank you.

So there are really four reasons why the pre-suit communications are relevant. As counsel for Samsung mentioned, we're not saying that they're going to be relevant for pre-suit willfulness. Of course, post-suit willfulness is still at issue in this case, and, of course, willfulness considers the totality of the circumstances.

01:55:54 Mr. Kolko, would you mind just turning briefly to
01:55:58 Slide 8, please?
01:56:03 This Court has noted in the past that pre-suit
01:56:06 conduct may be relevant to the Plaintiff's claims of
01:56:09 post-suit willfulness. To the extent that copying is out,
01:56:12 we can easily discuss the pre-suit interactions between
01:56:18 [redacted]
01:56:33 all of the IP related to that without
01:56:37 discussing copying or the key features that Samsung had
01:56:40 access to. And we have fact witness testimony that's been
01:56:44 cited in our briefs.
01:56:50 As it pertains to --
01:56:52 THE COURT: If there is no copying claim allowed
01:56:54 in the case, how does the pre-suit relationship affect
01:57:06 post-suit willfulness?
01:57:09 MS. JAY: So there are fact witnesses that have
01:57:12 been deposed in this case who can talk about the past
01:57:14 history between the companies and the technology and the
01:57:18 work that was exchanged. And so I can give you an example.
01:57:25 Let's turn to Slide 10, please.
01:57:28 This is Tony Rodriguez, the CFO of Cerence, and he
01:57:33 talked about how prior to the suit in this case, Cerence

01:57:37 reached out to Samsung a couple of times about business
01:57:42 opportunities. He was not asked follow-up questions about
01:57:44 what those specific business opportunities were. We, of
01:57:49 course, produced documents along those lines.

01:57:51 Mr. Haiber -- Slide 11, please -- he was a [redacted]
01:57:55 [redacted], and he is the current senior vice
01:58:00 president of R&D at Cerence. He was also deposed, and he
01:58:01 talked about some of the interactions that -- [redacted]
01:58:04 [redacted]
01:58:08 [redacted].

01:58:08 THE COURT: And my question is how does any of
01:58:11 that support post-suit willfulness?

01:58:15 MS. JAY: So in terms of the totality of the
01:58:18 circumstances, I think that the jury should be allowed to
01:58:21 consider that they were aware of, at a high level, the
01:58:24 technology that Cerence was working on and had done with
01:58:27 Samsung in the past.

01:58:29 And then once we gave them notice of the actual
01:58:31 infringement allegations as of the date of the complaints,
01:58:35 all of that comes into light, and they're able to consider
01:58:39 that. The pre-suit relationship in the context of now you
01:58:42 have notice that you are, in fact, infringing on our
01:58:46 patents and has Samsung acted as a reasonable party should
01:58:49 have by taking a license, doing a diligent investigation,
01:58:53 designing around the products, anything along those lines,

01:58:57 and they can take all of that into consideration when
01:58:59 determining whether post-suit willfulness has been met.
01:59:04 THE COURT: All right.
01:59:08 MS. JAY: And then separately from post-suit
01:59:11 willfulness, of course there are the GP factors that
01:59:15 Mr. Bergman analyzed under GP5, the commercial relationship
01:59:19 between the licensor and the licensee. [redacted]
01:59:32 Specifically that's just the general background, and we
01:59:34 cited to the whole paragraph. I'm not going to re-read it
01:59:38 to Your Honor, but it's set forth in our briefs, as well.
01:59:41 And he also uses it to rebut Samsung's expert
01:59:46 witness, Ms. Julia Rowe, who is their damages expert. She
01:59:50 says that there was no competitive relationship between the
01:59:54 parties, so Mr. Bergman, of course, must be able to
01:59:57 qualitatively rebut that, as well, and give his opinion as
02:00:01 to why there is evidence of an indirect competitor
02:00:04 relationship between the parties.
02:00:10 THE COURT: All right.
02:00:10 MS. JAY: And the last point that I'll make is
02:00:13 just that Cerence does have a request for injunctive
02:00:17 relief, which I understand may be taken up later as a bench
02:00:21 issue. I don't know if there will be a separate bench

02:00:24 trial specifically for injective relief. To the extent
02:00:27 there is not and we must present all evidence as part of
02:00:29 the jury trial, then, of course, whether or not there is
02:00:32 competition between the parties would be relevant to that
02:00:35 point, as well.

02:00:37 And if the Court doesn't have any other questions,
02:00:41 I'll withhold further comment.

02:00:43 THE COURT: All right. Thank you, Ms. Jay.

02:00:45 MS. JAY: Thank you.

02:00:46 MR. REIDY: Your Honor, I just want to respond to
02:01:04 address your question about why pre-suit communications are
02:01:09 not relevant to post-suit willfulness. And, you know, the
02:01:13 first thing I want to point out is this is another
02:01:15 situation where we have an interrogatory that asked
02:01:19 identify all bases for your contention that Samsung's
02:01:22 infringement is willful. And the operative response to
02:01:28 that interrogatory says nothing about pre-suit
02:01:34 communications. And it's not even an argument that was
02:01:38 raised in this briefing.

02:01:39 So if I can have the document camera, please.

02:01:44 So, you know, I don't have the whole response
02:01:57 copied in here in part because this was not an issue raised
02:02:01 in the opposition, but not hard to see here that basically,
02:02:07 their response on the willfulness rog -- if I can get it on
02:02:11 the camera -- doesn't mention any pre-suit communications

between the parties. It essentially goes on from here, Your Honor, to describe the accused functionalities, the Bixby Assistant and Google Assistant.

But even setting aside the failure to disclose this in discovery, communications that happened between [redacted] that is not connected to these patents that issued in 2021 and 2022 are simply not -- not at all relevant to post-suit willfulness.

THE COURT: All right.

MR. REIDY: So with that, Your Honor, I'll rest. Thank you.

THE COURT: All right. Thank you.

I'm going to carry this MIL, as well, and I'll look at it further in connection with the rulings on copying.

Which takes us to Defendant's MIL 5.

MR. REIDY: Oh, yes, sorry. Okay.

THE COURT: I'm not sure that MIL 5 is actually disputed.

MR. REIDY: Yes, you're right. You're right, Your Honor. I think at this point, we can agree that to the extent -- you know, we understand Cerence's opposition to be that as long as Samsung does not elicit affirmative testimony that it, quote, respects the intellectual

02:03:55 property rights of others, that it will not try to, you
02:03:59 know, obtain counter testimony or evidence in rebuttal.
02:04:03 And I think we can agree to that.

02:04:06 THE COURT: All right. Then I'll grant MIL No. 5
02:04:12 with the understanding that if Samsung takes a position in
02:04:23 front of the jury that is inconsistent with that, that the
02:04:26 Plaintiff can seek leave to open that door.

02:04:30 MS. JAY: Your Honor, Minna Jay for Cerence.

02:04:33 Just one click -- quick clarification on that
02:04:36 stipulation. I think we are in agreement. I just want to
02:04:39 make clear that, of course, we are still pursuing a
02:04:42 post-willfulness claim. So to the extent that -- we're not
02:04:44 going to say that Samsung generally disrespects
02:04:47 intellectual property, we're in agreement with that. But,
02:04:50 of course, we're going to be producing evidence, presenting
02:04:53 evidence that there is a post-suit willfulness claim.

02:04:57 THE COURT: No, I understand that nothing in this
02:05:00 grant of this MIL will prevent you from proving your case
02:05:07 or attempting to.

02:05:08 MS. JAY: Thank you, Your Honor.

02:05:09 THE COURT: All right. Are the parties ready to
02:05:26 move into the -- well, I guess there was the one matter of
02:05:32 the Court's standing MILs that Mr. Snyder wanted to
02:05:39 discuss. Has there been any progress on that?

02:05:42 MR. WANG: Your Honor, we went carefully through

02:05:47 that list of the Court's standing MILs just to make sure we
02:05:50 knew what we might be getting ourselves into.
02:05:52 Now, the only sort of thing I want to preface that
02:05:55 with, Judge, is in a way, we're sort of put in this
02:06:01 position where they want it sort of both ways, right? [redacted]
02:06:03 [redacted]
02:06:06 [redacted]
02:06:09 [redacted]
02:06:11 [redacted]
02:06:15 [redacted]
02:06:19 [redacted]
02:06:22 [redacted]
02:06:23 [redacted]
02:06:27 [redacted]
02:06:32 [redacted]
02:06:35 [redacted]
02:06:38 [redacted]
02:06:41 [redacted]
02:06:44 [redacted]
02:06:50 [redacted]
02:06:52 [redacted]
02:06:54 [redacted]
02:06:54 [redacted]
02:06:58 [redacted]
02:07:02 [redacted]

[redacted], et cetera.

MR. WANG: Yes, Your Honor. So 3, we won't -- we won't mention that as to Google. We won't bring up any of Google's other litigations.

THE COURT: Which one is that?

MR. WANG: That's No. 13, Your Honor.

THE COURT: Okay.

MR. WANG: Then there's 21, opinion of counsel. There was some sort of affirmative duty to do that. We won't do that.

24 was the sort of absence of a witness. I think that's fine, too. But, again, we'd like to know who the Google witness that apparently they know they're going to call live. I have a guess, but it's just a guess.

And then 25, we won't do the empty chair either.

On the whole size of the firms, we're not going to do that, but we should -- [redacted]

[redacted]

[redacted] and I may be more specific than the Court needed to be in the Hardin case.

MR. WANG: I appreciate that, Your Honor.

THE COURT: In any event, I'll take those into account, but I will note for this record that as to the six standing MILs that we have discussed, which are 3, 13, 14, 21, 24, and 25, those will apply to Google as well as to Samsung.

MR. WANG: That's fine, Your Honor.

And one last thing that I forgot to mention, and I'm sure it will come up with exhibits. You know, they have -- they have several objections to [redacted]

02:10:19 THE COURT: I will consider that argument when we get there.

02:10:21 MR. WANG: Thank you.

02:10:21 THE COURT: All right. Then I think we're ready to move to the exhibits, assuming the parties think this is the productive time to do that.

02:10:33 All right. Then we can take up first -- just the first bucket, first group, unless counsel have a better idea.

02:10:57 MR. TSEI: Good afternoon, Your Honor. It's James Tsei again from Russ August for Plaintiff, Cerence.

02:11:04 So I'll be talking about Buckets No. 1 and 2 from the Cerence objections to Samsung's DTX exhibits.

02:11:13 THE COURT: And just so that the record is clear, I'll try to see that a copy of this email, which is the September 4 email from Ms. Jay to the Court, that that will be attached to the minutes. It is what sets out these buckets of objections.

02:11:36 So we're starting with No. 1 on that list. Go ahead, Mr. Tsei.

02:11:40 MR. TSEI: Yes, Your Honor. And I apologize for the slight mix-up. I'd like to start with No. 2, and then proceed to No. 1 if that's okay with Your Honor.

02:11:49 THE COURT: All right.

02:11:49 [redacted]

02:11:54 [redacted] Dr. James Bress.

02:12:17 So to illustrate, the Bates prefix has the name Bress in it. It has the acronym SC, which I guess we understand refers to source code, followed by a Bates number.

02:12:30 So we have several objections to Samsung arguing [redacted]

02:12:45 Number two, we don't actually know what the source code pages are or from where they come, that is, we don't know if they, in fact, come from the source code that was made available for inspection during fact discovery.

02:12:59 Number three, the source code pages don't appear to be relied upon by any expert in the case, either through implicit discussion or a citation to a specific page, for example. And so it's not quite clear to us what these pages really are, and the most we've been able to glean from discussions with our colleagues on the other side is that they are source code pages which their testifying expert generated during the course of preparing his

02:13:31 responsive rebuttal opinions in the case. So we don't have
02:13:35 any foundation, for example, to sort of check to see if
02:13:37 they are, in fact, related to the code that was actually
02:13:40 produced in the case.

02:13:43 [redacted]
02:13:45
02:13:54

02:13:54
02:14:02
02:14:07 Plaintiff and its experts had an opportunity to inspect all
02:14:10 of that code, and this exhibit is an excerpt of that code.
02:14:15 [redacted]
02:14:18
02:14:24
02:14:27 would fill, I don't know how many tens of thousands of
02:14:31 pages or more. This is an excerpt that Dr. Bress does, in
02:14:35 fact, rely on for his expert opinions.

02:14:37 I [redacted]
02:14:40
02:14:46
02:14:49
02:14:52
02:14:56
02:14:59

02:15:00 To be clear, the only objection that they've made

is to this code as an exhibit. There is no Daubert motion to preclude any opinions that Dr. Bress has based on his review of the source code. And it is not the subject of their limine motion where -- Limine Motion No. 3 where they specifically said that it does not relate to any source code. It was only about this specific exhibit.

[redacted] the face of the code. And it was, in fact, relied on by Dr. Bress.

THE COURT: What is the evidence of its origin other than the report of Dr. Bress?

MR. SNYDER: [redacted]

[redacted]

[redacted] Your Honor.

THE COURT: I see one on the bucket list.

MR. SNYDER: Well, not one that we just heard from

[redacted]

THE COURT: And does Dr. Bress identify this section of the source code in a way that indicates the relevance of this particular 371 pages?

MR. SNYDER: I believe he does, Your Honor. I'm sorry, I didn't know what the objection was until just now, so I don't have the citations to specific footnotes in his report, but he made it clear what he is relying to it is. Like most expert reports, extensively footnoted.

THE COURT: And is there other source code that's going to be admitted in this case?

MR. SNYDER: Yes.

THE COURT: Does Samsung object to the introduction of its source code?

MR. SNYDER: I do not believe that there is an objection to any Samsung source code, Your Honor.

THE COURT: All right. Thank you, Mr. Snyder.

Mr. Tsei?

MR. TSEI: Yes, sir.

02:18:02 THE COURT: What do you have that would indicate
02:18:04 that this was not produced during discovery, as Mr. Snyder
02:18:09 asserts?
02:18:09 [redacted]
02:18:27 That is outside of the fact discovery period and at the
02:18:29 very end of the expert discovery period.
02:18:35 THE COURT: When did fact discovery in this case
02:18:37 close?
02:18:38 MR. TSEI: I believe it was April 21st, Your
02:18:42 Honor.
02:18:42 THE COURT: All right.
02:18:45 MR. TSEI: So I'll just make a few more points,
02:18:47 and I'll try not to be redundant.
02:18:50 [redacted]
02:19:00 [redacted]

02:19:16 [redacted]
02:19:17 [redacted]
02:19:20 [redacted]
02:19:23 [redacted]
02:19:25 [redacted]
02:19:28 [redacted]
02:19:32 [redacted]
02:19:36 [redacted]
02:19:41 [redacted]
02:19:44 [redacted]
02:19:50 [redacted]
02:19:53 [redacted]
02:19:56 [redacted]
02:20:03 [redacted]
02:20:06 [redacted]
02:20:09 [redacted]
02:20:11 [redacted]
02:20:14 [redacted]
02:20:38 [redacted]
02:20:40 [redacted]
02:20:45 [redacted]
02:20:50 [redacted]
02:20:54 [redacted]
02:20:59 [redacted]
02:20:59 [redacted]

02:21:01 [redacted]

02:21:10 THE COURT: All right.

02:21:19 MR. TSEI: Thank you, Your Honor.

02:21:20 MR. SNYDER: Could you leave that up, please?

02:21:23 MR. TSEI: Sure. I'm plugging it back in.

02:21:27 MR. SNYDER: Thank you.

02:21:27 This email, Your Honor, pointedly refers to source code printouts. Like most protective orders in cases involving source code that is protected as confidential, [redacted] It was made available on a source code computer that within the confines of the -- of the protective order could be inspected and was inspected by representatives of Plaintiff.

02:22:03 THE COURT: Maybe we can scroll down. It looks [redacted]

02:22:13 [redacted] [redacted] I believe, Your Honor.

02:22:19 THE COURT: All right. Mr. Tsei, does this [redacted]

02:22:28 MR. TSEI: No, sir, it does not.

02:22:30 [redacted]

[redacted]

THE COURT: All right.

[redacted]

02:23:57 [redacted]

02:23:59 THE COURT: All right. Mr. Snyder, what I'm going
02:24:01 to do -- I've got another matter that is waiting in the
02:24:05 wings. I'm going to take a recess in the Cerence matter
02:24:11 now, and I would ask you to see what you can find out that
02:24:16 supports the March production of the source code, and we'll
02:24:22 get back to that as soon as we have taken up the ASUS
02:24:30 Technology matter that is...

02:24:32 So what I'm going to do is ask you -- you can, to
02:24:37 the extent you're comfortable with it, leave your stuff
02:24:40 where it is, and I will ask the next group to respect the
02:24:47 privacy of your laptops and other things, but it will
02:24:53 probably take us 15 minutes or so to resolve this other
02:24:57 issue.

02:50:22 (Recess.)

02:50:22 COURT SECURITY OFFICER: All rise.

02:50:23 THE COURT: Good afternoon. Thank you. Please be
02:50:29 seated.

02:50:29 All right. Mr. Snyder, tell me where we are.

02:50:49 MR. SNYDER: Thank you, Your Honor.

02:50:49 [redacted]
02:50:58
02:51:02 [redacted]
02:51:04 .

02:51:09 But there are a series of steps that we can go

02:51:12 through and many of which, if Plaintiff had bothered, they could have gone through long before we got here and raised these dubious objections.

[redacted]

They then had their representatives come and inspect that source code computer, just as they were permitted to do under the protective order.

Dr. Bress in his expert report refers in many places to source code that is available on that computer [redacted]

[redacted]

THE COURT: All right.

[redacted]

All right. So to start with, Your Honor, this is an email just documenting the chronology of what happened. This is an email from me actually to Mr. Tsuei. He knows that we made available the inspection -- for inspection the [redacted]

And then they did inspect the code, and they [redacted], but that eventually is what happened.

Cerence made printouts of that source code. That's actually on their -- on the joint exhibit list. [redacted]

Now, after we got their opening report, Mr. Bress, our expert, obviously, you know, he wanted to inspect some other files on that same machine because he felt they rebutted some of the infringement theories that Cerence was

presenting. So he eventually, you know, prepared his -- he inspected those files. He made it -- he prepared his own [redacted]

[redacted]

And so from our perspective, that doesn't mean that the source code that they produced with the Bress [redacted]

THE COURT: All right. Thank you, Mr. Tsuei.

MR. LIANG: All right. So just to address that issue. It seems like the concern is almost a matter of form. We didn't cite the Bates numbers in the report, but [redacted]

02:57:02 [redacted]

02:57:43 MR. LIANG: Are you saying you want us to prove,
02:57:45 you know, that this is authentic? I mean, is that what
02:57:47 you're --

02:57:47 THE COURT: Mr. Liang. Mr. Liang, just...

02:57:52 [redacted]
02:58:10 don't think I'm going to get, no matter how long we spend
02:58:13 talking about this, any indication of exactly what parts of
02:58:18 Mr. Bress's exhibit were part of that production, but I'm

02:58:28 [redacted]

02:58:36 I don't think that it's hearsay, and so I am going
02:58:47 to overrule the objection to it. And I don't see any
02:58:50 [redacted]. And it seems that both sides have an intent to. But
02:59:02 in any event, I'll overrule the Plaintiff's objection to
02:59:06 [redacted]

02:59:07 And that takes us back to the first bucket, and I
02:59:11 think, Mr. Tsuei, you wanted to address that.

02:59:18 MR. TSUEI: Yes, sir, Your Honor.

02:59:19 Before I turn to Bucket No. 1, can I just ask the
02:59:25 Court that the holding on Group No. 2 be slightly modified
02:59:31 to be without prejudice to Cerence's ability to re-raise
02:59:35 issues concerning the authenticity of the DTX-054 source
02:59:42 code, for example, if it becomes apparent to us that the
02:59:46 range contains pages from files which we suspect were, in
02:59:50 fact, not produced or made available during fact discovery?

02:59:55 THE COURT: I'm not going to invite that, but
02:59:59 certainly it won't surprise me if you raise it if you find
03:00:03 something. But the fact that source code production is
03:00:09 supplemented does not indicate to me that there's an intent
03:00:16 to hide it. But if you come upon what you think is
03:00:21 evidence that there's been manipulation of the production
03:00:24 of the source code, I expect I will hear about it.

03:00:28 MR. TSUEI: Thank you, Your Honor.

03:00:38 Okay. Turning back to Group No. 1, the
03:00:40 commonality between the exhibits in Group No. 1 is that
03:00:45 they are all videos which we understand were created by
03:00:50 Samsung's non-infringement expert, Dr. Bress, in the days
03:00:52 leading up to the service of his non-infringement report.
03:00:54 The videos purport to show, from what we can see,
03:00:58 manual manipulation of a model of one of the accused
03:01:04 devices -- I think Galaxy Note 10 -- the manual
03:01:09 manipulation resulting in the operation of the device in
03:01:13 various ways, as well as what appears to us to be a testing
03:01:17 setup involving electrodes and multi-meters connected to
03:01:22 the phone in some videos.
03:01:24 And so from our perspective, these videos are not
03:01:28 evidence, at least for purposes of pre-admission. We see
03:01:31 them as just extensions of the expert report, which
03:01:36 Mr. Bress -- or Dr. Bress generated and Samsung served on
03:01:40 us in the ordinary course of the case.
03:01:42 So we don't actually think that the videos are --
03:01:45 have evidentiary value. And so, you know, for that
03:01:48 purpose, we believe that they are hearsay, that is, they
03:01:52 are out-of-court statements, and also contain out-of-court
03:01:55 statements which we understand Samsung will assert the
03:01:58 truth of. And so for that purpose, we would object to
03:02:02 their pre-admission.
03:02:06 THE COURT: All right.

03:02:06 MR. SNYDER: Mr. Tsuei is correct that those are
03:02:12 videos that were created by Dr. Bress as part of his
03:02:16 non-infringement work and are cited and relied on in his
03:02:20 non-infringement opinion.

03:02:21 They are not in any way, by my understanding,
03:02:25 informed by three and a half decades of legal practice,
03:02:29 hearsay. They are not statements. They are out of court,
03:02:32 but they are not statements. They are evidence of
03:02:34 activity. They are videos of actual behavior in a same way
03:02:39 of that a photograph or a video of an occurrence might be.
03:02:42 That is not hearsay. That is subject to completely
03:02:46 different standards of relevance and whether they are
03:02:50 substantially similar to the characteristics or
03:02:52 circumstances that are being depicted.

03:02:55 THE COURT: If they're not evidentiary, why are --
03:02:58 why would they be admitted into evidence?

03:03:01 MR. SNYDER: Well, I do think they're evidentiary.
03:03:03 They're not hearsay.

03:03:05 THE COURT: How are they evidentiary if they're
03:03:06 not asserting that what is depicted is accurate and true?

03:03:11 MR. SNYDER: So a hearsay is an out-of-court
03:03:15 statement, Your Honor, and that's different than -- than
03:03:17 saying -- than taking a photograph, for example, of
03:03:20 something. That's not a statement. That is a depiction of
03:03:23 an event. These videos are depictions of the actual

03:03:28 behavior that Plaintiff accuses of infringing.

03:03:32 They're not saying that that -- that the statement about them is true or not true. They're showing examples of this is how they actually behaved.

03:03:43 THE COURT: And hearsay does not require a statement. It's an assertion.

03:03:47 MR. SNYDER: Well, then I don't believe that they're assertions either, Your Honor.

03:03:51 I mean, the point of the hearsay rule is that that out-of-court statement isn't subject to, for example, cross-examination or other indicia of trustworthiness. It's not -- you wouldn't call a photograph, for example, hearsay. It's a depiction of an actual event. These videos are the same thing. They are depictions of actual behavior of the accused devices. The devices aren't making an assertion.

03:04:21 THE COURT: So how are they different than Dr. Bress describing what he did?

03:04:27 MR. SNYDER: Dr. Bress -- well, so it's a very good question, Your Honor. This is not a Daubert motion. It is not a limine motion. It is only an objection to this specific evidence. I don't believe there's any question about whether Dr. Bress can rely on this information and these experiments that he conducted.

03:04:47 He should be allowed to show the jury the

experiments that he conducted. He can describe exactly what he did. They refer to a testing setup, and I anticipate that he will, just as they cross-examined him -- they examined him about it during the deposition. He can show the jury then what experiments he conducted and what the results of those experiments were. And he can then give his opinion about what that means in the context of infringement.

This is directly rebutting assertions that Dr. Jayant made about the way the devices behave, which Dr. Bress will explain is contrary to the actual observed behavior of the devices.

THE COURT: Would you say that this is any different than an animation produced by a party to recreate an event?

MR. SNYDER: I think it would be very similar. The only difference, Your Honor, is that this is the -- these are examples of the actual events. So when you have a recreation, you're simulating something else that happened in reality. The allegation of infringement is that every time these devices do it, they are infringing.

So this may not be evidence of every instance of infringement, but they are examples of what they are accusing of infringing behavior.

I think the standard, though, would be very

similar. And for something like a recreation, if the -- if the recreation is substantially similar to the conditions that is being depicted, then it would be allowed.

These aren't just substantially similar, they are the conditions.

THE COURT: All right. Thank you, Mr. Snyder.

Mr. Tsuei, I understand from Mr. Snyder's remarks that Dr. Bress was deposed and that these videos were something that the Plaintiff had possession of at the time of his deposition; is that correct?

MR. TSUEI: I believe that is correct, Your Honor.

THE COURT: Tell me what you learned from Dr. Bress in the deposition that would cause you to question the -- whether the videos accurately represent what Dr. Bress will testify to orally.

MR. TSUEI: So I'll tell you one thing, it's not something we strictly speaking learned from Dr. Bress but is a fact, which is the testing setup on which Dr. Bress apparently relied, after having created it for purposes of the case, was never made available for inspection. All we have is, I think, his word as to how that testing setup was created.

And so to get to, I think, Your Honor's concern, I think, during your colloquy with Mr. Snyder, what is the reliability of the assertions that Samsung says are

apparent from these videos?

So we don't know. We have never seen the computer that is depicted in the videos. We have never seen the device that is hooked up to the computer that is depicted in the video. Neither do we have any guarantees of trustworthiness, nor other indicia of reliability about the methods through which the apparent assertions are being depicted in the videos.

And just so that it doesn't get lost, Your Honor, there's actually voice-over, as well, in the videos, which depending on how Samsung or Google intend to use those, I guess, statements or verbal utterances, but also plainly constitute hearsay, particularly if Samsung says this is what happens when this utterance is made in the ordinary operation of an accused product.

And so what I -- I take Mr. Snyder's main concern is they want to be able to have Dr. Bress explain that this is what he did, as well as maybe put on some slides, a photograph of his testing setup. That's fine with us. That is, I think, ordinarily allowed under this Court's practice, but it doesn't transform the work product that the expert generated during preparing his opinions into non-hearsay.

THE COURT: So is part of what's going on in the videos the use of the speech recognition?

03:09:31 MR. TSUEI: Yes, Your Honor, that's a part of it.

03:09:35 THE COURT: And so I guess what I'm going to hear is that it would be difficult for Dr. Bress to recreate that testing in the courtroom?

03:09:52 MR. TSUEI: Well, if that's something that Samsung would like to choose to do, I won't fault them for trying to do that, but I also would note that they're actually also permitted to just play the video as a demonstrative, I think, under the Court's ordinary procedures.

03:10:05 But, again, our point is it's still not evidence that is admissible. And so I think under the standard rule, the expert can, of course, rely on normally inadmissible materials and can explain them if the probative value of that presentation outweighs their prejudicial effect, which I suspect, you know, we may not necessarily dispute here.

03:10:29 THE COURT: Well, what I intend to do is to allow this bucket to remain on the exhibit list with an asterisk on these and indicate that they are not to be referred to in front of the jury until they have been admitted through Dr. Bress. And you may have -- you may be given an opportunity to traverse Dr. Bress on their admissibility or just to cross-examine. I'm not sure that varies, but I suspect that he'll be able to lay an appropriate foundation, but I don't know.

03:11:16 And so I'm going to allow them to be on the pre-admitted exhibit list but with that asterisk, and we're talking about DTX-57, 61, 126 to 129, 131 to 134, 137, and 173.

03:11:50 MR. SNYDER: Your Honor, may I allow one -- ask for one correction?

03:11:53 THE COURT: All right.

03:11:53 MR. SNYDER: I believe the exhibits to this addresses are DTX-57 through DTX-61, and not DTX-57 and 61.

03:12:02 THE COURT: Oh, I see. The DTX is repeated there. So it was hard to understand in that fashion, but all right, DTX-57 through 61.

03:12:17 That takes us to the next bucket, which is No. 3.

03:12:32 MS. JAY: Good afternoon, Your Honor. Minna Jay for Cerence.

03:12:51 These are Samsung presentations of survey results, as well as an Excel sheet containing what appears to be survey results. They are hearsay. It's obviously statements by Samsung, so not of a party opponent.

03:13:07 We believe that they should not be pre-admitted. To the extent that they think they can lay a foundation, they can try to do that through their witness. Under 402/403, as well, these survey results have nothing to do with the accused features in this case. There are no line items relating to Voice Assistant technology, Bixby, Google

03:13:27 Assistant. They only relate to other aspects of Samsung phones and pricing and colors and that sort of thing and draws no comparison with the accused features in the case So we think under 403, they should be also be excluded.

03:13:41 THE COURT: You refer to these as survey results?

03:13:45 MS. JAY: They appear to be Samsung presentations of consumer surveys that they conducted internally.

03:13:52 I can put them up on the screen if Your Honor would like to see an example of one.

03:13:56 THE COURT: That would be helpful.

03:14:38 MS. JAY: This is an example of DTX-158, and it appears to be a Samsung presentation. There's discussion about methodology, project overview -- I lost my connection to my mouse. Apologies. One second.

03:14:59 Okay. Here are some of the survey results. These are some of the features that were tested, easy to use iOS compatibility, FaceTime, nicer look and feel cameras, nothing to do with voice assistant technology, and that pervades throughout this presentation, as well as the others in this bucket.

03:15:28 THE COURT: All right. Thank you, Ms. Jay.

03:15:33 Let me hear the response.

03:15:35 MR. REIDY: Your Honor, Patrick Reidy for the Defendants.

03:15:53 Just as additional context, these three exhibits

show that the feature or features accused of infringement in this case are not purchase drivers for the accused products, and that is why our damages expert cites to them and discusses them in her report.

THE COURT: Why are they hearsay?

MR. REIDY: I think that they probably are out-of-court statements. I'm not hearing from Ms. Jay any reason to believe that they're not trustworthy. These are documents created in the ordinary course of Samsung's business, relied upon by Samsung, relied upon by Samsung's customers. And, you know, essentially we're just trying to -- we can, of course, admit them at trial. We're just trying to shortcut that process here.

THE COURT: I understand that. I don't see how they would be admitted at trial either if they're hearsay presentations. What would be the exception to the hearsay rule?

MR. REIDY: I would offer them as business records created -- created in the ordinary course of Samsung's business, and as a document that is ordinarily regularly relied upon by experts for exactly the purpose that they're being relied upon.

THE COURT: You know, 803(6), the business records exception, requires the declaration of a custodian.

MR. REIDY: Understood, Your Honor. So I don't

03:17:40 have that here. I don't have that now. I think that -- you know, I understand the hearsay objection. I guess what I'm trying to say is that I think at the end of the day, the residual exception should apply. These are Samsung documents. I'm not hearing any questions about their authenticity or trustworthiness.

03:18:05 THE COURT: Well, I think the issue about their trustworthiness is the hearsay issue. They're not subject to being sworn or cross-examined.

03:18:17 But I will sustain the hearsay objection to DTX-158 and 159 and 161.

03:18:30 MR. REIDY: All right. Thank you, Your Honor.

03:18:32 THE COURT: Thank you, Mr. Reidy.

03:18:33 MR. BUCZKO: Your Honor, this is Cerence's objection to Bucket 4, license negotiation emails.

03:18:59 And the one I want to look at, Mr. Kolko, is DTX-48.

03:19:03 Your Honor, our objection to this is hearsay. These are out-of-court statements used to prove the fact of the matter asserted. This is an email from someone from [redacted] negotiating in the back and forth underlying the [redacted]. We have a motion against the [redacted] in Daubert but putting that aside, there's still the hearsay aspect with regard to these negotiation emails.

03:19:41 There's another document in this bucket, DTX-43, that is a similar email chain.

03:19:48 DTX-37 is the actual [redacted] agreement. We agree that that would kind of rise and fall with the Daubert. We don't have a hearsay objection to that. So the main focus of this bucket is the emails which is DTX-48 is the one I want to look at.

03:20:06 THE COURT: So which exhibits do you say you have a hearsay objection to?

03:20:10 MR. BUCZKO: 43 and 48, DTX-43 and DTX-48, Your Honor.

03:20:15 THE COURT: All right. Let me hear the response to the hearsay objection to 43 and 48.

03:20:21 MR. LIANG: All right. So I put up DTX-43 -- sorry, 48, the same one that was shown by Plaintiff's counsel. This is Mark Liang.

03:20:33 So waiting for it to show up in a moment.

03:20:40 All right. So it's not hearsay because it's a statement of a party opponent, or at least some of these emails are. And you need the other statements to -- and some of the statements even by Microsoft refer to prior statements by Cerence's representatives. The party opponent in this case is Cerence or its representatives at Global IP. Global IP was a law firm retained by Cerence to engage in this negotiation for what was ultimately the

03:21:08 [redacted].

03:21:12 And you can see -- I mean, this is an email, for example, from Mr. Alex Debski to [redacted]. He actually says: Happy New Year. Cerence accepts [redacted].

03:21:24 This is clearly a statement by Cerence, by its representatives or agents, Global IP. So it's not hearsay under the party opponent rule, statements of a party opponent, 801.

03:21:35 THE COURT: Is the relevance in the statement by Global IP or in the statement that Global IP is responding to?

03:21:45 MR. LIANG: The relevance -- well, actually that raises another point. It's not -- the use of this -- well, it's to be determined at trial, but the use of this isn't even necessarily the truth of the matter, but rather that there were negotiations between the parties all the way through until the agreement was signed.

03:22:01 This is actually another potentially disputed issue that we -- seem to be apparent from the deposition of Mr. Rodriguez. He actually expressed doubts as to whether the agreement really resulted from these negotiations between Global IP and [redacted]. And these emails, which were introduced in this depo, refute that possibility. So

they're used -- they're not hearsay, A, because they're statements of a party opponent, and it is relevant that Cerence was accepting the offer that [redacted] gave. And they're also being used not even as -- for the statements being asserted, but merely the fact that these negotiations actually happened in this time range.

THE COURT: All right.

MR. LIANG: And --

THE COURT: Mr. Liang, I think that's probably all I need to hear on that.

Let me hear the response. Thank you.

MR. BUCZKO: So, Your Honor, it's the hearsay statements that we're concerned with. That's why we object to this, Your Honor.

THE COURT: What statement is that?

MR. BUCZKO: It's the top of DTX-48.

If I could see that, Mr. Kolko.

It's the statement by Microsoft. Ms. Dong is a Microsoft employee. And so this is the top of the email. This is the hearsay statement. And, you know, the statements from the licensing intermediary, I don't know -- I don't agree that that's necessarily a statement of a party opponent in terms of negotiating between the two entities. Certainly when Mr. Debski introduced himself as Cerence and says Cerence accepts, then I do agree on that

point. But I don't know the specific relevance of this document or what they're going to try to -- what they're using this for. But it is hearsay.

THE COURT: What is there in the statement by Ms. Dong that you're saying is hearsay that is in any way prejudicial?

MR. BUCZKO: I don't know exactly, Your Honor, how they're going to use this. I mean, she says we also wanted to clarify the purpose/intent of the last portion of Section 4. This is kind of incomplete because they don't even have the draft license attached to this.

THE COURT: But you're not objecting to the license?

MR. BUCZKO: The license -- we have a Daubert motion addressing their expert's use of the license, and we are objecting to the license under -- we agree it would rise and fall with that Daubert motion. And then we have the additional hearsay objection to the emails, Your Honor.

THE COURT: All right. I'm going to overrule the objection to DTX-43 and 48 and pre-admit this bucket. If the Daubert ruling changes that, then we'll address that after -- after that ruling. But at this point, the objections in this bucket are overruled.

MR. BUCZKO: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Tsuei.

03:25:39 MR. TSUEI: Thank you, Your Honor.

03:25:40 So let me address our Bucket No. 6, which refers to the late-produced extent of use or use metrics information, the relevance of which and involvement for which overlaps with several other disputes.

03:25:56 THE COURT: Just to keep the record clear, that looks like Bucket 5.

03:26:04 MR. TSUEI: My apologies, Your Honor. Yes, I have a misnumbering here. The next bucket is Bucket 5.

03:26:10 THE COURT: All right.

03:26:11 MR. TSUEI: So I want to discuss this bucket and make two points. There are two groups of exhibits here which are materially different. The first group is DTX-49 through 51, and the second group is DTX-70.

03:26:24 DTX-49 is a -- what appears to us to be an Excel spreadsheet which was produced at about 4:00 p.m. on the last day of discovery which several of Defendants' experts have described as extent of use information.

03:26:45 For the reasons I think we've already gone over earlier today, we don't believe that evidence should be permitted to be the subject of an opinion from Samsung's experts, neither do we believe it to be appropriate for Samsung or Google to use a fact witness to sponsor and make arguments based off of this evidence.

03:27:01 Exhibits -- 51 is also slightly different in that

it was produced at the end of expert discovery, that is, long after the close of fact discovery. And we interpret it to be an updated version of the Goggle Assistant-related use metrics.

DTX-70 is, I believe, a copy of Samsung's corrected second amended responses to Cerence's interrogatories. The date on this document, I believe, is in May 2025. And this is the set of interrogatory responses that is referenced in the pending motions, which Cerence has articulated and argued were late-produced information which should be excluded from the case.

Now, of relevant note, we received an email from Samsung last night indicating that they were going to cut down DTX-70 from its full, I guess, several-hundred page length of interrogatory responses to a subset of the information therein. I don't believe we have received a copy of that cut-down version, but I believe based on representations made over email, it will include several, I guess, charts which Samsung generated and put into these late-served interrogatory responses shortly before the close of expert discovery.

THE COURT: So you're saying this Exhibit 70 is Samsung's interrogatory responses?

MR. TSUEI: Correct.

THE COURT: All right. And is there a hearsay

03:28:55 objection to that?

03:28:57 MR. TSUEI: There is, Your Honor.

03:28:58 So I take it Your Honor is aware that in most
03:29:02 cases, statements made by a party in support of their own
03:29:05 positions in the case are hearsay if they try to use it to
03:29:08 prove the truth of the matters they're asserting therein.

03:29:12 THE COURT: I've heard that.

03:29:13 MR. TSUEI: That that is a -- I regret not having
03:29:18 started off with that, but, yes, it is also all hearsay.

03:29:21 THE COURT: Okay. And are we talking about 49,
03:29:30 50, and 51, or just 49 and 51?

03:29:32 MR. TSUEI: 49, 50, and 51, as well as 70, with 70
03:29:41 being the interrogatory responses.

03:29:42 THE COURT: And are you saying -- you said 49 was
03:29:46 served on the last day of discovery?

03:29:50 MR. TSUEI: Yes, sir.

03:29:51 THE COURT: And 50 and 51, was it, were with
03:29:56 expert reports?

03:29:57 MR. TSUEI: Not quite, Your Honor. I believe 50
03:30:00 was also served at 4:00 p.m. on the last day of discovery,
03:30:05 and 51 was served either the morning of the close of expert
03:30:10 discovery or I think the preceding Friday, which would have
03:30:14 been May 16th.

03:30:15 THE COURT: All right. Let me hear the response
03:30:17 to that, Mr. Tsuei.

03:30:20 MR. SNYDER: Thank you, Your Honor. Darin Snyder for Defendants.

03:30:23 Perhaps I can provide some clarity. We talked this morning about the chronology and circumstances of these -- the production of this usage information. It is chronicled in some detail in the Steckel Daubert motion and the briefing related to MIL No. 3. In that motion, there is a reference to three exhibits, H, I, J, which are Google usage information. Those correspond to DTX-49, 50, and 51.

03:31:03 So Exhibit H to the briefing is at DTX-49. Exhibit I to the briefing is DTX-50. Both of those were produced during the discovery period. It was the last day of the discovery period, after extensive communications between Plaintiff's counsel and Google's counsel that are recounted in that briefing.

03:31:32 [redacted] Dr. Bress's, rebuttal report because it responds to a newly accused feature in Dr. Jayant, Google's -- Plaintiff's expert's infringement report, and specifically the feature called [redacted]

03:32:06 The Samsung-related information is a little -- is different. So let me try and explain what was going on

there. Again, the chronology of that production is laid out in the briefing. The original Exhibit 70 is a series of interrogatory responses. We realize that that was not the appropriate way to create a trial exhibit. [redacted] Exhibits A through G, that were attached to those interrogatory responses.

Exhibits A through F of those interrogatory responses were produced before the close of discovery.

[redacted]

Exhibit 70A is only the version -- or is only the tables Exhibit A through G to those interrogatory responses. So they do not contain statements of party opponents. The interrogatory responses were originally included because, as detailed in the briefing, [redacted] That is in Interrogatory 20, but we understand that it would not be appropriate for a trial exhibit, so exhibit -- [redacted].

[redacted] [redacted]

03:33:57 MR. SNYDER: [redacted].

03:34:09 [redacted]

03:34:24 THE COURT: And has a witness opined about the manner in which these were created?

03:34:28 MR. SNYDER: Samsung produced a detailed interrogatory response. That's the response to Interrogatory 20 that describes the creation of -- of the [redacted] They're -- the -- Mr. Steckel, who relied on the Google data as part of his opinion, was deposed. He was not asked any questions about that data.

03:35:02 THE COURT: So your theory is that these exhibits are Samsung business records?

03:35:08 MR. SNYDER: They are Samsung business records, or they are Google business records.

03:35:14 THE COURT: Who created them? I thought you said Samsung created them.

03:35:23 [redacted] [redacted]

[redacted] [redacted]

03:35:32 [redacted] [redacted]

[redacted]

[redacted]

THE COURT: And do you have a custodian who has opined the necessary inclusions for 803(6)?

MR. SNYDER: We have not provided that testimony yet, Your Honor.

THE COURT: How is it that you would have the Court admit them without it?

MR. SNYDER: We didn't think there would be a dispute about the source of the information, particularly when Plaintiff forewent the opportunity to depose Dr. Steckel about that data, but that -- that information could be provided.

THE COURT: They asserted a hearsay objection to it.

MR. SNYDER: That is correct. That is something that has happened very, very recently, Your Honor. This data was produced months ago.

THE COURT: All right. I know you've got stipulations on a number of things, as far as documents that come from the parties. I don't recall seeing any stipulation about admission of documents from Google.

MR. SNYDER: I don't know that there is a stipulation that is specific. There are several Google documents that we have agreed to put on the joint exhibit list. There are Google documents that both sides want to

03:37:11 use. Certainly Plaintiff wants to use several
03:37:18 Google-produced documents, and I don't know that any
03:37:19 questions have been raised about the authenticity of any of
03:37:22 those documents, Your Honor.

03:37:23 THE COURT: And what about 70A, the documents that
03:37:27 you say were created by Samsung?

03:37:28 MR. SNYDER: [redacted]

03:37:47 I use the plural because those tables were not
03:37:52 produced all at the same time. So there are several
03:37:55 versions of the responses that are in the original DTX-70
03:37:58 which we have withdrawn and want to replace with
03:38:02 Exhibit 70A which has only the tables.

03:38:05 THE COURT: But it also needs to comply with
03:38:12 803(6) if you're going to have it admitted into evidence.

03:38:15 MR. SNYDER: The information that is in that
03:38:18 Interrogatory 20 should provide all of the -- all of the
03:38:21 information that is required by that exception to the
03:38:23 hearsay rule, Your Honor.

03:38:25 THE COURT: You know, that -- that -- how does it
03:38:30 indicate who the custodian is?

03:38:33 MR. SNYDER: I don't know that it identified -- I don't have the response memorized, Your Honor. I don't know that it identifies a person by name. It does identify the portions of the business that are responsible.

03:38:51 THE COURT: Well, I'm afraid, Mr. Snyder, that you're not ready for an exhibit hearing if you don't have your ducks in a row on the hearsay rule. And I don't know what I'm supposed to do with it. I understand it is important.

03:39:15 But 803(6) says that all of these conditions are shown by the testimony of a custodian or another qualified witness or by a certification that complies with Rule 901. And those things that have to be shown are the time at which the record was made, whether it was kept in the course of a regular business, was that a regular practice, so I don't know how I can find those things based on what you're telling me.

03:39:52 MR. SNYDER: If that is the -- if the Court is inclined to rule in that way, I would request that there be an asterisk to granting any objection to these exhibits to give us -- and give the Defendants an opportunity to lay that foundation.

03:40:10 THE COURT: Well, I tell you what, I'm -- we're not going to finish all of this today, I don't believe. So I'm going to pass Bucket 5 and come back to it. If we end

03:40:28 up not finishing today, we'll schedule a further hearing.
03:40:33 And in the interim, you can get a declaration that complies
03:40:38 with Rule 803(6).
03:40:40 MR. SNYDER: Thank you, Your Honor.
03:40:40 THE COURT: Let's go on to the next website --
03:40:59 next bucket.
03:41:15 Mr. Tsuei?
03:41:16 MR. TSUEI: I apologize, Your Honor. Your Honor
03:41:19 indicated his desire to move this discussion until after
03:41:21 the rest of the buckets, but just so it doesn't get lost,
03:41:25 [redacted]
03:41:28
03:41:31 And so
03:41:35 we had no opportunity during fact discovery to explore or
03:41:40 examine the probative value of this evidence.
03:41:43 THE COURT: All right. Well, when we come back to
03:41:48 Bucket 5, I'll further explore those issues, as well.
03:41:51 MR. BUCZKO: Jacob Buczko for Plaintiff. And I'm
03:42:01 going to address Cerence's Bucket 6.
03:42:06 And, Mr. Kolko, can I have DTX-4, please?
03:42:09 Okay. And this Bucket 6, these are all
03:42:20 third-party websites and related documents and some videos
03:42:23 that pertain to the [redacted] that we talked about a
03:42:28 little bit in connection with Cerence's MIL 1.
03:42:32 This is from -- this is not only just a -- the

03:42:37 Cerence web -- or, sorry, [redacted] that were subject to the Court's MIL orders earlier today.

03:43:07 But these exhibits, they're all third-party websites. They're third-party documents. They're also not authenticated. They're offered for the truth of the matter asserted. They're hearsay. So we don't see any basis for them to be admitted into evidence.

03:43:22 And in addition, DTX -- there are similar websites like this on the list in the bucket. DTX, I think, 5 and 6 are -- and maybe 9 are also videos, which I think have -- you know, those are further assertions that have authenticity problems. We don't know where they came from or what they are.

03:43:47 THE COURT: And none of these, I take it, have been elected as invalidating prior art?

03:43:51 MR. BUCZKO: No, Your Honor, none of this is elected prior art.

03:43:54 THE COURT: All right. Thank you, Mr. Buczko.

03:44:10 MR. REIDY: Your Honor, Patrick Reidy for the

03:44:32 Defendants.

03:44:32 Plaintiff's counsel, I don't know if it's
03:44:37 deliberate or not, but ignores completely that all of these
03:44:44 documents were authenticated and established as business
03:44:49 records through a deposition of Sensory's CEO, Todd Mozer,
03:44:54 and a corresponding declaration identifying each of the
03:45:01 DTXs in this bucket as business records.

03:45:04 THE COURT: They're all from Sensory?

03:45:06 MR. REIDY: So some produced by Samsung, some
03:45:12 produced by Sensory --

03:45:16 THE COURT: Well, by that I mean --

03:45:18 MR. REIDY: They're all reviewed --

03:45:20 THE COURT: -- all created by Sensory?

03:45:25 MR. REIDY: Initially, yes.

03:45:25 THE COURT: All right.

03:45:27 MR. REIDY: Todd Mozer -- sorry, Your Honor.

03:45:29 THE COURT: And so you said -- are you
03:45:31 representing that each of these exhibits was discussed in
03:45:37 Mr. Mozer's deposition?

03:45:40 MR. REIDY: What I'm representing, there's two
03:45:42 things. Some were discussed during the deposition.

03:45:45 To provide a little bit more context, Mr. Mozer
03:45:51 signed a declaration in which he identified each of these
03:45:57 exhibits as business records. During the deposition, he
03:46:06 swore to that declaration, and it was an exhibit to his

deposition. Plaintiff's counsel attended that deposition and raised no concerns about the authenticity of any of these exhibits.

THE COURT: Can you show me his declaration? I am assuming from your statement that it's a typical 803(6) business record declaration?

MR. REIDY: Right. So if you can share my screen.

Well, maybe I can connect my laptop to the monitor over there, which worked earlier.

So -- sorry.

So, Your Honor, what I'm sharing on the screen is the declaration of Todd Mozer. He's the chairman and CEO of Sensory. And in this declaration, he certifies, as stated in Paragraphs 3 and 4, that the documents identified in this declaration are business records. And I've annotated this version of his declaration to show specifically where the agreements -- sorry, the documents in this bucket are identified.

THE COURT: All right.

MR. REIDY: So --

THE COURT: I'm just trying to keep this moving. That looks, Mr. Tsuei, like -- or, I'm sorry, Mr. Buczko, like a valid 803(6) declaration.

Do you have any argument against that?

MR. BUCZKO: Yes, Your Honor. I actually -- I

03:49:22 didn't catch it, but it didn't seem like this declaration
03:49:26 was signed.
03:49:29 MR. REIDY: Your Honor -- Your Honor, as was
03:49:31 established at his deposition, he could not sign it before
03:49:35 the deposition. So I can pull up the portion of the
03:49:38 transcript, if it would be helpful, but he swore to the
03:49:41 contents of the declaration under oath at his deposition --
03:49:45 THE COURT: All right.
03:49:46 MR. REIDY: -- at which Plaintiff's counsel had an
03:49:48 opportunity to object, and they did not.
03:49:52 THE COURT: Do you have any argument against that,
03:49:57 Mr. Buczko, that Mr. Mozer swore to the truth of this
03:50:04 declaration?
03:50:06 MR. BUCZKO: I don't have specific knowledge one
03:50:08 way or the other. I'll take counsel's representation. I
03:50:10 just noticed flipping through it that it wasn't signed.
03:50:14 And if the same substance was signed and counsel's
03:50:17 representing to that, then I'm not going to --
03:50:20 THE COURT: I think the representation is that the
03:50:24 witness at his deposition said that -- swore that this
03:50:28 declaration was truthful.
03:50:30 MR. BUCZKO: Yes, Your Honor. And I don't have
03:50:34 specific knowledge to dispute that. I just saw that this
03:50:38 was not signed, and that's why I brought it up. So I --
03:50:41 but if it's -- I'm not disputing Mr. Reidy and his account

03:50:45 of what happened at the deposition, that this was signed.

03:50:48 But, Your Honor, this declaration -- and if we 03:50:51 look at some of the exhibits, the exhibit I looked at, 03:50:54 DTX-4, was a Wayback Machine printout which comes from, 03:50:58 like, another third party. You know, the business records 03:51:02 requirement requires that a document contains information 03:51:07 that was made at the time that the information was known 03:51:11 and it's kept in the ordinary course of business. And I 03:51:15 don't think Wayback Machine printouts are -- follow that 03:51:20 exception. And that was DTX-4.

03:51:25 THE COURT: It's unusual to have a witness who was 03:51:31 part of the creation of a document that's on the Wayback 03:51:36 Machine authenticate it. But there's certainly no reason 03:51:39 that he can't look at the Wayback Machine version of a 03:51:44 Sensory document and say I swear that that's a true and 03:51:49 correct copy.

03:51:50 MR. BUCZKO: He signed it, and he swore to it. I 03:51:54 mean, these documents date back 15 years ago. He must have 03:51:57 an incredible memory, but it's -- it's frankly a little 03:52:03 dubious. I know he swore to it, and I'm not -- I don't 03:52:06 want to attack it that way, but it's --

03:52:08 THE COURT: Business records declarations are 03:52:10 never based on the personal knowledge of the declarant as 03:52:13 to the accuracy of the information. It's just the personal 03:52:17 knowledge of the declarant that this is a record that was

kept in the ordinary course of business and the other conditions, but...

MR. BUCZKO: And I think the other conditions is the issue. I mean, that they had -- he has knowledge of how these 15-year-old documents were created. It's -- and specifically about how each and every one, and it's a list of about, you know, 20 or 30 documents.

THE COURT: It says that in 1994, he incorporated Sensory. So I think the man has a -- the possibility of knowing what he's talking about.

MR. BUCZKO: I don't doubt that he certainly has a lot of knowledge about his company, but the specific contents of this entire list of documents, I think, is beyond what's reasonable, and that's -- you know, that's my argument. You know, it's -- a lot of these documents, again, are just websites, videos, and things like that. And there could be hearsay within hearsay there in terms of, like, the videos and things that were said and assertions made in the videos.

And also beyond the hearsay objection, Your Honor, we have the MIL objection that Your Honor ruled on, MIL 1. A lot of these documents -- and you asked me before whether any of these are elected prior art. None of them are.

So we also have that -- that objection, the 402/403. I don't want to revisit MIL 1, but I just want to

note for the record that we have those objections to these also.

THE COURT: All right. I'm not sure, how do these implicate MIL 1?

MR. BUCZKO: So MIL 1 was about the Sensory TrulyHandsFree NIA that was being treated as prior art. And Your Honor issued an order on that, and that there couldn't be evidence and argument -- I don't recall the exact wording, but generally evidence or argument regarding the status of this information as prior art without -- and the door could be opened to some extent with copying evidence.

THE COURT: Well, frankly, that would be based on an attempt to show that -- or an argument that the documents were before the priority date of the asserted patents and some comparison to the limitations of the asserted patent.

I wouldn't see how any of these documents in and of themselves would violate MIL 1. It would be the use of these documents by Defense counsel that would run afoul of MIL 1. But as far as the hearsay objection goes, I think that they have met that with Mr. Mozer's declaration and deposition.

Tell me about any other objections you have.

MR. BUCZKO: I think that covers it all. I think

03:55:41 the declaration, as Your Honor ruled, would cover the
03:55:44 authenticity also. So I think that -- that clears our
03:55:49 objections, and it sounds like you made your order.

03:55:54 THE COURT: All right. Then I will overrule the
03:55:57 objections to DTX-4, 5, 6, 9, 11, 13, 14, 122, and 124.

03:56:15 MR. BUCZKO: Thank you, Your Honor.

03:56:15 THE COURT: Thank you, Mr. Buczko.

03:56:18 That takes us to Bucket 7.

03:56:34 MR. TSUEI: Your Honor -- sorry.

03:56:41 MR. REIDY: This is Patrick Reidy for the
03:56:44 Defendants.

03:56:44 We can withdraw Bucket 7 from our --

03:56:51 THE COURT: All right. Then DTX-148 is withdrawn.

03:57:03 That takes us to No. 8.

03:57:06 MR. TSUEI: Your Honor, after internal discussion,
03:57:14 we've decided -- that is the Cerence's team has decided to
03:57:19 withdraw our objections to currently Bucketed No. 8, which
03:57:22 includes DTX-089.

03:57:28 THE COURT: All right. So DTX-89 will be
03:57:32 pre-admitted.

03:57:40 Which takes us to No. 9.

03:57:42 MR. TSUEI: Yes, Your Honor.

03:57:43 Bucket No. 9 relates to the non-infringement
03:57:49 argument which is implicated in the pending motion to
03:57:54 exclude certain opinions of Dr. Bress. The exhibits in

03:57:59 question here are PDF versions of web pages, as well as
03:58:15 user manuals of various Samsung Galaxy A model numbers.
03:58:21 So our objection here is not uniform. So starting
03:58:26 with DTX-174, we object to 174 as late-produced in that it
03:58:35 is publicly available information that Samsung produced at
03:58:39 the close of expert discovery to support a non-infringement
03:58:42 argument as opposed to what they were required to do, which
03:58:48 was to produce it during fact discovery.
03:58:50 We have articulated arguments regarding this and
03:58:55 similar web pages in the pending briefing.
03:58:58 Exhibit 176, which is representative of 175 and
03:59:05 176, are timely produced Samsung user manuals for certain
03:59:12 Galaxy A models.
03:59:15 Our objection here is not strictly speaking as to
03:59:18 their admissibility but to their potential and proper use
03:59:22 during trial, which is to support what we contend in the
03:59:27 briefing to be a late-disclosed and improper
03:59:30 non-infringement argument. And so the relief we would be
03:59:34 asking for that second category of items here is a finding
03:59:40 from the Court that Samsung is precluded from making such
03:59:44 arguments based off of that evidence.
03:59:46 THE COURT: And what briefs are you talking about?
03:59:49 MR. TSUEI: The most important one, I think, is
03:59:52 the pending Cerence motion to exclude certain opinions of
03:59:59 Samsung's non-infringement technical expert, Dr. James

Bress. There are also overlapping issues and arguments briefed in the also pending Cerence motion to exclude opinions of Samsung's economic expert who is, I believe, Ms. Julia Rowe.

THE COURT: So what I guess you're asking is that the Court carry the objection to 175 and 176, along with the motion you just referred to?

MR. TSUEI: I believe, Your Honor, that in large part would be acceptable to Cerence, but I do think, Your Honor, that a ruling on DTX-174 is appropriate and can be issued at this time based on the record.

DTX-174 is, as I said earlier, a PDF version of a web page, I believe, that Dr. Bress navigated to and created during the course of his work for preparing his non-infringement opinions. That web page, we believe, is hearsay.

To the extent that Samsung argues that there is a business records exceptions, for example, no evidence establishing the foundation for the application of that exception has been articulated by Samsung.

THE COURT: I'll ask you in a moment to show me 174, but can you give me the docket number of the motion that you're saying addresses what you call the late infringement -- non-infringement theory?

MR. TSUEI: Yes, Your Honor. One moment, please.

So the motion to exclude certain opinions of Samsung's non-infringement expert, Dr. Bress, begins at Docket No. 141.

THE COURT: All right.

MR. REIDY: Your Honor, if I may, this is Patrick Reidy. We can withdraw DTX-174.

THE COURT: All right.

MR. REIDY: We just plan to use it as a demonstrative.

THE COURT: DTX-174 is withdrawn by Defendant.

And I'll carry the objection to 175 and 176, along with the motion at Docket 141.

MR. REIDY: Your Honor, this is Patrick Reidy.

If I may, I'm not sure that the objection to DTX-175 and 176 is coextensive with the motion to exclude Mr. Bress's opinions.

THE COURT: Well, then let me let you address that.

MR. REIDY: Your Honor, I believe I can perhaps -- perhaps it is appropriate to -- we can withdraw for now -- sorry, we will -- we will look to obtain witness evidence at trial to admit Docket No. 170 -- sorry, DTK-175 and --

MR. SNYDER: DTX.

MR. REIDY: -- DTX-175 and 176. My apologies.

THE COURT: So you're withdrawing those as

04:04:22 exhibits; is that what you're saying?
04:04:24 MR. REIDY: Yes, for now, Your Honor.
04:04:26 THE COURT: All right. That takes us to 168.
04:04:48 MR. TSUEI: Yes, Your Honor. So this is Cerence's
04:04:50 Bucket No. 10. This used to contain more DTXs and other
04:04:56 web pages, but since we're down to 168, the main issue with
04:04:59 168 is that it is a PDF printout of a third-party's, I
04:05:06 guess, industry technology reviewer's discussion of certain
04:05:11 Samsung Bixby features. If the Court is so inclined, you
04:05:17 can review just a version of it which I'll just put on the
04:05:20 screen.
04:05:20 MR. REIDY: Your Honor, my apologies. We can
04:05:22 withdraw for now Buckets 10 and 11, as well.
04:05:29 THE COURT: All right. So 168, 77, and 79 are
04:05:39 withdrawn.
04:05:44 MR. TSUEI: Just to clarify, Your Honor, I didn't
04:05:47 quite hear. That includes 77 and 79 of Bucket 11; is
04:05:52 that --
04:05:52 THE COURT: Yes, that is accurate.
04:05:57 MR. TSUEI: Thank you.
04:06:01 THE COURT: All right. That gets us to the
04:06:08 Plaintiff's exhibits -- the Defendants' objections to the
04:06:13 Plaintiff's exhibits.
04:06:20 MR. LIANG: All right. Your Honor, I think the --
04:06:32 this is Mark Liang for the Samsung Defendants.

I think the first bucket is PTX-174, which is basically the attachments to an expert report -- the attachments specifically to the damages expert report of Jim Bergman, Cerence's damages expert.

Put it on this screen, please. Oh, it doesn't work?

Okay.

THE COURT: Typically, those would be hearsay, and I see --

MR. LIANG: Yeah, exactly. I mean, I'll describe it orally while we're trying to pull it up. It's 69 pages of calculations. There's even statements -- narrative statements in there describing what he's understanding the data to show in some instances. And there's even hearsay within hearsay in that he cites in excerpts conclusions from the survey expert on PDF Page 11. So, yeah, there's a lot of hearsay issues with the document.

THE COURT: Let me hear from Plaintiff as to the hearsay issue.

Does the Plaintiff contend that any of these are simply 1006 summaries?

MR. BUCZKO: Yes, we do, Your Honor. That's what we're offering them as. These aren't all the attachments to Mr. Bergman's report. We were -- our intent was to include only the attachments that summarized the accused

04:08:01 product financials that Samsung produced in this case.
04:08:04 Those are produced as Excel documents. They're unwieldy.
04:08:08 They're hard to use as exhibits and print out. So these
04:08:13 summarize that data.
04:08:16 FRE 1006 explicitly allows also calculations of
04:08:20 data, to the extent there are any calculations here. We
04:08:23 specifically took out all the ones that we believe had any
04:08:26 opinion in it, and so we also didn't want to include any
04:08:32 summaries that had overall revenue, to the extent there
04:08:37 were any.
04:08:37 THE COURT: Well, typically, the problem with 1006
04:08:43 summaries is whether or not they are exercising the
04:08:47 judgment of the creator as opposed to simply compiling data
04:08:53 from large sources.
04:08:54 So I guess what I'll do, then, is ask Mr. Liang to
04:08:58 point out anywhere where he thinks it's not simply a
04:09:04 compilation of large numbers of underlying documents.
04:09:10 MR. LIANG: I'm referring to co-counsel since this
04:09:23 screen isn't working.
04:09:23 Yeah, you can go to the very first page. You just
04:09:26 have to rotate it so the table is shown.
04:09:28 But, I mean, this is clearly a selection of
04:09:34 certain data he picked out. And if you go to the bottom --
04:09:37 I mean, you can tell from the bottom of each set of rows,
04:09:40 he actually does a total summation of these. So this is

not, you know, just a summary of voluminous records. He's actually -- it's not really a summary at all. He's just taking a lot of records that were produced by Samsung, and then he adds up the totals, and then eventually uses the totals as part of his calculations.

So it's filled with calculations like this. And as further examples, I just want to highlight PDF Page 11. This is the hearsay within hearsay where, for example, this is not a voluminous record summation. It's actually just excerpting conclusions from the survey expert. And so he's taking the survey expert's assertions and conclusions and then repeating them as part of an input to his calculation.

And there's other examples like this, but most of the -- this exhibit, PTX-174, consists of, you know, summations of different data that was produced. It's not simply just compiling or summarizing records.

THE COURT: There's nothing wrong with it totalling up large columns of numbers, but the problem comes when there are -- there is judgment that only certain numbers are relevant, and you can't tell which ones the expert has chosen, that sort of a thing.

Certainly Schedule 4.1 that you have on the screen does not look like just a 1006 summary, but --

MR. LIANG: Right.

THE COURT: Let me ask Mr. Buczko if he can show

me what it is that he is contending is just a 1006 summary.

MR. BUCZKO: Your Honor, we withdrew this 4.1, so this is out. We're not looking to admit this.

So the first page that Mr. Liang showed, that was just total units of accused products. The selection of data -- purported selection of data was just the data for the accused products. And the sources are all Samsung's -- Samsung's own financials that it produced in this case.

THE COURT: When did you withdraw Schedule 4.1?

MR. BUCZKO: We withdrew this, I think, two nights ago or a night ago, and I'm not -- maybe the lines crossed, and it didn't -- something happened, but we definitely withdrew this schedule. And we're definitely not asking that this comes in.

THE COURT: So does Samsung now have a copy of the version of PTX-174 that you are moving to admit?

MR. BUCZKO: Samsung should. It would be the exhibit minus this Schedule 4.1. I think this is the only one that we withdrew from what we had before.

THE COURT: All right. And are you representing that all of the rest of the pages of 174 that you're moving to admit are just compilations of Samsung numbers?

MR. BUCZKO: Yes, Your Honor.

THE COURT: All right. Mr. Liang, can you show me something different?

04:13:00 MR. LIANG: All right. So for the record, I don't -- we don't recall receiving a revised version. But in any event, to answer the question, go to PDF Page 15 or 16, either one. Start with 15 and then go to 16.

Right. So here it's not just adding up numbers. It's actually taking quantities -- you can tell from the footnotes he's actually citing prior calculations from prior schedules. And then he's taking the outputs of those calculations, and then he's doing even more complex calculations. So he's not simply adding things but actually calculating what he considers to be a gross profit margin, both in absolute terms as well as percentage terms. He calculates what he calls gross profit margin for tablets, watches. He calculates a total, and the footnotes refer to other schedules with additional calculations.

If you go to the next page, 16, he calculates -- this is actually something that he directly uses in his damages -- in his profit splitting opinions, an R&D expense ratio or expense -- expenditures. And he calculates the ratio of that, the percentage.

So there's a lot of detailed calculations here. And, you know, he also cites here you can tell to a lot of different data points that have been provided -- or produced. So it just looks like to me like this is just expert opinion assertions, work product, not simply a

collection of data points we produced without any commentary.

And as you noted, there's a careful selection of which data he would look at by the expert. So this is our concern.

There's also other portions I want to just point to quickly where -- you know, I mentioned there was, like, actually narrative in this.

If you go to Page -- PDF Page 47. Just rotate it.

Well, I mean, you can tell from even looking at it sideways, but there's clearly, like, narrative descriptions here of what, you know, he's analyzing and how he understood the data, how he actually filtered the data or -- and selected it. So there's additional opinion or assertions here, as well.

So, you know, these are just some representative examples. If you flip through this -- I mean, at a certain point, like, half or more of this exhibit is kind of what I just described. And at that point, I'm not sure what the purpose is at that point of having this whole exhibit.

THE COURT: All right. Thank you.

Mr. Buczko, these look like fairly standard schedules of a damages expert's report. Those are sometimes offered by agreement, but over objection, the best you could use them as would be demonstratives. But

they -- they're -- what I saw was clearly not just a 1006 summary. It was an elaboration of his theory.

So I'll sustain the hearsay objection to PTX-174.

MR. BUCZKO: Thank you, Your Honor.

THE COURT: That takes us to PTX-120.

MR. LIANG: Pull up PTX-120. That's the exhibit we identified as representative in this bucket.

Patrick, PTX-120.

All right. So this bucket consists of a lot public websites, third-party websites that were other public documents from third parties that the -- Cerence pulled from the Internet, I guess, and produced. And this is one example. It's what I would call a messy printout of a web page about Google Assistant even though a lot of the web page -- there's actually a relevance issue. It's actually about Gemini which is not an accused product.

So this is a -- and it has a Bergman Bates number. So this is something that the damages expert, I suppose, was citing as part of his opinions, pulling from public web pages.

So these are all, I think, hearsay -- there's authenticity, relevance in this instance, but more than anything, I think a hearsay issue with these third-party documents.

THE COURT: All right. Thank you, Mr. Liang.

04:17:59 MS. JAY: Good afternoon, Your Honor. Minna Jay
04:18:08 for Plaintiff again.
04:18:09 The first note that I want to make is that this
04:18:29 bucket does not contain all third-party documents. PTX-119
04:18:34 is, in fact, a Samsung.com printout, so it's a statement by
04:18:40 a party opponent undisputedly.
04:18:40 THE COURT: PTX-119 is from whom?
04:18:43 MS. JAY: Samsung, Your Honor. You can see from
04:18:45 the URL at the top, it's an insights.samsung.com printout.
04:18:52 For the remaining exhibits in this bucket, they
04:18:56 are indeed Google.com printouts, or they are articles that
04:19:02 have been published by Google, Inc. For example, PX-135,
04:19:11 these are -- this one is actually a Rowe/Samsung document.
04:19:15 So Ms. Rowe, who is Samsung's damages expert, relied on
04:19:20 this and produced it to us.
04:19:20 [redacted]
04:19:23 [redacted]
04:19:26 [redacted]
04:19:29 [redacted].
04:19:37 THE COURT: [redacted]
04:19:39 [redacted]
04:19:49 [redacted]
04:19:49 MS. JAY: [redacted]
04:19:53 [redacted]
04:19:57 [redacted] There's non-infringement statements

set forth specifically relating to the [redacted]

THE COURT: Well, I tell you what, you know, I can let you try to admit these through the Google witness, but I'm not going to admit them without some witness authentication.

Do you have any other witness that can authenticate and lay a foundation for these documents?

MS. JAY: Not at this time, Your Honor. It would likely have to be through the Google witness.

And, again, the caveat is PTX-119, which is a Samsung document, it's not a Google document obviously. A Samsung document is properly an admission by Samsung.

THE COURT: But you're saying that the rest of these, 120, 121, and 134 to 137, are all Google?

MS. JAY: Yes, Your Honor, that is correct.

THE COURT: All right. Then let me hear from the Defendant as to those.

Mr. Liang, why isn't 119 an admission?

MR. LIANG: So on 119, I think we'll withdraw the hearsay objection, and we'll just let that in -- I'll withdraw the hearsay objection.

These others are -- they say Google. I think some of them might actually be a third party. But in any event,

04:21:47 Google is a third party. So they're not a party opponent.
04:21:49 I don't think they've cited any case law. We're not aware
04:21:52 of any under which a third party would constitute a party
04:21:56 opponent for the purposes of the case. Otherwise, anything
04:21:58 is a party admission or statement at that point. So...
04:22:03 THE COURT: I am not going to rule that those
04:22:07 Google documents are admissible as admissions. But I will
04:22:17 allow those Google documents to remain on the Plaintiff's
04:22:21 exhibit list with asterisks that they cannot be used unless
04:22:27 and until they are admitted into evidence through the
04:22:32 testimony of the Google witness.
04:22:42 I think fairness requires that Plaintiff be given
04:22:45 that opportunity. I'm not sure whether a Google witness
04:22:48 will be able to do that, but they can have an opportunity.
04:22:53 So PTX-120 is admitted. And 119, 121, 134 through
04:23:02 137 can remain on the list with an asterisk.
04:23:14 That takes us to the next bucket.
04:23:17 MS. JAY: Your Honor, just to clarify, I think you
04:23:21 said 120 was admitted. It was PTX-119, which is the
04:23:27 Samsung document.
04:23:28 THE COURT: That is what I intended. Thank you.
04:23:30 MS. JAY: Thank you, Your Honor.
04:23:32 MR. REIDY: Your Honor, Patrick Reidy for the
04:23:56 Defendants.
04:23:56 PTX-87, PTX-113, and PTX-166 are agreements

between [redacted].

We're objecting to these on hearsay grounds and on 402/403 grounds because it's not clear to us who Plaintiff intends to introduce these exhibits through. They don't have any witnesses that can speak to these agreements, the context around these agreements. Otherwise, everything in them is just hearsay.

So that's basically our objection. These are also obviously relevant to their copying arguments and subject to the Daubert motion related to their damages expert, Mr. Bergman.

So to the extent that those motions are granted, the relevance of these documents would be that much less.

THE COURT: All right. So these are all third-party documents, and there's a hearsay and authentication objection to them; is that right?

MR. REIDY: I wouldn't say -- I'm not sure that they're third-party documents. I think they were produced from, you know, the records of either Samsung or Cerence, but they're --

THE COURT: Well, it's really who created them, not who literally produced them that would indicate that. You're saying that these were created by Cerence and Samsung?

04:26:09 MR. REIDY: So these are agreements between Samsung and third parties, so ostensibly created by Samsung at some point in time, along with these third parties.

04:26:23 THE COURT: So they're not hearsay then. Typically, agreements are a fact of the utterance matter rather than offered for the truth. And you say they are with Samsung?

04:26:45 MR. REIDY: Yes. The agreements include Samsung as a party, yes.

04:26:49 THE COURT: Okay. So tell me more about your objection then.

04:26:54 MR. REIDY: So, Your Honor, ostensibly they're going to have their experts talk about what these agreements are and what they mean. But there's no fact witness either at Samsung or at Cerence or anywhere else that can speak to what these agreements are.

04:27:13 THE COURT: And if they are Samsung agreements, why do they require someone to speak to what they are? I mean, the idea of an admission is that it's your document, you explain it. That's -- that's the essence of the theory.

04:27:36 MR. REIDY: Okay. Your Honor. We will --

04:27:49 THE COURT: If you want to show me one to illustrate your objection, that's fine. But if they really are Samsung agreements, it's hard for me to envision how

they would not be admissible against Samsung, unless they're irrelevant.

MR. REIDY: So, Your Honor, I suppose we will reserve our objection to any testimony about the circumstances around these agreements or what they reflect or mean as lacking foundation. But we will withdraw our hearsay objection to them.

And to the extent Your Honor grants the pending motions, the Daubert motion against Mr. Bergman and the motions regarding the copying issue, we would argue that they are irrelevant to any issue in the case and, therefore, unduly prejudicial to the extent they're admitted.

THE COURT: All right. Well, if there is a motion granted which undermines the relevance of these exhibits, then you can reurge your objection. But at this point, I'll overrule the objection to PTX-87, 109 to 110, 166, and 173.

MR. REIDY: Your Honor, I am -- so I am just addressing Bucket 3, which is PTX-87, PTX-113, and PTX-166.

THE COURT: Those are the representative exhibits, but --

MR. REIDY: Or, sorry, my apologies.

Yes, okay, so PTX-87, 109 to 110, 166, and 173. Understood.

04:29:45 THE COURT: All right. That takes us to PTX-82.

04:29:54 MR. TSUEI: So, Your Honor, before we get into PTX-82, Cerence can withdraw and does hereby withdraw PTX-82 to avoid the dispute.

04:30:07 And as an additional note, the exhibits to which the objections are withdrawn from the previous bucket should also include Exhibit 113, which I believe was left off erroneously from the fourth column from the left.

04:30:26 THE COURT: All right. I see it's in the representative column but not in the other column. Then PTX-113 will also be pre-admitted.

04:30:46 And that takes us to 50.

04:30:49 MR. LIANG: Yeah, so Bucket 5, we'll withdraw the objections on these, so they can come in. This PTX-50 was the representative one, and it includes PTX-50, 253, 55, 58 to 59.

04:31:07 THE COURT: All right. Thank you, Mr. Liang.

04:31:10 That takes us to Bucket 6.

04:31:41 MR. WOLF: Your Honor, may I speak to a housekeeping matter while Mr. Reidy gets ready for this?

04:31:44 How would you like to handle the motion to compel for the second Cerence 2 matter? My colleague has been -- should we release him, or do you intend to argue it, or how would you like to proceed?

04:31:55 THE COURT: You know, when I set this, my

04:31:58 assumption was that because it's the same parties, it would
04:32:02 be convenient, and we would just take it up at the end if
04:32:05 we got there. But --
04:32:11 MR. WOLF: We've been more long-winded than we all
04:32:16 intended, I'm sure, Your Honor. I apologize for that.
04:32:20 THE COURT: If both sides of that want to be
04:32:22 released, that's fine. I'm here --
04:32:25 MR. WOLF: We can stay as long as you want, Your
04:32:28 Honor. I just didn't want to overtax the Court. We can do
04:32:32 this whenever you want to do it.
04:32:33 THE COURT: My hope is that we'll finish the
04:32:36 exhibits. And if we have time, then we'll turn to the
04:32:41 motion to compel.
04:32:44 MR. WOLF: Thank you, Your Honor.
04:32:45 THE COURT: All right. So does anyone from the
04:32:51 Defense want to speak to the objection to Bucket 6?
04:32:56 MR. REIDY: Sorry, just one moment, Your Honor.
04:34:11 Your Honor, I believe we can withdraw our objections to
04:34:14 Bucket 6.
04:34:14 THE COURT: All right. Then the documents in
04:34:21 Bucket 6 will be pre-admitted.
04:34:23 And that takes us to the last bucket, Bucket 7.
04:34:36 MR. REIDY: Your Honor, sorry, just a sec.
04:35:03 All right. So, Mr. Buczko, which exhibits are you
04:35:07 withdrawing?

04:35:08 MR. BUCZKO: Yeah, Cerence is withdrawing PTX-122 to 129. Those are the notes to the financial statements.

04:35:17 THE COURT: And that's 122 through 129?

04:35:20 MR. BUCZKO: Yes, Your Honor.

04:35:21 THE COURT: All right.

04:35:24 MR. REIDY: Our objection to the remaining financials pertains to the Court's standing MIL on overall financial wealth and size, if any of those exhibits show those overall numbers.

04:35:42 THE COURT: And are you asking whether they do, or are you saying that they do?

04:35:45 MR. REIDY: I am sure that they do, and I'm just pulling them up.

04:35:49 THE COURT: Okay.

04:36:13 MR. REIDY: PTX-31 is Samsung's summary financials and shows net sales on a quarterly basis throughout the damages period.

04:36:26 THE COURT: For the entire company?

04:36:28 MR. REIDY: For the accused products.

04:36:29 THE COURT: Oh, all right.

04:36:31 MR. REIDY: And --

04:36:33 MR. SNYDER: 170?

04:36:36 MR. REIDY: 170 is the same, Your Honor, with respect to SEC sales.

04:36:57 THE COURT: Just of the accused products?

04:36:59 MR. REIDY: Of the accused products, yes.

04:37:02 THE COURT: All right. And is your objection that the Plaintiffs' damages expert does not rely upon the total sales of the accused products in his calculation?

04:37:19 MR. REIDY: No. My objection is simply the admission of the evidence showing the total amount of the sales, the total value.

04:37:33 THE COURT: All right. Then let me hear from the Plaintiff whether those figures are necessary to the damages expert's opinions.

04:37:49 MR. BUCZKO: Your Honor, these figures are necessary. These are the accused product financials that go into Mr. Bergman's calculation. He cites them dozens of times throughout his report and in his schedules, and we tried to put in the summary schedules, but they didn't get in. So this is the source document. I don't even think this document has totals in it, Your Honor. It's just the accused product -- literally the accused product sales. I didn't see even totals for all the time periods here.

04:38:21 So I don't -- frankly, I don't know what the objection is. You know, in a patent case, certainly here where Mr. Bergman uses the revenue from the accused products as part of his royalty base, this is kind of central financial evidence, not overall company sales, overall wealth or anything like that.

04:38:42 THE COURT: All right. Well, I guess what I'll need from the Defendant is a showing that the -- these numbers are not, in fact, necessary to the Plaintiff's expert's opinion.

04:39:04 MR. REIDY: Your Honor, in light of Plaintiff's withdrawal of the other exhibits within this bucket, we'll withdraw our objections to these.

04:39:11 THE COURT: All right. Then PTX-31 and 170 will be pre-admitted.

04:39:39 We carried, Mr. Snyder, the Bucket 5 with your Exhibits 49 to 51, and 70 and --

04:39:57 MR. SNYDER: And 70A, to be particular, Your Honor.

04:39:59 THE COURT: 70A. Yes, you're right.

04:40:01 Do you have a proposal as to how we should address those?

04:40:07 MR. SNYDER: We can provide very quickly the necessary declaration under 803(B) to provide the foundation for those -- for that data.

04:40:20 THE COURT: And then, Mr. Tsuei, I think you indicated that you had an argument about whether they were timely that was not based on whether they're hearsay. Do you want to address that?

04:40:38 MR. TSUEI: Yes, Your Honor.

04:40:47 So without conceding, Your Honor, that we will

04:40:51 agree to the outcome and vision by our colleagues at Samsung that they can get by the hearsay objection by generating a custodial declaration and complying with the rules, the other issue which that approach fails to solve is the timeliness of the production of the underlying metrics that Samsung purports to want to establish the 803 exception and foundation for.

So I think of note is one portion of Exhibit 70A, I believe, which I will show on the screen right now if the Court should permit.

If I could have the camera, please, or rather the screen.

So we were just provided about an hour ago a copy of what is labeled DTX-70A, which is the last exhibit in this bucket. The timeliness issue is most acute with respect to the last portion of this PDF.

Let me just scroll to it and show the Court what it looks like.

So beginning at PDF Page 32 is a cover sheet for Exhibit G. And what follows over the following pages is a number of what appear to be charts that are populated with data, as well as labels for rows and columns of -- I guess what appears to be a chart.

So this data was produced at the very close of expert discovery. I heard Mr. Snyder say earlier today

04:42:54 that the timing of the production of this particular data
04:42:59 is justified because it was only after they received the
04:43:03 opening infringement report that they understood the
04:43:05 feature being accused was the one that they sampled here
04:43:09 for the use metrics information.

04:43:12 As Your Honor, I think, can see for itself, that
04:43:15 is an issue that was fully briefed in the motions. The
04:43:18 feature in question is called Wake Up While Media Is
04:43:22 Playing feature. It was directly accused in the
04:43:25 preliminary infringement contentions and specifically
04:43:28 called out by means of highlighting in the charts that we
04:43:32 served on Samsung.

04:43:33 And in addition to that, of course, during the
04:43:35 ordinary course of the case we've asked questions about
04:43:38 this feature, asked, I guess -- we had discovery requests
04:43:41 on this feature, as well. And so Mr. Snyder's assertion
04:43:44 that there was some sort of unfair surprise here about this
04:43:47 feature, I think, is not well taken.

04:43:49 In addition to Exhibit G, that leaves still the
04:43:58 Google-produced metrics, the production and history of
04:44:01 which is, of course, as Mr. Snyder said, also documented in
04:44:05 the pending motions.

04:44:06 As I mentioned earlier, just because they produced
04:44:08 an 803(6) custodial declaration now three weeks before
04:44:12 trial still doesn't absolve or mitigate the prejudice that

04:44:16 Cerence suffered and will suffer if Samsung and Google are permitted to rely on this late-produced evidence. We just have never had an opportunity to question either a custodian or a knowledgeable Google or Samsung fact witness about these metrics given the timing of the relevant exhibits here.

04:44:37 And so I didn't hear a proposal from Mr. Snyder on how that prejudice might be mitigated or otherwise cured. And we welcome them to suggest a path forward. But without that mitigation, we would say that the allowance of Samsung to use this data is highly improper and prejudicial.

04:44:55 THE COURT: All right. Thank you, Mr. Tsuei.

04:44:58 MR. SNYDER: Thank you, Your Honor. Darin Snyder for Samsung Defendants.

04:45:04 Let me address each of those issues in turn.

04:45:08 Mr. Tsuei is correct that the usage information that is at Exhibit G of DTX-70A was produced during expert discovery, not during fact discovery. It was produced then because we understood for the first time, after viewing Dr. Jayant's infringement report, that they were specifically accusing a feature called Wake Up When Music Is Playing. And that was -- these are usage statistics related to that. That history is detailed in the briefing on the Steckel Daubert motion.

04:45:49 So then turning to the Google information,

04:46:01 Exhibits 49 and 50 were produced during discovery.
04:46:05 Exhibit 51 was produced with the non-infringement report
04:46:12 of -- at the same time as the rebuttal reports. They did
04:46:15 not ask any questions of Mr. Steckel about the usage
04:46:20 information, although they certainly had the opportunity
04:46:21 when he was deposed more than a month later -- almost
04:46:27 exactly a month later, after that usage information was
04:46:29 produced. In fact, they complained for the first time
04:46:33 about the timing of that production after the deposition
04:46:36 was over and threatened to file a Daubert motion.
04:46:40 We offered to allow Cerence to file supplemental
04:46:43 expert reports, and our offers to try and resolve this
04:46:46 issue without motion practice or excluding the exhibits is
04:46:51 also detailed in the briefing on the Steckel Daubert
04:46:54 motion.
04:46:54 So it's not true that we haven't offered any
04:46:57 suggestions for how to cure the prejudice. We think the
04:47:00 timing of the production was fully justified given the
04:47:03 circumstances of discovery, including the dates of their
04:47:07 accusations, and we attempted to resolve it. But they did
04:47:11 not want to do that in favor of bringing this motion.
04:47:14 THE COURT: Mr. Snyder, what I'm going to do is
04:47:19 handle this in two ways. One, I'm going to give you --
04:47:27 tell me if a week doesn't work -- but to file or to serve
04:47:33 on Plaintiff an 803(6) declaration that speaks to these

04:47:45 exhibits and say that you can confer with the other side and within 10 days from now file a joint notice that indicates whether there is an agreement that that is an adequate 803(6) certificate that would take care of the hearsay component.

As far as the timing component, I'll carry that objection with the Steckel Daubert and take it up in connection with that motion.

MR. SNYDER: Thank you, Your Honor. One week will suffice.

THE COURT: All right. That is all of the exhibit issues. And what I'll do is say that I need for each side to prepare an updated exhibit list that contains all the agreements and rulings issued during this process today and for the parties to exchange those within the next week, and then if there are disputes, to file a joint notice within two weeks that sets out what the remaining disputes are, and I'll get with the parties about getting those resolved.

I would like to, in the next few minutes, take up the motion to compel.

Mr. Tsuei, what do you have?

MR. TSUEI: Thank you, Your Honor. I apologize for the interruption.

I just also wanted to mention one final thing regarding the late-produced metrics, having understood

04:49:43 Your Honor's direction to the parties. The, I think, core
04:49:46 point where -- perhaps I neglected to mention is that
04:49:49 counsel for Google represented to Cerence that additional
04:49:53 non-technical documents are unnecessary in the case and
04:49:57 would not provide any new relevant information.

04:50:00 That language and representation is called out at
04:50:03 Page 4 of our motion at Docket 139. And we would submit to
04:50:09 Your Honor that that representation belies the assertions
04:50:13 generally that Mr. Snyder made on the record now.

04:50:19 THE COURT: I will consider that as part of the
04:50:21 briefing on that.

(Hearing concluded at 4:50 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes 9/9/2025

SHELLY HOLMES, CSR, TCRR
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2025

Date